**UNITED STATES of America, et al., Plaintiffs,**

**v.**

**State of WASHINGTON, et al., Defendants.**

**Case No. CV 9213.**

United States District Court, W.D. Washington, at Seattle.

COMPILATION OF MAJOR POST–TRIAL SUBSTANTIVE ORDERS (January 1, 2013 through December 31, 2013).

---

992

TABLE OF CONTENTS

| ORDER | PAGE |
|---|---|
| Order on Motion for Reconsideration (1/9/13) | 993 |
| Order on Motion for Referral to Settlement Judge (2/1/13) | 994 |
| Order on Suquamish Motion for Reconsideration (2/5/13) | 994 |
| Order on Lummi Motion for Reconsideration (2/15/13) | 996 |
| Memorandum and Decision (3/29/13) | 1000 |
| Permanent Injunction Regarding Culvert Correction (3/29/13) | 1023 |
| Joint Motion for Order Approving Consent Decree and Settlement Agreement (4/23/13) | 1025 |
| Order Approving Consent Decree and Settlement Agreement (4/23/13) | 1030 |

Order on Lummi Motion for Stay Pending Appeal (4/26/13) 1030

Order on Motion for Partial Summary Judgment (7/8/13) 1033

Order on Motions for Summary Judgment and Motion for Declaratory Judgment (7/29/13) 1039

Order on Motion for Reconsideration or, in the Alternative, for Certification (9/3/13) 1054

Order on Motion to Strike (9/13/13) 1058

Consent Decree and Settlement Agreement—Squaxin Island Tribe and Gold Coast Oyster LLC (11/15/13) 1059

Order Approving Consent Decree and Settlement Agreement—Squaxin Island Tribe and Gold Coast Oyster LLC (11/18/13) 1063

Order Dismissing Grower's Petition for Review and Granting Treaty Tribe's Motion to Strike Reply Brief (11/21/13) 1063

Order Denying Motions for Stay Pending Appeal (12/5/13) 1066

COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS
(Through December 31, 2013)

ORDER ON MOTION FOR RECONSIDERATION

Subproceeding No. 05–4

(January 09, 2013)

RICARDO S. MARTINEZ, District Judge.

The Suquamish Tribe has filed a motion for reconsideration of the Court's November 20, 2012 Order granting a motion to quash a deposition subpoena directed to Dr. Barbara Lane, and granting a protective order from further discovery. Dkt. ## 216, 223. Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier. . . ." Local Rule CR 7(h)(1). The Court deems it unnecessary to direct opposing party Tulalip to respond to the motion, and shall deny it.

■ Suquamish argues that it "needs Dr. Lane's expert opinions, the methods she used to derive them and the specific facts and data she used to support them to properly prepare its case." Motion for Reconsideration, Dkt. # 223, p. 2. Further, Suquamish asserts that the Court committed manifest error in the statement that "it does not appear to the Court that Dr. Lane has been identified by the Tulalip as an expert." *Id.*, quoting Order on Motion to Quash, Dkt. # 218, p. 3. Suquamish has attached to the Motion for Reconsideration a copy of the Tulalip Tribe's revised witness list, designating Dr. Lane as an expert witness in this matter. This designation was filed by Tulalip on October 17, 2012. Dkt. # 183. However, nowhere in the Suquamish response to the Tulalip motion to quash, or in the attached declaration, did Suquamish point to or cite to this designation. The parties' witness lists were filed in accordance with the Court's pre-trial schedule, which was proposed by the parties and adopted by the Court on March 20, 2012. Dkt. # 161. The witness lists were filed in anticipation of the trial, which at that time was set for February 4, 2013. The Court does not normally review these until the week prior to trial. In the

absence of a citation to the specific document, the Court had no reason to review the entire record for evidence to support the Suquamish argument that Tulalip had designated Dr. Lane as an expert.

The Court did not commit "manifest error" because it did not make an actual finding that Dr. Lane had not been designated an expert by Tulalip. Instead, it simply made the observation that this did not appear to be the case. Moreover, the Court's decision on the motion to quash was based on other reasons as set forth in the Order.

Nor does the Tulalip designation constitute "new evidence" which could not have been produced earlier. In responding to the motion to quash, Suquamish could have cited or pointed to the expert witness designation filed at Dkt. # 183 to bring it to the Court's attention, but failed to do so. Thus the designation cannot serve as a basis for reconsideration. Local Rule CR 7(h)(1). However, the Court now acknowledges that Tulalip did designate Dr. Lane as an expert witness on October 17, 2012. This acknowledgment does not constitute a finding that the designation was timely or proper under the rules and procedures applicable to this case, particularly those relating to latter-day testimony by Dr. Lane.

Beyond this acknowledgment, the motion for reconsideration is DENIED.

### ORDER ON MOTION FOR REFERRAL TO SETTLEMENT JUDGE

Subproceeding No. 91–1 (Halibut)

(February 1, 2013)

This matter is before the Court for consideration of a request by the Quileute Tribe for referral to a settlement judge. Dkt. # 411. The request is made pursuant to language in the Court's March 14, 2012 Order on Motions to Modify the Status Quo, in which the Court stated, "Should the parties wish to return to settlement negotiations following this year's halibut fishery, they may request a referral to Magistrate Judge Tsuchida." Dkt. # 397, p. 6. The request is timely under the Court's February 26, 2010, directive that requests for assistance in changing the *status quo* for the halibut fishery must be filed by September 30 for the following year's fishery. Dkt. # 228. However, the Quileute Tribe does not specify what modifications to the *status quo* are sought; the request appears to simply contemplate a return to the 2012 settlement negotiations that concluded unsuccessfully.

No other Tribe has joined in the request. The Port Gamble S'Klallam and Jamestown S'Klallam Tribes ("S'Klallam") have opposed it. Dkt. # 413. Pointing to the management measures which were put in place for 2012 to supplement the *status quo* plan, they state, "[t]he S'Klallam Tribes simply want the parties to honor the Court Order already in place, and not establish another free-for-all with everything on the table. They would like to see a harvest management structure within the Court Ordered Plan that prevents TAC overage." Response to Request for Reference to Settlement Judge, Dkt. # 413, p. 5. The Court would like to see that as well.

The request for referral to a settlement judge (Dkt. # 411) is accordingly DENIED.

### ORDER ON SUQUAMISH MOTION FOR RECONSIDERATION

Subproceeding 11–2

(February 5, 2013)

This matter is before the Court on a motion for reconsideration filed by the Su-

quamish Tribe ("Suquamish"). Dkt. # 62. The Suquamish ask the Court to strike a footnote from the Order on Motion for Summary Judgment filed October 11, 2012. Dkt. # 59. Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier. . . ." Local Rule CR 7(h)(1). The Court deems it unnecessary to direct other parties to respond to the motion, and shall deny it for the reasons set forth below.

The Suquamish have objected to footnote 5 to the Order, which, viewed in context, was a footnote to the following statement:

> While Judge Boldt described the Lummi U & A in FF 46 as including marine areas from Fraser River south to the present environs of Seattle, "and particularly Bellingham Bay," the Lummi have pointed to no facts before Judge Boldt which would support the conclusion that he intended to include **all** the marine waters in between. Indeed, this Court has found in a previous subproceeding that Judge Boldt's "from" and "to" language in describing a U & A does not include all the waters in between.

Order on Motion for Summary Judgment, Dkt. # 59, p. 15 (emphasis in original). The Court illustrated this statement with the challenged footnote, which reads as follows:

> In a recent subproceeding addressing similar language by Judge Boldt in describing the Suquamish U & A ("the marine waters of Puget Sound **from** the northern tip of Vashon Island **to** the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal"), this Court

found that Judge Boldt did not intend to include all of Puget Sound, and excluded certain area to the east of Whidbey Island. Subproceeding 05–03, *affirmed, U.S. v. Washington (Upper Skagit v. Suquamish),* 590 F.3d 1020 (9th Cir. 2010). This determination was made by examining the evidence that was before Judge Boldt, specifically Dr. Lane's report on Suquamish fishing areas.

*Id.,* p. 15 n. 5 (emphasis in original).

In asking the Court to strike this footnote, the Suquamish state the following objection:

> In footnote 5, the court *sua sponte* opined that not only did Judge Boldt not intend to include all of Puget Sound in his 1975 determination of Suquamish's usual and accustomed fishing ground ("U & A") but that he excluded certain area to the east of Whidbey Island, indicating an affirmative action by Judge Boldt to exclude the area. This particular issue was not before the court in the above subproceeding and nothing in the record in subproceeding 11–02 supports this finding.

Motion for Reconsideration, Dkt. # 62, p. 1–2. They argue that the footnote constitutes manifest error because "the court's opinion in footnote 5 does not reflect the current state of the law in this case and if footnote 5 is not stricken, the result will be a manifest injustice against Suquamish and any other tribe who hereafter tries to expand its U & A pursuant to Paragraph 25(a)(6)." *Id.,* p. 6.

The Suquamish have misconstrued both the meaning and the effect of the footnote. First of all, the footnote is not an opinion or finding of the Court. It is a summary of the Court's ruling in a subproceeding in which the U & A of the Squamish Tribe was put at issue. Subproceeding 05–03. It is that ruling, not a footnote summarizing it, which is the law of the case. That

ruling has been affirmed on appeal and the time for reconsideration is past. Second, the Suquamish have overlooked a comma and misread the plain language of the footnote. The footnote does not state that "he [Judge Boldt] excluded certain area to the east of Whidbey Island" as they argue in the motion. It was this Court that excluded certain areas to the east of Whidbey Island, specifically Saratoga passage and Skagit Bay, from the Suquamish U & A. Order on Motions for Summary Judgment, Subproceeding 05–03, Dkt. # 198, p. 15. The Court found that "in describing the Suquamish U & A as the marine waters of Puget Sound from Vashon Island up to the Fraser River, Judge Boldt could not have intended to include Saratoga passage or Saratoga Bay." *Id.* Thus the sentence to which the Suquamish object should be read as follows: "[T]his Court found that Judge Boldt did not intend to include all of Puget Sound, and [the Court] excluded certain area[s] to the east of Whidbey Island."

The Court finds it unnecessary to strike and re-state the footnote, as it is sufficiently clear as written. The motion for reconsideration is accordingly DENIED.

## ORDER ON LUMMI MOTION FOR RECONSIDERATION

### Subproceeding 11–2

### (February 15, 2013)

This matter is before the Court for consideration of a motion for reconsideration and clarification filed by the Lummi Nation ("Lummi"). Dkt. # 61. Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier...." Local Rule CR 7(h)(1). The Court deems

it unnecessary to direct a response to the motion, and shall deny reconsideration.

### DISCUSSION

On October 11, 2012, this Court granted a motion for summary judgment filed by the Requesting Tribes, namely the Jamestown S'Klallam, Lower Elwha Klallam, and Port Gamble S'Klallam (together, "the S'Klallam"), on their Request for Determination regarding the usual and accustomed fishing area ("U & A") of the Lummi Nation, the Responding Tribe in this matter. Dkt. # 59. Specifically, the Court found that

(1) The Usual and Accustomed Fishing Area (U & A) of the Lummi Nation does not include the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, an area more specifically described as the marine waters east of a line running from Trial Island near Victoria, British Columbia, to Point Wilson at the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosario Strait, the San Juan Islands, and Haro Strait; [and]

(2) The Lummi Nation is prohibited from issuing regulations or otherwise authorizing its fishers to exercise treaty fishing rights in the waters described above....

*Id.*, p. 16. This determination was based on a finding that it is the law of the case that the Lummi U & A does not include the Strait of Juan de Fuca, together with a review of the evidence that was before Judge Boldt which supported that conclusion. *Id.*, pp. 8, 11–15.

The Lummi request reconsideration and clarification

because the Court erred when it concluded that Salmon Fishing Areas 6A and 7 were included in the scope of the

issues decided in Subproceeding 89–2. In the alternative, Lummi seeks clarification as to the northern and eastern boundaries of the area described in the Court's Judgment.

Motion for Reconsideration, Dkt. # 61, p. 2. This assertion regarding what the Court concluded is surprising in light of the fact that the Court's analysis and conclusions did not at any time consider or mention Salmon Fishing Area 6A or 7 ("Areas 6A or 7") by name, nor did the parties argue the summary judgment motion using these terms.

Both of these areas lie, in whole or in part, within the area which has been described as the Strait of Juan de Fuca in this subproceeding and its predecessor, 89–2.[1] The various Requests for Determination and Court Orders in this subproceeding and in 89–2 framed the issues in terms of the geographical description, Strait of Juan de Fuca, not the catch areas designated by the State of Washington. *See,* Request for Determination, March 3, 1989, C70–9213, Dkt. # 11209; Judge Coyle's Order dated February 13, 1990, Dkt. # 11596; Lummi Cross–Request for Determination, April 12, 1990, Dkt. # 11690; Judge Rothstein's Order dated September 1, 1998, Dkt. # 16550; the Ninth Circuit Court of Appeals ruling in *U.S. v. Washington (Lummi),* 235 F.3d 438, 449 (9th Cir.2000).

Nevertheless, the Lummi contend that "Judge Coyle **could not have** ruled on Lummi's rights to fish" in Areas 6A and 7. Motion for Reconsideration, Dkt. # 61, P. 4 (emphasis in original). According to the Lummi, this is because, in moving for summary judgment on their Request for Determination, the Skokomish and Klallam Tribes asked for an order declaring that the U & A of the Lummi does not include "any part of the areas of the Puget Sound and Strait of Juan de Fuca currently designated by the Washington Department of Fisheries as Commercial Salmon Management and Catch Reporting Areas 6C, 6, 6D, 6B and 9," and for an injunction prohibiting Lummi fishing in these areas. Skokomish and Klallam Tribes' Motion for Summary Judgment, August 18, 1989, Dkt. # 11347. According to Lummi,

> [t]he Klallams chose to characterize the general geographic designations as Areas 6C, 6, 6D, 6B, and 9, and Judge Coyle gave them what they sought. What they asked for, and what Judge Coyle granted, did not include Areas 6A and 7.

Motion for Reconsideration, p. 4. This argument is refuted by the footnote on the following page of the motion for reconsideration, noting that the S'Klallam also described the disputed area by the Marine Fish–Shellfish Management and Catch Reporting Areas for halibut, naming Areas 23A, 23B, 23C, 23D, 25A, 25B, 25C, 25D, 25E, and 26A. Motion for Reconsideration, Dkt. # 61, p. 5 n. 2, quoting Skokomish and [S'Klallam] Tribes' Response to Lummi Cross–Motion for Summary Judgment, Dkt. # 13986, p. 8. Areas 23A and 23B overlap the Salmon Catch Reporting Areas 6A and 7 which the Lummi assert were not addressed in Judge Coyle's decision.

Judge Coyle's Order on cross-motions for summary judgment was not limited to the narrow issue of catch areas 6C, 6, 6D, 6B, and 9. The Lummi cross-motion, filed August 21, 1989, argued that "the Strait of

---

1. According to the map included with the Lummi motion, Area 6A encompasses a small triangle of marine waters immediately to the west of the northern part of Whidbey Island and the southernmost reach of Fidalgo Island.

Area 7 encompasses the marine waters surrounding and flowing between the San Juan Islands and extends south beyond Lopez Island into the Strait of Juan de Fuca. Motion for Reconsideration, p. 3.

Juan de Fuca is within Puget Sound." Lummi Memorandum in support of Summary Judgment, August 21, 1989, Dkt. #11352, p. 7. Lummi also argued that Judge Boldt "necessarily awarded a portion of the Strait of Juan de Fuca to the Lummi Indian Tribe. At a minimum, this award included the easternmost part of Catch Reporting Areas 6 and 6B...." *Id.* Thus, "[u]nder the presumption against subdividing catch reporting areas, the Lummi right to fish extends throughout Areas 6 and 6B." *Id.* Judge Coyle flatly rejected these arguments, stating that "there is no such 'presumption' against subdividing Catch Reporting Areas in this litigation." Decision and Order on Cross–Motions for Summary Judgment, February 13, 1990, Dkt. #11596, p. 15. Judge Coyle also rejected the idea of defining tribal U & A's by lines drawn by the State of Washington to manage various fisheries. Noting that the management area boundaries are under State control and subject to change, Judge Coyle agreed with the Requesting Tribes and the United States that "resort to subdivision of Catch Reporting Areas could well result in the alteration or dilution of treaty rights whenever the State chose to alter the boundaries of the Catch Reporting Areas." *Id.,* pp. 15–16. He then framed his decision in terms of the broader geographic terms of the S'Klallam and Skokomish Request for Determination, stating that "there is no question in the court's mind from the evidence presented to Judge Boldt that the Lummis' usual and accustomed fishing places were not intended to include the Strait of Juan de Fuca." *Id.,* p. 13. No subparts of the Strait of Juan de Fuca were excepted from this ruling.

In reaching its decision in this subproceeding, the Court independently reviewed and discussed the evidence that was before Judge Boldt regarding Lummi fishing locations, together with his specific language. Order on Motion for Summary Judgment, Dkt. #59, pp. 11–14. The Court noted the evidence that the Lummi were highly dependent upon reef net fishing, which was conducted nearshore off promontories and headlands, and that no reef net sites were reported south of Lopez Island. *Id.,* p. 13. There was no evidence before Judge Boldt to demonstrate Lummi fishing in the open area of the Strait of Juan de Fuca lying south and offshore of the San Juan Islands and west of Whidbey Island. This area comprises the southernmost part of Area 7 and all of Area 6A. While the Court does not agree with the Lummi position that Judge Coyle **"could not have"** ruled on Lummi's rights in Areas 6A and 7 (because it was not specifically mentioned in the moving papers or the Order), even if the Lummi are correct on that point, this Court's independent review has found no evidence which would support Lummi treaty-time fishing in these areas.

There is further reason to deny the motion with respect to Area 6A, which lies immediately west of the northern shores of Whidbey Island. The parties agree that this area was described as not in dispute in the proceedings in 89–2. *See,* Response to the Lummi Cross–Motion for Summary Judgment, January 3, 1994, Dkt. #13986, p. 8 ("The court should note that WDF Salmon Catch Reporting Area 6A, which is the eastern most portion of the Strait of Juan de Fuca just off the shores of Whidbey Island is not included in the disputed areas.") A Stipulation filed April 10, 1998, by the Lummi and Swinomish states, in its entirety, "Come now the Lummi Nation and the Swinomish Indian Tribal Community and stipulate that the Cross Request for Determination filed by the Lummi Nation in this Subproceeding does not include any request for relief regarding Western Washington State Salmon Catch Reporting

Area 6A (1987) is not at issue in this subproceeding [sic]." Dkt. # 16448. Thus, Area 6A was, in the words of S'Klallam counsel, "stipulated out" of the Lummi Cross–Request for Determination. Plaintiff's Motion for Summary Judgment, Dkt. # 40, p. 11.

▆ That Area 6A was not in dispute in 89–2 was confirmed at the oral argument on this motion. The Court asked for clarification regarding Area 6A, as to whether it was in dispute or not. Counsel for the S'Klallam responded,

> Area 6A was the subject of a stipulation by Lummi, that it was not going to claim area 6A in this subproceeding, even though the plain language of the description—You don't stipulate unless you need to. The plain language of the description plainly included 6A. So they stipulated it out of the case. We did not sue them for 6A, because they were not opening 6A. Since you have to file actions that are not in conformity with Final Decision No. 1, it represented our recognition that they weren't exactly opening that.

Transcript of Proceedings, September 27, 2012, p. 43. Where the Lummi stipulated that they did not claim Area 6A in the prior proceedings, that stipulation relinquishing the claim becomes part of the law of the case. They may not now establish a right to fish there by asserting that Judge Coyle failed to specifically address it.

▆ The Lummi have asked that, in the event the motion for reconsideration is denied, the Court clarify the northern and eastern boundaries of the case area, which is the area from which Lummi fishing is excluded. These boundaries were set forth in the Order on Motion for Summary Judgment as Haro and Rosario Straits, the San Juan Islands, and Whidbey Island. Dkt. # 59, p. 16. However, the Lummi assert that

> [t]here is undisputed evidence that Lummi conducted reef net fishing in the waters below low tide offshore of Lopez, San Juan, Fidalgo islands and trolled for salmon "in the contiguous waters of Haro and Rosario Strait and in the islands," and fished on halibut banks. Given the evidence, the northern and eastern boundaries of the [sic] must be some distance south and seaward of the San Juan Islands, and west and seaward of the mainland, respectively.

Motion for Reconsideration, Dkt. # 61, p. 8. This argument is correct with respect to the San Juan Islands, but not Whidbey Island. As noted above, there were no Lummi reef net sites identified south of the southernmost point of Lopez island. Therefore the Lummi U & A should include nearshore waters immediately to the south of San Juan Island and Lopez Island, but not the waters immediately west of Whidbey Island.[2]

While the Court wholly agrees with Judge Coyle's disapproval of defining boundaries of tribal U & A's by lines drawn by the State of Washington as fishery management zones, the Court notes that these nearshore waters south of San Juan and Lopez Islands are congruent with the southernmost part of Area 22A of the Washington Marine Fish–Shellfish Management and Catch Reporting Areas, as set forth in WAC 220–22–400(5).[3] Lum-

---

**2.** Pursuant to the Ninth Circuit's opinion in *U.S. v. Washington,* 235 F.3d 438, 453 (9th Cir.2000), the Lummi U & A includes Admiralty Inlet. Lummi fishing boats may therefore pass through the waters west of Whidbey Island on their way to fishing grounds in Admiralty Inlet, but they may not fish until the arrive there.

**3.** Website http://apps.leg.wa.gov/wac/default.aspx?cite=220–22–400, accessed February 13, 2013.

mi fishing in this area would be within their U & A as defined by Judge Boldt and would not violate this Court's Order on summary judgment. With that clarification, the balance of the Lummi motion for reconsideration is DENIED.

## MEMORANDUM AND DECISION

### Subproceeding 01–1

### (March 29, 2013)

This matter was initiated by a Request for Determination ("Request") filed in 2001 by plaintiffs Suquamish Indian Tribe, Jamestown S'Klallam, Lower Elwha Band of Klallam, Port Gamble Clallam, Nisqually Indian Tribe, Nooksack Tribe, Sauk–Suiattle Tribe, Skokomish Indian Tribe, Squaxin Island Tribe, Stillaguamish Tribe, Upper Skagit Tribe, Tulalip Tribe, Lummi Indian Nation, Quinault Indian Nation, Puyallup Tribe, Hoh Tribe, Confederated Bands and Tribes of the Yakama Indian Nation, Quileute Indian Tribe, Makah Nation, and Swinomish Tribal Community, and Muckleshoot Indian Tribe (hereafter, "the Tribes"). Plaintiff United States of America joined in the request. The Request for Determination, filed pursuant to the Permanent Injunction in this case, asked the Court to find that the State of Washington has a treaty-based duty to preserve fish runs, and sought to compel the State to repair or replace culverts that impede salmon migration to or from spawning grounds.

On August 23, 2007, the Court ruled on cross-motions for summary judgment, finding in favor of the Tribes and declaring that

> the right of taking fish, secured to the Tribes in the Stevens Treaties, imposes a duty upon the State to refrain from building or operating culverts under State-maintained roads that hinder fish passage and thereby diminish the number of fish that would otherwise be available for Tribal harvest. The Court further declares that the State of Washington currently owns and operates culverts that violate this duty.

Order on Cross–Motions for Summary Judgment. Dkt. # 392, p. 12. The matter was then set for a bench trial on remedies.

The trial was held over seven days in October 2009, and final argument was heard on June 7, 2010. The Court has delayed its ruling in the hope that the parties would resume their settlement negotiations, but it does not appear that has occurred. The Court directed the parties to file supplemental memoranda on the current status of the matter by February 1, 2013. Dkt. # 733. Having considered the testimony and exhibits submitted at trial, together with the final arguments and supplemental memoranda, the Court now issues its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. This is a designated subproceeding of *United States v. Washington*, C70–9213, based on language in the 1855 Treaty of Point Elliot in which the Tribes were promised that "[t]he right of taking fish at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory." During the negotiations leading up to the signing of the treaties, Governor Issac Stevens and other negotiators assured the Tribes of their continued access to their usual fisheries. Declaration of Richard White, Dkt. # 296, ¶¶ 8, 9, 11. Governor Stevens assured the Tribes that even after they ceded huge quantities of land, they would still be able to feed themselves and their families forever. As Governor Stevens stated, "I want that you shall not have simply food and drink now but that you may have them forever." *Id.,* ¶ 14.

Both the negotiators and the Tribes believed that the fisheries were inexhaustible. *Id.* Thus, during the negotiations, the "Indians, like whites, assumed that their cherished fisheries would remain robust forever." Declaration of Joseph Taylor III, Dkt. # 297, ¶ 7.

2. In construing the treaty, the Supreme Court found that

> Governor Stevens and his associates were well aware of the "sense" in which the Indians were likely to view assurances regarding their fishing rights. During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the governor's promises that the treaties would protect that source of food and commerce were crucial in obtaining the Indians' assent. It is absolutely clear, as Governor Stevens himself said, that neither he nor the Indians intended that the latter "should be excluded from their ancient fisheries", and it is accordingly inconceivable that either party deliberately agreed to authorize future settlers to crowd the Indians out of any meaningful use of their accustomed places to fish.

*State of Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 677, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (citations omitted).

3. The following facts are admitted by the parties: [1]

**SALMON BIOLOGY AND FISH PASSAGE**

3.1 In 1973, biologists from some of the parties to this case prepared a Joint Statement Regarding the Biology, Status, Management, and Harvest of the Salmon and Steelhead Resources of the Puget Sound and Olympic Peninsular Drainage Areas of Western Washington. The parties submitted it to this Court as Joint Exhibit 2a. In Section 3–400 of the August 24, 1973 Final Pretrial Order in Phase I (Docket # 353), the parties adopted its contents as admitted facts in this case, and the Court adopted them as findings of fact in Finding of Fact 164 of Final Decision # 1 (Docket # 414). The contents of Part I and Part II through 2.2.5.3 of Joint Exhibit 2a are hereby incorporated by reference as admitted facts in this Subproceeding.

3.2 For purposes of this case, the terms "anadromous salmonids" or "salmon" refer to the following species: Oncorhynchus kisutch (Coho); Oncorhynchus tshawytscha (Chinook); Oncorhynchus gorbuscha (Pink); Oncorhynchus nerka (sockeye); Oncorhynchus keta (Chum); and Oncorhynchus mykiss (formerly Salmo gairdnerii) (steelhead).

3.3 Salmon spawn in freshwater, migrate to the sea, and return to spawn again in fresh water. When juvenile salmon move from freshwater to salt, they are known as smolts.

3.4 Transport and storage of wood, large woody debris, and sediment in fish bearing streams are important components of healthy productive salmon habitat.

3.5 Juvenile salmon move both upstream and downstream in response to habitat changes, predation, and population pressures.

**MODERN TRIBAL HARVESTS**

3.6 In 1974 this Court found: "Subsequent to the execution of the treaties and in reliance thereon, the members of the Plaintiff tribes have continued to fish for subsistence, sport and commercial purposes at their usual and accustomed places. Such fishing provided and still provides an important part of their livelihood, subsistence and cultural identity."

---

**1.** Docket numbers in this section refer to the main case, C70–9213.

*United States v.Washington,* 384 F.Supp. 312 (W.D.Wash.1974), Finding of Fact 31.

3.7 In 1974 this Court found: "Fish continue to provide a vital component of many Indians' diet. For others it may remain an important food in a symbolic sense—analogous to Thanksgiving turkey. Few habits are stronger than dietary habits and their persistence is usually a matter of emotional preference rather than a nutritional need. For some Indians, fishing is also economically important. Fishing is also important for some non-Indians." *United States v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974), Finding of Fact 29.

3.8 The magnitude of modern tribal salmon harvest has fluctuated as a result of many factors, some of which are human-caused and some of which are naturally occurring.

3.9 As a result of widespread alterations of waterways and sharply diminished salmon populations, the areas available for tribal harvest of salmon have decreased significantly since 1855.

3.10 Since Treaty time, overharvest, habitat alteration, poor hatchery practices, and hydropower development are some of the human-caused factors that have greatly reduced the abundance of salmon available for tribal harvest in the Case Area.

3.11 As described in Findings of Fact 33, 56, 70, and 193 in Final Decision, # 1, the number of tribal members engaged in the harvest of fish declined for several decades before 1974 due to employment acculturation, the crowding out of Indians from their traditional fishing places by non-Indians, and many years of state enforcement actions against Indians exercising their claimed treaty rights, among other reasons.

3.12 As stipulated by the parties in Stipulation Re: Treaty and Non–Treaty Harvest Data (Docket # 19363/577), Tribal harvest of salmon in the Case Area from 1974 through 2007, as recorded in the treaty ticket fish database maintained by the Northwest Indian Fisheries Commission, is shown below and in Exhibit AT–003–16 (chart attached as Attachment A to Order).

3.13 Tribal members in modern times and to the present have continued to harvest salmon despite increased production costs, restricted fishing areas, fewer and shorter open seasons, fluctuating market prices, competition from farm raised salmon, other human and nonhuman stresses on harvest, and the availability of other economic opportunities.

3.14 Many members of the Tribes would engage in more commercial and subsistence salmon fisheries if more fish were available.

3.15 Some Tribes are engaged in fisheries enhancement for the purpose of providing additional fishing opportunities for tribal members, but those efforts are inadequate to meet tribal needs for salmon.

3.16 No plaintiff Tribe has abandoned its fisheries.

3.17 "Escapement" refers to adult salmon that escape harvest and other mortality and return to the spawning grounds.

3.18 Salmon of the same species, originating in the same area and returning to spawn at the same time of year, are referred to as a "stock."

3.19 The State and the Tribes regulate their respective fisheries to restrict the amount of harvest that might otherwise occur by limiting the number of vessels, the type of harvest gear, and the times and places during which fishing may occur.

3.20 State and tribal fisheries co-managers plan salmon fisheries each year based, among other things, on the predict-

ed abundance of harvestable salmon within the Case Area, the need for adequate escapement to replenish the population, and the predicted effects of harvest on particular stocks. Because some salmon stocks that spawn in the Case Area are intercepted in fisheries up and down the west coast of North America, and because some fisheries in the Case Area intercept stocks that spawn in Canada or the Columbia River Basin, the process of planning state and tribal fisheries occurs as part of a broader planning context that involves the governments of Canada, the United States, Alaska, Oregon, California, Idaho, and Indian Tribes that are not parties to *United States v. Washington.*

3.21 Some State and tribal fisheries within the Case Area harvest stocks that originate both within and outside the Case Area, and are planned to provide adequate escapement of stocks originating both within and outside the Case Area. Some salmon fisheries in northern Puget Sound and the Strait of Juan de Fuca target stocks from the Fraser River in Canada. Harvest levels of Canadian stocks are set through negotiations with Canada under the Pacific Salmon Treaty.

3.22 Mixed stock fisheries are those in which salmon of more than one stock are present.

3.23 Mixed stock fisheries that target one stock may incidentally harvest other stocks.

3.24 Salmon stocks of more and less abundance often are found together throughout the Case Area. To protect stocks that are weak or low in abundance, State and Tribal fisheries co-managers often limit the harvest of stronger stocks in mixed stock fisheries to levels below those which the stronger stocks could sustain. The impact of this management strategy on harvest can be two-fold: first, additional harvest of stronger stocks can be limited in a mixed stock fishery; and second, a fishery can be moved to "terminal areas" where weaker stocks are not mixed with stronger stocks. Because Tribal treaty fishers can harvest only in their usual and accustomed grounds and stations ("U & A"), the mixed stock management strategy of limiting harvest of abundant stocks to protect less abundant stocks can affect the harvest by a treaty tribe with U & A in the mixed stock fishing area but without U & A in the terminal area where the harvest has been moved.

3.25 As stipulated by the parties in the Stipulation Re: Treaty and Non–Treaty Harvest Data (Docket # 19363/577), for purposes of this Subproceeding only, the following table (attached to this Order as Attachment A) depicts treaty tribal catch of sockeye presumed to be of Canadian origin. Treaty catch of U.S. origin versus Canadian origin sockeye stocks in Puget Sound was determined by applying an assumed percentage to total catch for each year. For Canadian origin stocks, the assumed percentage was determined by totaling the treaty sockeye landings in pre-terminal areas (Salmon Catch Reporting Areas 4B, 5, 6, 6C, 7, 7A and 9) and dividing by the total. The Salmon Catch Reporting Areas are depicted in Exhibits AT–008–2 and AT–008–3.

**STOCK STATUS**

3.26 Salmon populations in the Case Area at Treaty time were robust and had not suffered any appreciable human-caused decline.

3.27 There have been declines in the populations of salmon originating within the Case Area since Treaty time.

3.28 Today, while some salmon stocks in the Case Area are healthy, others are depressed, in danger of extinction, or already extinct.

## CULVERT OPERATION AND EFFECTS

3.29 Culverts are structures used to pass roads over streams and streams under roads.

3.30 Whether a culvert poses a velocity barrier to fish depends, in part, on the swimming strength of the fish in terms of both speed and endurance.

3.31 Different species of salmon have different swimming strengths.

3.32 Juvenile salmon have less swimming strength than adult salmon of the same species.

3.33 Larger culverts have lower headwater at a given flow than smaller culverts and pass debris and sediment better than smaller culverts and therefore reduce the risk of structural failure of culverts at road crossings. Washington law currently requires that culverts shall be installed according to an approved design to maintain structural integrity to the 100–year peak flow with consideration of the debris loading likely to be encountered.

3.34 Among other factors, a partial fish passage barrier may delay migration and block the passage of smaller salmon.

## CULVERT CORRECTION AND DESIGNS

3.35 Various options are available to prevent or remedy the existence of fish passage barrier culverts at stream-road intersections. These options include bridges, different types of culvert design methods, and relocation of roads to avoid the stream.

3.36 Scientists employed by state, federal and tribal agencies continue to conduct research on fish passage through culverts.

3.37 The current state of scientific knowledge supports the proposition that culverts which most closely simulate the characteristics of the natural stream channel and substrate are the least likely to inhibit fish passage.

3.38 During the 1990s, the Washington Department of Fish and Wildlife began developing a new method for designing culverts called the "stream simulation" method. That method is described in Exhibit AT–121 (W–089–B), *Design of Road Culverts for Fish Passage* (WDFW, 2003). Other entities, including the U.S. Forest Service, have developed and use similar "stream simulation" culvert design methodologies. *See* Stream Simulation: An Ecological Approach to Providing Passage for Aquatic Organisms at Road–Stream Crossings, May 2008 (AT–119). "Stream simulation" culverts are designed to create or maintain natural stream processes within the culvert. To accomplish that objective, all stream simulation designs dictate that a culvert should be at least as wide as bank-full width plus a buffer. Each agency calculates the width of the buffer slightly differently but the required culvert size is not significantly different.

3.39 No state, federal or tribal manual or regulation requires the use of stream simulation in the design, construction, or maintenance of culverts, although many agencies prefer the use of stream simulation culverts in anadromous fish bearing streams.

3.40 The Washington Department of Fish and Wildlife ("WDFW"), along with federal agencies such as National Marine Fisheries Service ("NMFS") and United States Forest Service ("USFS"), currently recommends use of the stream simulation method, and the State uses it in some culvert replacement projects.

3.41 At this time, the stream simulation method of culvert design as described in *Design of Road Culverts for Fish Passage* (WDFW, 2003) (Exhibits

AT–121 and W–089–B), as well as the version developed by the U.S. Forest Service, *see* Stream Simulation: An Ecological Approach to Providing Passage for Aquatic Organisms at Road–Stream Crossings, May 2008 (AT–119), represents the best science currently available for designing culverts that provide fish passage and allow fluvial processes.

3.42 In most places, the stream simulation culvert design method provides effective transport of sediment.

3.43 Culverts designed to result in predetermined water velocities or depths at predetermined flows are known as "hydraulically designed" culverts.

3.44 The hydraulic design criteria in Table 1 of WAC 220–110–070(3) (Exhibit W–089–F) include criteria intended to permit passage by a 6–inch adult trout.

3.45 The State uses the adult trout criteria from Table 1 of WAC 220–110–070(3) (Exhibit W–089–F) when designing hydraulically designed culverts for juvenile salmon passage.

3.46 The hydraulic design criteria in the adult trout portion of Table 1 of WAC 220–110–070(3) establish a maximum permissible change in water surface elevation at or above the culvert outlet of 0.8 foot.

3.47 For culverts built in fish-bearing waters, WDFW regulations at WAC 220–110–070(3) (Exhibit W–089–F) also permit culverts in small streams using a "no-slope" design method in which the culvert is placed on a flat gradient and is partially buried in the streambed. The WDFW no-slope design method for fish passage is accepted by the National Marine Fisheries Service under the Endangered Species Act for use only in very small streams where the natural slope is less than 3 percent and the culvert length is less than 80 feet, among other limitations. The Tribes have been involved in at least one barrier correction involving the no-slope design.

**STATE CULVERTS**

3.48 Washington State law has long required that obstructions across or in streams be provided with a durable and efficient fishway, maintained in an effective condition and continuously supplied with sufficient water to freely pass fish.

3.49 As early as 1881, Washington residents recognized the need to preserve fish access to habitat and passed laws to prohibit the construction of human-made barriers.

3.50 In 1949, the Washington Department of Fisheries issued a publication noting that salmon spawning areas are constricted by major obstructions such as dams and minor obstructions such as barrier culverts. In 1950, the Attorney General of Washington published an Attorney General's Opinion, AGO 1950 No. 304, stating that highway culverts are subject to the Washington State law requiring fish passage at stream obstructions.

3.51 The principal State road- and land-managing agencies, and consequently the principal agencies responsible for state-owned stream crossing culverts, are Washington State Department of Transportation ("WSDOT"), Washington Department of Natural Resources ("WDNR"), WDFW and State Parks. WSDOT is not the principal land-owning agency in the Case Area.

3.52 The WSDOT is the State agency responsible for constructing and maintaining State Highways so that, when the highways cross fish bearing streams, fish passage is not obstructed.

3.53 The WDNR manages State trust lands within the Case Area and it manages an extensive network of roads on those lands, many of which cross streams bearing salmon.

3.54 The WDFW owns or manages Wildlife Areas and other lands in the Case Area that contain roads that cross streams bearing salmon. Some of the streams are routed through culverts under these roads.

3.55 In the early 1990's WSDOT commenced a project with the WDFW to identify barrier culverts under State highways.

3.56 In 1997 the State initiated efforts to identify and correct barrier culverts on lands owned or managed by WDFW.

3.57 In 1998 the State initiated efforts to identify and correct barrier culverts owned by the WDNR and located on its forest lands.

3.58 The State began an effort to identify barrier culverts on State Parks' lands in 2001.

3.59 State Parks hired WDFW to identify barrier culverts on its lands within the Case Area, but the contract has expired.

3.60 WDNR differed from the other state agencies (WDFW, WSDOT, and State Parks) in the way it assessed fish bearing streams.

3.61 The WDFW maintains a database called the Fish Passage and Diversion Screening Inventory database (FPDSI) that contains data from culvert inventories that WDFW has conducted or that other governmental and private entities have submitted to WDFW. The WDNR maintains a separate database for its culverts. The State has not generated a consolidated list of barrier culverts owned by the different State agencies.

3.62 Because the FPDSI is a live database that is regularly edited and updated, inventory numbers relate only for a specified date. Inventory numbers also depend on distinguishing between numbers of barriers, which may include structures other than culverts; numbers of sites, which may include more than one culvert; and

between sites that affect "fish," "anadromous fish," which include bull trout, sea run cutthroat trout, and kokanee or just "salmon."

3.63 As of March 2009, the WDFW culvert database showed 1215 anadromous and resident fish passage barrier culverts under WSDOT roads in the Case Area. Of these, 807 barriers had more than 200 meters of anadromous salmonid habitat upstream. Included within the 807 barrier culverts are some 20–30 sites that are barriers only to bull trout, sea run cutthroat trout, or kokanee.

3.64 In December 2000, WDNR completed its formal inventory efforts to identify barrier culverts at stream crossings on its forest roads statewide within lands that it owned as of that year. Since that date, WDNR has not conducted a formal culvert inventory.

3.65 The initial WDNR barrier culvert inventory, completed in 2001, identified potential barrier culvert sites using road maps and stream location maps that contain inaccuracies and omissions of both streams and roads.

3.66 Because of assumptions made during the WDNR inventory process, WDNR's barrier culvert inventory included some culverts on streams that do not have fish, and excluded some blocking culverts where salmon are present. WDNR, Plaintiff Tribes and others have identified additional fish-bearing streams on WDNR lands, and additional barrier culverts under WDNR roads, which were not identified during WDNR's formal inventory.

3.67 As part of its program to consolidate its upland holdings in the state, WDNR sells, purchases or exchanges forestlands on a monthly basis. When WDNR adds to, reduces, or exchanges its upland holdings, it affects both the number of roads and culverts beneath those roads.

These additional culverts undergo a preliminary assessment for fish passage during the exchange appraisal process and are included in WDNR's inventory once the purchase or exchange is finalized.·

3.68 Following the completion of WDNR's culvert inventory in 2001 and taking into account adjustments to the inventory, WDNR identified 860 culverts within the Case Area to remediate because they were barriers to either resident or anadromous fish. As of April 2009, the WDNR culvert database showed 455 remaining culverts that are barriers to either resident or anadromous fish under roads it manages on lands within the Case Area. As of April 2009, WDNR has identified 228 culverts within the Case Area which are anadromous barriers.

3.69 In 2007, WDFW completed its efforts to identify barrier culverts at stream-road crossings on lands it owns or manages in the Case Area except for some water access sites and lands WDFW acquired within the past 2 years. Because its initial inventory has not been fully completed statewide, WDFW has not yet developed a plan for reassessing WDFW-owned culverts that WDFW has previously determined to be passable.

3.70 As of March 2009, the WDFW culvert database showed 89 fish passage barrier culverts on State Parks lands within the Case Area, of which 28 have at least 200 meters of salmon habitat both upstream and downstream. State Parks has corrected one of its barrier culverts in the Case Area.

3.71 As of July 2009, WDFW had identified 71 fish passage barrier culverts under roads on its lands in the Case Area, of which 51 have at least 200 meters of salmon habitat both upstream and downstream.

## CULVERT INVENTORY, ASSESSMENT, AND PRIORITIZATION

3.72 Before 1998, to determine whether a culvert passed fish, the State relied upon the professional judgment of biologists and engineers. In the 1990s, the WDFW published a standardized methodology for assessing culverts for fish passage. The most recent version is entitled *Fish Passage Barrier and Surface Water Diversion Screening Assessment and Prioritization Manual* (WDFW 2000) (Exhibits AT–051 and W–087–E) (hereinafter referred to as WDFW's *Assessment Manual* (2000)). Some Tribes and federal agencies have used the WDFW methodology to assess culverts for fish passage.

3.73 Since 1998, to determine whether a culvert meets the maximum velocity and other requirements of WAC 220–110–070(3)(b)(ii) (Exhibit W–089–F), WDFW has relied on evaluation of physical characteristics of the culvert. WDFW refers to this as a "Level A" barrier assessment. This assessment is described in WDFW's *Assessment Manual* (2000) (Exhibits AT–051 and W–087–E).

3.74 In some cases, WDFW considers physical characteristics of the culvert insufficient by themselves to assess barrier status. In such cases it assesses the potential barrier using hydraulic calculations, known as a "Level B" analysis. This assessment is described in WDFW's *Assessment Manual* (2000) (Exhibits AT–051 and W–087–E).

3.75 Level B barrier assessment requires a determination of the area of drainage basin upstream of the culvert. Level B assessment is difficult or impossible in many cases, particularly for sites within floodplains or tidal streams or having multiple parallel culverts, or culverts set at an unusual gradient.

3.76 Because streams are dynamic in nature, periodic re-assessment or monitoring of culverts is necessary.

3.77 WDFW uses the hydraulic criteria for adult trout in Table 1 of WAC 220–110–070(3) (Exhibit W–089–F) to determine whether or not a culvert is a barrier to juvenile salmon.

3.78 The WDFW developed the Priority Index methodology as a tool for organizing information, to help decision-makers prioritize culverts for correction. It is not law. Although the State calculates Priority Index values for many of its barrier culverts, those values do not control the order in which culverts are repaired and do not represent a "priority list." Other factors may cause a culvert with a lower PI score to be corrected before a culvert with a higher PI score.

3.79 In its initial inventory completed in 2001, WDNR determined Priority Index values ("PI values") for barrier culverts. WDNR has not updated those values subsequently, nor has it determined PI values for barrier culverts that were not identified in the initial inventory.

3.80 Each of WDNR's regions has its own protocols that it follows to reassess habitat.

3.81 Because of the time and expense associated with determining habitat gain in the field, WDNR has used a GIS-based process to calculate the habitat gain. Since 2001, WDNR regions have used the RMAP process and their own prioritization methods to determine when barriers will be removed.

3.82 WDNR does not have direct knowledge of all of the culverts located upstream or downstream of its culverts.

3.83 The relative location (upstream or downstream) of barrier culverts in relation to one another is not uniformly maintained in the State's Fish Passage and Diversion Screening Inventory (FPDSI) database.

3.84 The WDFW, under a contract with WSDOT, has been assessing the extent and condition of habitat above and below WSDOT barrier culverts in order to help prioritize corrections.

3.85 As of October, 2009, the WDFW estimated that it will complete its habitat assessments and prioritization for all WSDOT barrier culverts in the Case Area by January 2013, assuming present staffing levels. Priority Index values have not been calculated for every fish barrier. In the absence of complete habitat assessment information, it is possible to create a Surrogate PI (SPI) using Geographic Information Systems (GIS) data. WDFW sometimes uses surrogate PIs to decide where to focus habitat assessment efforts before identifying projects for scoping.

3.86 Fishery scientists use marine survival rates to annually estimate how many Coho salmon smolts will survive to enter fisheries as adults. These annual estimates of adult abundance, by stock, are compared to the average stock abundance during the FRAM Coho Base Period and that proportion is used in annual pre-season modeling—designated as a stock specific "Abundance Scalar". These stock scalars vary from year to year as they reflect both the environmental conditions that produced the out-migrating smolts (freshwater survival) and the resulting adults (marine survival).

## STATE CULVERT CORRECTION PROGRAMS

3.87 In 1990, WDFW and WSDOT executed a Memorandum of Understanding Concerning Compliance With the Hydraulic Code (Exhibits AT–153 and W–087–B). Among other things, the agencies agreed to conduct an inventory of fish passage barriers on WSDOT rights-of-way.

3.88 In 1997, the Washington State legislature created the Fish Passage Task Force.

3.89 In December 1997, the Fish Passage Task Force reported to the State legislature that fish passage barrier culverts are a "key factor" in the wild salmon equation. It concluded that "Clearly, the creation of new barriers must be prevented and the rate of barrier correction must be accelerated if Washington wild salmon and trout stocks are to recover." Since 1997, the state agencies have identified fish passage barriers under their roads and have accelerated the rate of correction of such barriers.

3.90 The WDFW and State Parks each have asserted a goal of correcting their barrier culverts by July 2016.

3.91 The State currently has set no deadline for the WSDOT to correct all of its barrier culverts.

3.92 The primary factor determining the rate at which the State can correct fish barrier culverts is the level of funding for such corrections.

3.93 The WDFW determines that a barrier culvert is "corrected" when it has been removed, replaced or modified in such a way as to meet the hydraulic design criteria of WAC 220–110–070(3) (Exhibit W–089–F).

3.94 According to the WDFW *Assessment Manual* (Exhibits AT–051 and W–087–E), "A significant reach is defined as a section of stream having at least 200 linear meters of useable habitat without a gradient or natural point barrier.... An exception to the significant reach threshold may occur if high quality ... habitat exists upstream of the barrier in anadromous waters."

3.95 WSDOT-owned culverts that are fish passage barriers are largely remediated through two different funding structures. First, fish barriers can be remediated as part of a capital construction project when the barriers fall within the boundaries of a highway construction project. This funding comes from the capital part of the Transportation budget. Second, fish passage barriers can be addressed with funding from the WSDOT I–4 (aka, Environmental Retrofit) budget.

3.96 WSDOT and WDFW have agreed pursuant to a Memorandum of Agreement (W–093–G) that barrier culverts shall be corrected as part of a highway project when in-stream work at the site of the culvert requires that WSDOT obtain a Hydraulic Project Approval ("HPA").

3.97 The Washington State Salmon Recovery Funding Board has no record of WSDOT ever receiving grant award funds towards a culvert or fish passage project.

3.98 WDFW has received grants for culvert inventory work, but as of January 2009, not for culvert correction or monitoring.

3.99 About 20% of WDNR's barrier remediation projects have been accomplished by requiring timber purchasers to correct culverts as part of a timber sale contract. WDNR pays for corrections to its barrier culverts not remediated by timber purchasers principally through fees on timber sales that are credited to the Access Road Revolving Fund ("ARRF Fund"). The ARRF Fund is a non-appropriated account managed by the WDNR to maintain, repair, and reconstruct access roads, or public roads used to provide access to public lands. RCW 79.38.050. WDNR also uses grant funds and FEMA funds to correct small numbers of culverts.

3.100 For the biennia covering the period from 2007–11, WDNR did not request any appropriations of general funds from the State legislature for correction of bar-

rier culverts on state-owned trust lands. WDNR requested such funds in its proposed budget for the 2005–2007 biennium and in prior biennia for other road maintenance work, but the requested funds were not appropriated by the legislature. WDNR requested and received general fund monies for seven barrier culvert remediation projects on non-trust lands dedicated to conservation (called Natural Area Preserves and Natural Resource Conservation Areas).

3.101 The funding available from the ARRF Fund for culvert corrections, and the number corrected as part of timber sales, depend in part on the volume and price of timber sold and harvested from WDNR lands.

3.102 Before 2001, WDNR had no deadline for correcting its fish passage barrier culverts.

3.103 Prior to 2006, the WDNR did not have sufficient funding to correct all of its barrier culverts by July 2016.

3.104 WDNR believes it will be able to correct its anadromous barrier culverts within the Case Area prior to July 2016, which is the deadline set by State law.

3.105 State agencies request separate appropriations for their operating and capital budgets. The budget requests for WDFW, WDNR and State Parks are made as part of the general budget and WSDOT's budget requests are included in a separate transportation budget. Funds for culvert work on lands or roads an agency manages may fall within its capital budget or its operating budget, or the transportation budget.

3.106 As of January 2009, WDFW reports that it has expended approximately $2,000,000 to fix state-owned barriers in the Case Area since 1999. WDFW includes dams, fishways as well as culverts in "state owned barriers." Also included within the $2,000,000 was some post-construction monitoring.

3.107 WDFW has prepared a 10–year project planning document for correcting by July 2016 its statewide fish passage barriers.

3.108 The WDNR has determined the average cost of remediating its barrier culverts as follows:

a) no slope design method: $41,000

b) stream simulation design method: $54,000

c) bridge: $123,000.

The average of all three types of structures is approximately $81,000. However, none of those figures includes costs for the engineering related to the design of the replacement structure, which are typically around 10% of the total project cost. WDNR estimates the average cost to remove a culvert from a forest road that is being abandoned is $13,000.

3.109 WDFW estimates that the average cost to correct its fish passage barriers is $230,000 in 2008 dollars.

3.110 In the transportation budget, the State legislature may re-appropriate funds not expended by the end of the biennium. Such re-appropriations are made at the subprogram level and are not project specific.

3.111 WSDOT has tracked the costs of performing stand-alone barrier correction projects through its I–4 Environmental Retrofit program. WSDOT has not been able to track the costs of corrections undertaken as part of a larger highway improvement project because the barrier replacement costs are not easily segregated from the cost of the rest of the project. For example, documentation of the costs of cement is typically for the entire project, without an easy way to extract how much

was exclusively used for the culvert construction.

3.112 The funding source (federal versus state), the bidding environment, and labor laws can all affect the cost of the project.

3.113 The Washington State Legislature could designate specific additional revenue sources for fish passage barrier remediation in a manner similar to the current "Nickel" (5 cent per gallon special gasoline tax) or Transportation Partnership Act ("TPA") (9.5 cent per gallon special gas tax) programs either as additional programs or when the current Nickel and TPA programs expire.

3.114 The State Legislature could reprioritize some portions of the Transportation Budget to increase funding for fish passage barrier remediation, but only at the expense of other projects and responsibilities.

3.115 Current bidding on WSDOT construction projects is typically running 15 to 20 per cent lower than the WSDOT engineers' pre-bid estimates of project costs.

3.116 WSDOT highway construction projects are categorized as either improvement or preservation programs within the state transportation budget. WSDOT improvement projects are aimed at correcting specific deficiencies within the transportation system or network. WSDOT's improvement program consists of both safety and mobility projects. WSDOT preservation projects are aimed at preserving at-risk roads and bridges.

3.117 In addition to the fish passage retrofit barrier program, both the chronic environmental deficiencies (CED) program and the stormwater retrofit program provide benefits to fish survival. Chronic environmental deficiencies are locations along the state highway system where recent, frequent, and chronic maintenance

needs are causing impacts to fish and fish habitat. An example of a CED is erosion of a road prism from a stream close to a state highway.

3.118 WSDOT mobility projects typically consider barrier corrections when known and when HPAs are required. Since 1991, WSDOT has completed 143 fish passage projects statewide in the course of Transportation projects, of which 32 require additional work to meet current passage criteria.

3.119 Culverts owned by WDNR, WDFW and State Parks are generally found underneath narrow unpaved roads which carry a smaller amount of traffic compared to the average state highway. For these reasons, the cost of correcting these culverts is less than the cost of correcting culverts under state highways.

3.120 The budget for WSDOT is largely funded from the 37.5 cents per gallon gas tax. The projected revenue from the gas tax for the 2009–2011 biennium based on the March 2009 forecast is $2.653 billion. This tax is directed into the Motor Vehicle Fund for disbursement. An additional $373 million is projected to be collected from licenses, permits, and fees that is available to be paid into the Motor Vehicle Fund.

3.121 The net disbursement of the 37.5 cents per gallon tax is as follows: 9.5 cents is dedicated to projects specified in the Transportation Partnership Act ("TPA") that was enacted in 2005. The 9.5 cent TPA tax was enacted with restrictions that the revenue raised by the tax can only be spent on projects that have been specified and approved by the legislature. Another 5 cents of the gas tax is dedicated to the projects specified by the Legislature when the Nickel tax was passed. The Nickel tax is scheduled to sunset when the projects specified by the Legislature have been

completed and the bond debt has been retired. The cities and counties receive 11 cents from the gas tax revenue. Another 4 cents of the gas tax revenue is dedicated to paying bond debt.

## MONITORING AND MAINTENANCE

3.122 Culverts have a hydraulic design life of 30 to 80 years, depending on their material and other factors.

3.123 All culverts will require some level of maintenance during their useful life to ensure hydraulic function.

3.124 The parties are unaware of any studies that have estimated or determined the rate at which currently passable culverts may become fish passage barriers in the future or identified methods for estimating or determining such rates.

3.125 Culverts that are not fish passage barriers when installed may become barriers over time due to erosion, hydrologic changes, and other natural processes.

3.126 WDFW monitors WSDOT barrier culvert correction projects built with dedicated funding for one year after construction. WDFW conducts spawner surveys on some culverts that have been corrected to verify that adult salmon are getting through the new structure and spawning upstream of it. Projects that failed to meet fish passage criteria are listed as barriers in the Fish Passage and Diversion Screening Inventory database and/or scoped and programmed for correction along with other barriers.

3.127 The Forest Practices Rules require WDNR to maintain fish passage in its culverts. After major storm events, WDNR visually inspects large culverts for damage.

3.128 Fishways are formal structures that include specific features to optimize fish-passage conditions, providing maximum vertical gain over a given distance. Fishways applied at culverts typically consist of a series of pools separated by weirs that control the elevation differential between pools.

3.129 Fishways require regular inspection and maintenance.

3.130 WSDOT contracts with WDFW to inspect its fishways.

## SALMON RECOVERY EFFORTS

3.131 The WDFW has recognized that culverts must be corrected in order to accomplish the State's salmon recovery efforts and to comply with several laws including fish passage laws and the new Forest Practices Rules.

3.132 The State Salmon Recovery Funding Board has worked with Indian Tribes and others to correct fish passage barrier culverts with the result that habitat previously inaccessible to fish has become accessible. Since 1999, the SRF Board has awarded funds for salmon habitat restoration projects, such as placement of large woody debris, planting of riparian vegetation, and removal of fish passage barrier culverts. The primary sources of SRF Board funding are the Washington State Legislature and the federal Pacific Coastal Salmon Recovery Fund.

3.133 None of the recovery plans identified in the Statewide Strategy to Recover Salmon, *i.e.*, recovery plans for Puget Sound Chinook; Hood Canal Summer Chum; Lower Columbia Chum; Lower Columbia Steelhead; Lower Columbia Chinook; Lower Columbia Coho; Middle Columbia Steelhead; Upper Columbia Steelhead; Upper Columbia Chinook; Snake River Spring Chinook; and Snake River Steelhead, obligate any party other than the National Marine Fisheries Service and thus are neither enforceable nor regulatory.

3.134 The federal government provides some of the funds spent by the State for

correction of barrier culverts and for other salmon recovery activities. Much of the grant money awarded by the Salmon Recovery Funding Board comes from the Pacific Coastal Salmon Recovery Fund. Tribes have been the recipients of some of these funds. Pretrial Order, Dkt. # 614, pp. 5–30.

**This concludes the admitted facts.** The Court further finds as follows:

4. At the time of trial in 2009, WDFW had identified 807 WSDOT barrier culverts which blocked more than 200 meters of salmon habitat upstream of the culvert. Admitted Fact 3.63. Fisheries scientists have identified approximately 1,000 miles of stream, comprising nearly 4.8 million square meters of stream habitat upstream of blocked culverts. State Exhibit AT–323. This habitat is unavailable to salmon moving upstream to spawn.

5. The correction of human-caused barriers is recognized as the highest priority for restoring salmon habitat in the Case Area. Declaration of Mike Henry, Ex. AT–004.

6. Fish, especially salmon, continue to be an important part of the Tribes' history, identity, and culture.

7. Salmon abundance has declined precipitously from treaty times, but particularly in the last few decades. Numerous salmon stocks that originate or are fished in the Case Area have been listed as threatened or endangered under the Endangered Species Act ("ESA"). These stocks include Puget Sound Chinook, Lower Columbia River Chinook, Ozette Lake Sockeye, Puget Sound Steelhead, and Hood Canal Summer Run Chum.

8. Both treaty and non-treaty harvests have declined substantially since the time of the first decision in *U.S. v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974) ("Boldt Decision").

9. The decline in abundance of salmon has greatly reduced fishing opportunities for the Tribes. Tribal members have been forced to greatly limit the amount of time they fish, and the areas fished. The reduced fishing opportunity has contributed to a decline in the number of tribal members who are now engaged in the traditional activity of fishing.

10. The reduced abundance of salmon and the consequent reduction in tribal harvests has damaged tribal economies, has left individual tribal members unable to earn a living by fishing, and has caused cultural and social harm to the Tribes in addition to the economic harm.

11. Tribal members learn fishing skills from older members of the Tribe. Reduced fishing opportunities interfere with the learning process for younger fishermen and women.

12. Reduced salmon harvests interfere with the Tribes' traditional First Salmon Ceremonies, which traditionally utilize fish from local streams. Tribal members are also less able to provide salmon for other ceremonies such as naming ceremonies, weddings, and other gatherings.

13. The Tribes are at present unable to harvest sufficient salmon to meet their needs and provide a livelihood for those tribal members who desire to fish for salmon for a living.

14. Salmon production is directly related to the amount and quality of habitat available. Loss and degradation of habitat have greatly reduced salmon production in the Case Area.

15. Cyclical patterns in ocean conditions and other natural disturbances cannot account for the persistent, long-term downward trend in Case Area salmon populations.

16. Reductions in salmon harvests by tribal and non-tribal fishers, leaving more adult fish to spawn, will not result in substantial increases in salmon production unless accompanied by gains in habitat, particularly spawning ground.

17. A fish passage barrier culvert is a culvert that impedes the passage of any life stage of any species of anadromous fish at any flow level which would allow the passage of fish, but for the culvert. This includes all culverts identified as barrier culverts under the 2000 WDFW Barrier Assessment manual.

18. The Washington Administrative Code ("WAC") contains rules and expresses policies governing state agencies. WAC 220–110–010 under the Hydraulic Code Rules states that it is the intent of WDFW to provide protection for all fish life through a statewide system of "consistent and predictable rules." The technology provisions of WAC 110 represent "common provisions for the protection of fish life for typical projects proposed to the department." *Id.* The regulations represent "the best available science and practices related to protection of fish life." *Id.*

19. WAC regulations applicable to the Washington Forest Practices Board provide that "[t]o protect water quality and riparian habitat, roads must be constructed and maintained in a manner that will prevent potential or actual damage to public resources." WAC 222–24–010(2). This "will be accomplished by constructing and maintaining roads so as not to result in the delivery of sediment and surface water ... in amounts that preclude achieving desired fish habitat and water quality" and by "providing for fish passage at all life states" (referring to the WDFW Hydraulic Code). *Id.*

20. Fish passage barrier culverts have a negative impact on spawning success, growth and survival of young salmon, up-

stream and downstream migration, and overall production. According to "Extinction is Not an Option: Statewide Strategy to Recover Salmon" (September 1999),

> Unnatural physical barriers interrupt adult and juvenile salmonid passage in many streams, **reducing productivity and eliminating some populations.** Barriers may also cause poor water quality (such as elevated temperature or low dissolved oxygen levels) and unnatural sediment deposition. Impaired fish access is one of the more significant factors limiting salmonid productivity in many watersheds.

> Fish blockages or barriers are caused by dams, culverts, tide gates, dikes, and other instream structures.... **These structures block fish access to an estimated 3,000 miles of freshwater spawning and rearing habitat.**

Ex. AT–114, at II.17–18 (emphasis added).

21. Young salmon, which do not have the swimming power of adults, are more easily blocked by barrier culverts. As a result, they may never migrate to the ocean, reach maturity, and return to spawn.

22. The negative effect of culverts is not limited to blocking actual passage of fish and preventing them from reaching spawning grounds. Improperly designed culverts may result in loss of spawning and rearing habitat due to shortening and simplification of the channel, loss of pools and other complex habitats, elimination of riparian vegetation, changes in litter and food sources, improper filtration of sediment, and other adverse impacts on the stream. Testimony of Dr. Martin Fox, AT–001, p. 2.

23. Culverts may also cause negative effects on stream quality and fish habitat by altering the water velocity, which may

cause sedimentation or erosion, and may ultimately result in a "perched" culvert which is a barrier to upstream fish movement. Red Cabin Creek on State Route 520 provides an example of a culvert filled with sediment. AT–010–8 to AT–010–12. A culvert blocked with sediment may divert water into adjacent ditches and channel, causing erosion and stranding fish, leading to additional mortality of adult and juvenile salmon. AT–010–13.

24. Culverts which are improperly designed, installed, or maintained may completely bar salmon from access and cause local extirpation of a run. Testimony of Mike McHenry, AT–004, p. 4. For example, Chinook salmon from Pysht River and Morse Creek on the Olympic Peninsula are locally extirpated. *Id.*, p. 3.

25. A 1994 analysis of loss of coho salmon production in the Skagit River watershed determined that 6% to 13% of the loss throughout the watershed was attributable to barrier culverts. When tributaries alone were analyzed, 44% to 58% of the loss of salmon production was attributable to barrier culverts. AT–010, p. 10.

26. Culverts which do not allow the downstream movement of woody debris and sediment have a negative impact on the downstream spawning grounds and general stream habitat. Such culverts also may become blocked with debris and fail during high water events, causing severe erosion and damage to habitat downstream. The effect on salmon populations can be "devastating." Testimony of Lawrence Wasserman, AT–010, p. 28.

27. State-owned barrier culverts are so numerous and affect such a large area that they have a significant total impact on salmon production. WDFW categorizes culverts as blocking "significant habitat" when there is at least 200 meters of inaccessible habitat upstream of the culvert. As of the trial date in 2009, there were 1,114 state-owned culverts in the Case Area, including at least 886 that blocked "significant habitat," including 807 such culverts under roads built or maintained by WSDOT, 28 under the control of State parks, and 51 under the control of WDFW. WDFW records showed at that time that State-owned barrier culverts blocked salmon access to an estimated 1,000 miles of stream and nearly five million square meters of habitat. Admitted Facts 3.64–3.71. A WSDOT spreadsheet inventory of the culverts and the amount of spawning and rearing habitat blocked by each appears in the record at AT–323.

28. In the year of the trial and two following years, 2009–2011, WSDOT completed twenty-four barrier culvert replacement projects. Tribes' Post–Trial Supplemental Brief, Dkt. # 751, p. 5; Declaration of Alix Foster, Dkt. # 749, Exhibit A, pp. 8–15.[2] Tables 5 and 7 in the WSDOT *Fish Passage Barrier Inventory: Progress Performance Report* (July 2012) ("2012 Barrier Inventory") provide these figures for Regions 1, 2, and 3 (Northwest, North Central, and Olympic Regions). (Twenty-five projects are listed for the years 2009–2011, but one, at Wagley's Creek, is a dam removal rather that replacement of a culvert.) At this rate of eight projects per year, assuming no new barrier culverts

**2.** This supplemental brief and supporting declarations were filed at the Court's direction. The Court requested supplemental memoranda of the parties to address changes in the facts that may have occurred since the time of trial. The Declaration of Alix Foster presents facts that appear in the WSDOT *Fish Passage Inventory Progress Performance Report* (July 2012), a State document of which the Court may take judicial notice. The document is available online at www.wsdot.wa.gov/ and a copy of this document is attached as Attachment B to this Order.

were to develop, it would take the State more than 100 years to replace the "significantly blocking" WSDOT barrier culverts that existed in 2009.

29. Estimates based on an assumption of no new barrier culverts are unsound, as new barrier culverts have in fact been identified since 2009. WSDOT reported 1,158 fish passage barrier culverts in the Northwest and Olympic Regions in 2009. *See,* WSDOT *Fish Passage Barrier Inventory: Progress Performance Report* (July 2009) ("2009 Barrier Inventory"), AT–072, p. 7. The 2012 WSDOT report lists a total of 1,236 fish passage barriers culverts in these same two regions. The number of barriers with significant habitat gain in these two regions alone has **increased** from 883 to 930. *Compare,* Table 2 in the 2009 Barrier Inventory with Table 2 in the 2012 Barrier Inventory (attached as Attachment B to this Memorandum and Order).

30. According to the Declaration of Paul Wagner filed in support of the State's supplemental memorandum, WSDOT works with WDFW to reassess barrier culverts. This reassessment leads to the statewide totals reported in the 2012 Barrier Inventory. Declaration of Paul Wagner, Dkt. # 746, ¶ 8. As of the date of that report, the total number of WSDOT fish passage barriers, state-wide, was 1,988, of which 1,519 were barriers with significant habitat gain. *Id;* 2012 Barrier Inventory, Table 2. Of the 1,519 barriers with significant habitat gain, 817 lie within the Case Area. *Id.,* ¶ 8.

31. The increase in the total number of WSDOT barrier culverts has occurred despite the fact that twenty-four barrier culverts in the Case Area have been corrected since 2009. Extrapolation from these data would lead to the untenable conclusion that under the current State approach, the problem of WSDOT barrier culverts in the Case Area will never be solved.

30. WDFW and DNR have achieved greater success than WSDOT in constructing remedies for barrier culverts. From 2009 through 2012, WDFW remedied twenty-eight barrier culverts in the Case Area, resulting in 46,415 linear meters of habitat gain upstream of these culverts. Declaration of Julie Hennings, Dkt. # 744, ¶¶ 5, 9–10. This work was the result of appropriations to WDFW by the legislature of $1,000,000 for the 2009–11 biennium and $2,731,000 in the 2011–13 biennium. *Id.,* ¶¶ 9, 10. An additional $1,495,000 was appropriated in 2012 from the Jobs Now! Act to correct fish passage barriers on WDFW land, of which $810,000 was for correction of culverts within the Case Area. *Id.,* ¶ 10.

31. As of January 29, 2013, there remained fourteen culverts which blocked more than 200 meters of salmon and steelhead habitat on WDFW lands in the Case Area, and another five culverts which blocked less than 200 meters of anadromous fish habitat in the Case Area. Declaration of July Hennings, Dkt. # 744, ¶ 6.

32. From 2009 through 2012, DNR remediated 126 barrier culverts in the Case Area. Declaration of Alex Nagygyor, Dkt. # 740, ¶ 5. DNR has eighty-seven culverts which pose barriers to anadromous fish remaining at this time. *Id.*

33. Most of the funds available to DNR for correcting barrier culverts come from the Access Road Revolving Fund ("AARF"), which is derived from income from timber sales. *Id.,* ¶ 10. During the 2011 to 2013 biennium, DNR also received $5,700,000 from the State's Capital Budget (Building and Construction Account) for Road Maintenance and Repair Plan ("RMAP") work, which includes culvert repair. *Id.,* ¶ 11. DNR has received addi-

tional funds, totaling $4,000,000 from FEMA (Federal Emergency Management Agency). *Id,* ¶ 12.

34. State Parks has corrected one barrier culvert since the 2009 trial. Declaration of Deborah Peterson, Dkt. # 742, ¶ 7. It is estimated that twenty-three significant barrier culverts remain in the Case Area on land under the control of State parks. *Id.,* ¶ 5.

35. The State Forest Practice Board has promulgated regulations under the Forest Practices Act which provides that the goals for road maintenance and culvert replacement established in WAC 222–24–010 (set forth in relevant part above in FF 19) are "expected to be achieved by October 31, 2016." WAC 222–24–050. This regulation is binding on DNR and has been adopted by WDFW and State parks. *See,* Admitted Fact 3.90. The original date of July 1, 2016 has been extended to October 31, 2016. Declaration of Alex Nagygyor, Dkt. # 740, ¶ 15.

36. WDFW has stated its intention to remedy six of the remaining fourteen culverts which block more than 200 meters of upstream habitat before the 2016 deadline. *Id.,* ¶ 12. WDFW represents that the remaining eight culverts pose challenges such as interference with hatchery operations, or access issues, which it will discuss with the Tribes. *Id.*

37. If DNR maintains the rate of barrier correction that it has achieved over the past three years, the remaining eighty-seven barrier culverts will be corrected by the 2016 deadline. Declaration of Alex Nagygyor, Dkt. # 740, ¶ 16.

38. Correction of fish passage barrier culverts is a cost-effective and scientifically sound method of salmon habitat restoration. It provides immediate benefit in terms of salmon production, as salmon rapidly re-colonize the upstream area and

returning adults spawn there. Exhibit AT–004, p. 12.

39. Restoration of salmon runs through correction of State-owned culverts benefits both Tribal and non-Tribal fisherman.

40. Species listed under the Endangered Species Act (Puget Sound Chinook, Hood Canal summer chum salmon, and Puget Sound steelhead) are monitored by the National Marine Fisheries Service (NMFS). The data and conclusions are published in periodic status reviews. Plaintiff United States of America presented selected pages from the NMFS December 10, 2010 *Status Review Update for Pacific Salmon and Steelhead Listed under the Endangered Species Act.* Declaration of Yvonne Marsh, Dkt. # 736, Exhibit 1. The status report identifies risk factors for Puget Sound Chinook as "high fractions of hatchery fish in many populations and widespread loss and degradation of habitat." *Id.,* p. 2. Noting a recent decline in productivity of the Hood Canal summer chum salmon, the status report suggests that "improvements in habitat and ecosystem function [are] needed." *Id.,* p. 3. For Puget Sound steelhead, the status report makes the alarming observation that "steelhead in the Puget Sound DPS [distinct population segment] remain at risk of extinction throughout all or a significant portion of their range in the foreseeable future ..." *Id.,* p. 4. The Biological Review Team identified "degradation and fragmentation of freshwater habitat, with consequent effects on connectivity, as a primary limiting factor and threat facing the Puget Sound steelhead DPS." *Id.*

41. NMFS is responsible for implementing Section 7 of the Endangered Species Act (ESA) for actions that affect habitat of threatened or endangered species. Federally funded or permitted actions by the State of Washington which affect anadromous fish, such as repair or replace-

ment of culverts, require consultation with NMFS under Section 7 and, where the action potentially effects listed species, the preparation of a biological opinion. Declaration of Steven Landing, Dkt. # 737, ¶¶ 1–2. NMFS has issued programmatic biological opinions that address culvert repair and replacement by the State of Washington to streamline the process. If the project satisfies certain design criteria, the federal agency can issue a permit or provide funding without further Section 7 consultation with NMFS. *Id.,* ¶ 3.

42. On December 12, 2012, NMFS issued a programmatic biological opinion for the Federal Highway Administration (FHWA) and Army Corps of Engineers for the WSDOT's Preservation, Improvement, and Maintenance Activities program. This programmatic opinion covers projects conducted by WSDOT, including projects within the Case Area, which are funded by the FHWA, or permitted by the Corps, and include specified activities such as culvert repair and replacement. *Id.,* ¶ 5. There is an even more streamlined "fast track" process for projects that involve culverts which block passage of ESA-listed species. *Id.,* ¶ 6.

43. In order to qualify for these expedited permits, projects that replace culverts on streams with listed species must apply the WDFW stream simulation or no-slope design criteria. These design criteria are relied upon by NMFS to ensure fish passage. *Id.,* ¶ 7.

44. The State of Washington has invested a great deal of time and money in developing the Fish Passage Priority Index referred to in FF 3.78. WSDOT has invested $3,800,00 for fish passage barrier inventory and prioritization since October, 2009. Declaration of Paul Wagner, Dkt. # 746, ¶ 6. In the 2009–2011 biennium, WSDOT and WDFW began to reassess culverts thought to have the highest likeli-

hood of becoming barriers, in order to evaluate their current status. *Id.,* ¶ 8. This reassessment led to the July 2012 statewide totals listed in FF 29–30. Nowhere in this declaration does Mr. Wagner connect the twenty-four culverts that were corrected by WSDOT within the Case Area in 2009–2011 (FF 28) with the assessment and prioritization process.

45. Only four of the twenty-four fish passage barriers corrected by WSDOT in 2009–2011 were among the 163 culverts identified by the State for priority in correction. *See,* State of Washington Post–Trial Brief, Dkt. # 663, p. 13–14; AT–323; 2012 Barrier Inventory, Tables 5 and 7.

46. Priority Index numbers range from 1 to 62. Declaration of Michael Barber, W–088, ¶ 12. The higher the number, the higher the priority to fix the culvert. As of 2009, most (but not all) WSDOT barrier culverts with a PI greater than 20, and no additional barrier culverts in the watershed, had been fixed. *Id.*

47. PI numbers for the twenty-four WSDOT culverts which were repaired or replaced in the Case Area in 2009–2011 ranged from 6.36 (Yarrow Creek tributary on SR 520) to 26.44 (Terrell Creek culvert replacement on SR 542). 2012 Barrier Inventory, Tables 5 and 7.

48. The State of Washington asserted at trial that the average cost to replace a WSDOT culvert would be $2,300,000. However, the actual cost of construction for twelve WSDOT stream simulation culvert projects completed prior to the 2009 trial ranged from $413,000 to $1,674,411; the average cost for the twelve was $658,639 each. AT–101, *Fish Passage Projects Completed with Dedicated I–4 Funds.*

49. WSDOT has provided with its supplemental memorandum a table titled "WSDOT Barrier Correction Projects

Completed since June 2010." Declaration of Paul Wagner, Dkt. # 746, Exhibit A. The table lists thirty-one barrier correction projects statewide, of which twenty-four used either the stream simulation design or a bridge. Mr. Wagner states that the average cost of these twenty-four WSDOT projects was $1,827,168. *Id.,* ¶ 9. However, it is difficult to confirm this figure from the tables, as eight of the stream simulation culvert projects, along with four of the "no-slope" design projects, have no cost listed. It appears these twelve are the ones described by Mr. Wagner as "constructed and funded as a part of other transportation projects." *Id.,* ¶ 5. See FF 3.111.

50. Full-span bridges across streams, and stream simulation culverts, offer superior fish passage and habitat benefits compared to hydraulic design and no-slope culverts. Stream simulation culverts are less likely than hydraulic design or no-slope culverts to become fish passage barriers in the future. Bridges or stream simulation culverts are the preferred WSDOT choices. Declaration of Paul Wagner, Dkt. # 746, ¶ 9.

51. Of the fish passage barrier corrections undertaken by WSDOT since 1992, approximately two-thirds have been undertaken as part of a highway maintenance or improvement project, and one third have been "stand-alone" projects funded through the I-4 program.

52. A large portion of WSDOT's funding comes from the United States. According to documents provided with the supplemental memorandum, the State expects to receive over $22,000,000 for fish passage barrier projects from the federal government in the years 2011 to 2017. Declaration of Alix Foster, Dkt. # 749, Exhibit 12. Of this amount, $15,813,000 is expected in the 2013–2015 biennium.

53. Combined with the federal funding for fish passage barrier correction, the State anticipates another $14,425,000 from the 2005 Transportation Partnership Account, for a total of $37,387,000 for fish passage barrier correction in the years 2011–2017. *Id.*

54. The WSDOT budget is separate from the State of Washington operating budget and capital budget, as demonstrated in "A Citizen's Guide to Washington State: 2012 Transportation Budget." Declaration of Alix Foster, Dkt. # 749, Exhibit 10. According to this state document, for the 2011–2013 biennium, the State of Washington budget allocates $60.9 billion to the Operating Budget, $9.9 billion to the Transportation Budget, and $3.7 billion to the Capital Budget. *Id.* The Operating Budget funds day-to-day operations; the Capital Budget funds acquisition and maintenance of buildings and facilities, including public schools and higher education facilities; and the Transportation Budget funds both operations and capital expenditures for transportation, including road building, maintenance, and repair. *Id.*

55. Of the $9.9 billion budgeted for transportation, $7.88 billion is allocated to WSDOT. *Id.*

56. The separation of the Transportation Budget from the Operating and Capital budgets ensures that money will not be taken from education, social services, or other vital State functions to fund culvert repairs.

57. The largest source of revenue for the Transportation Budget is the state gas tax, which is predicted to comprise 46.4% of the revenue available to transportation services in the 2011–2013 biennium. Transportation Revenue Forecast Council: November 2012 Transportation Economic and Revenue Forecasts; Declaration of Alix Foster, Dkt. # 749, Exhibit 11, Figure

2. Under the Washington State Constitution, the gas tax revenue must be devoted exclusively to transportation needs, including correction of barrier culverts under State highways.

58. Total transportation revenues are expected to rise in the years 2012–2016, compared to 2008–2012. *Id.,* Figure 1. The Fiscal Year 2013 increase in revenue is 5.6% over FY 2012. *Id.* Continued growth is predicted at an annual rate of 1.2% per year over the next ten years. *Id.*

59. Much of this increased funding for transportation could be used to correct WSDOT barrier culverts at a faster rate than has been maintained previously.

60. There is no evidence that increased funding toward correction of barrier culverts to meet the State's obligations under the Stevens Treaties will compromise safety or mobility programs also funded by the State's Transportation Budget.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter pursuant to Paragraph 25 of the Permanent Injunction, as amended August 11, 1993 ("Paragraph 25"). *U.S. v. Washington,* 384 F.Supp. 312, 419 (W.D.Wash.1974); C70–9213, Dkt. # 13599. Pursuant to this section, the Court has continuing jurisdiction to determine "whether or not the actions, intended or effected by any party ... are in conformity with Final Decision # 1 or this injunction...." Paragraph 25(a)(1). The construction, maintenance, repair and replacement of culverts are actions effected by the State of Washington which may be evaluated for conformity with Final Decision # 1. The Court also has jurisdiction to consider "[d]isputes concerning the subject matter of this case which the parties have been unable to resolve among themselves, and [s]uch other matters as the court may deem appropriate." Paragraph 25(a)(4), (7). The State and the Tribes have attempted to resolve this issue and have been unable to do so without Court involvement. The Court deems it appropriate to resolve the dispute at this time.

2. The scope of this subproceeding includes only those culverts that block fish passage under State-owned roads. Stipulation of Plaintiffs and State of Washington Regarding Scope of Sub–Proceeding, Dkt. # 341, ¶ 1.

3. The Court is not limited in granting relief to requiring that culverts identified as blocking fish passage be repaired. The Court may use its equitable powers to formulate a remedy consistent with orders entered in this case. Stipulation, Dkt. # 341, ¶ 2.

4. This Memorandum and Decision incorporates all previous rulings in this subproceeding, including but not limited to rulings on waiver and estoppel, the inapplicability of constitutional defenses asserted by the State of Washington, and the declaratory judgment entered in favor of the Tribes on August 23, 2007. The State of Washington's motion for reconsideration of that ruling, set forth in the post-trial memorandum, is DENIED.

5. The Treaties were negotiated and signed by the parties on the understanding and expectation that the salmon runs were inexhaustible and that salmon would remain abundant forever. Finding of Fact ("FF") 1–2.

6. Salmon stocks in the Case Area have declined alarmingly since treaty times. A primary cause of this decline is habitat degradation, both in breeding habitat (freshwater) and feeding habitat (freshwater and marine areas).

7. One cause of the degradation of salmon habitat is blocked culverts, meaning culverts which do not allow the free

passage of both adult and juvenile salmon upstream and downstream. Culverts which block the upstream passage of adult salmon returning to spawn render large stretches of streambed useless for spawning habitat, and reduce the number of wild salmon produced in that stream. Culverts which block stream areas in which juvenile salmon rear may interfere with their feeding and escapement from predators. Culverts which block the passage of juvenile salmon downstream prevent these salmon from reaching the sea and attaining maturity.

8. Harvests of salmon have declined dramatically since 1985. Some stocks of native salmon have become so depleted that the species is listed as threatened or endangered.

9. Where culverts block passage of fish such that adult salmon cannot swim upstream to spawn and juveniles cannot swim downstream to reach the ocean, those blocked culverts are directly responsible for a demonstrable portion of the diminishment of the salmon runs.

10. The depletion of salmon stocks and the resulting diminished harvests have harmed the Tribes and the individual members economically, culturally, and personally. It is not necessary that the Tribes quantify the amount of loss in order to demonstrate their entitlement to relief from further harm.

11. Non–Tribal fishermen have also been injured economically and personally by the diminished salmon harvests.

12. The Eleventh Amendment to the United States Constitution does not bar the plaintiffs' claims for injunctive relief against the State of Washington.

■ 13. Plaintiffs seeking a permanent injunction must satisfy a four-part test before the Court may grant such relief. The Tribes "must demonstrate (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction". *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 130 S.Ct. 2743, 2756, 177 L.Ed.2d 461 (2010).

■ 14. The Tribes have demonstrated, as set forth above in Findings of Fact 6–14, that they have suffered irreparable injury in that their Treaty-based right of taking fish has been impermissibly infringed. The construction and operation of culverts that hinder free passage of fish has reduced the quantity and quality of salmon habitat, prevented access to spawning grounds, reduced salmon production in streams in the Case Area, and diminished the number of salmon available for harvest by Treaty fishermen. The Tribes and their individual members have been harmed economically, socially, educationally, and culturally by the greatly reduced salmon harvests that have resulted from State-created or State-maintained fish passage barriers.

■ 15. This injury is ongoing, as efforts by the State to correct the barrier culverts have been insufficient. Despite past State action, a great many barrier culverts still exist, large stretches of potential salmon habitat remain empty of fish, and harvests are still diminished. Remedies at law are inadequate as monetary damages will not adequately compensate the Tribes and their individual members for these harms. Salmon harvests are important to Tribal members not only economically but in their traditions, culture, and religion; interests for which there is no adequate monetary relief.

16. The balance of hardships tips steeply toward the Tribes in this matter. The promise made to the Tribes that the Stevens Treaties would protect their source of food and commerce was crucial in obtaining their assent to the Treaties' provisions. FF 2; citing *State of Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 677, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Equity favors requiring the State of Washington to keep the promises upon which the Tribes relied when they ceded huge tracts of land by way of the Treaties.

17. It was the intent of the negotiators, and the Tribes' understanding, that they would be able to meet their own subsistence needs forever, and not become a burden on the State treasury. Order on Cross–Motions for Summary Judgment, Dkt. # 392, p. 10. The Tribes' ability to meet their subsistence and cultural needs is threatened by the depletion of salmon stocks which has resulted from the continued existence of fish passage barriers. State action in the form of acceleration of barrier correction is necessary to remedy this decline in salmon stocks and remove the threats which face the Tribes. The State has the financial ability to accelerate the pace of barrier correction over the next several years and provide relief to the Tribes. FF 48–49; 51–59. Under state and federal law, barrier culverts must be corrected in any case. Any marginal costs attributable to an accelerated culvert correction schedule are more than offset by the benefit that will accrue to the Tribes. Increased State spending on barrier correction will not adversely affect state programs such as education or social welfare, because the transportation and general operating budgets are separate. FF 54, 60.

18. The public interest will not be disserved by an injunction. To the contrary, it is in the public's interest, as well as the Tribes' to accelerate the pace of barrier correction. All fishermen, not just Tribal fishermen, will benefit from the increased production of salmon. Commercial fishermen will benefit economically, but recreational fishermen will benefit as well. The general public will benefit from the enhancement of the resource and the increased economic return from fishing in the State of Washington. The general public will also benefit from the environmental benefits of salmon habit restoration.

19. The State's duty to maintain, repair or replace culverts which block passage of anadromous fish does not arise from a broad environmental servitude against which the Ninth Circuit Court of Appeals cautioned. Instead, it is a narrow and specific treaty-based duty that attaches when the State elects to block rather than bridge a salmon-bearing stream with a roadbed. The roadbed crossing must be fitted with a culvert that allows not only water to flow, but which insures the free passage of salmon of all ages and life stages both upstream and down. That passage is best facilitated by a stream simulation culvert rather than the less-effective hydraulic design or no-slope culvert.

20. An injunction is necessary to ensure that the State will act expeditiously in correcting the barrier culverts which violate the Treaty promises. The reduced effort by the State over the past three years, resulting in a net increase in the number of barrier culverts in the Case Area, demonstrates that injunctive relief is required at this time to remedy Treaty violations.

## CONCLUSION

The permanent injunction requested by the Tribes and joined by the United States

is reasonable and sufficiently narrowly tailored to remedy specific harms. The Court shall accordingly GRANT the Tribes' motion for a Permanent Injunction (Dkt. # 660) and adopt the proposed Order presented by the Tribes.

## PERMANENT INJUNCTION REGARDING CULVERT CORRECTION

### Subproceeding No. 01–1 (Culverts)

### (March 29, 2013)

This matter came before the Court for trial beginning on October 13, 2009, for the purpose of determining the appropriate remedy for the violation by the defendants of certain of the Plaintiff Tribes' rights under treaties between the Tribes and the United States. By amended order dated August 23, 2007, the Court has ruled that the State of Washington has built and currently operates stream culverts that block fish passage to and from the Tribes' usual and accustomed fishing places, depriving the Tribes of the fishing rights reserved in the treaties. The Court has carefully and fully considered the Court's prior rulings in this subproceeding, the evidence presented at the remedy phase trial, the pre-trial and post-trial briefings of the parties, the arguments of counsel and applicable law, and on March 29, 2013 entered Findings of Fact and Conclusions of Law. Based upon the foregoing, it is hereby:

Ordered, adjudged and decreed that the State of Washington, the Washington State Department of Transportation (WSDOT), the Washington State Department of Fisheries and Wildlife (WDFW), the Washington State Department of Natural Resources (DNR), and the Washington State Parks and Recreation Commission (State Parks), their agents, officers, employees, successors in interest, and all persons acting in concert or participation with any of them (Defendants), are permanently enjoined and restrained to obey, to respect, and to comply with all rulings of this Court in this subproceeding and with each provision of this injunction, subject only to such modifications as may be approved by the Court in the future.

1. As used in this injunction, the word "culvert" shall mean any structure, other than a full-span bridge or tide gate, that is constructed to convey water beneath a roadway, and shall also include associated fishways or other fish passage structures, and bridges built to replace any culvert that is subject to this injunction. The word "salmon" shall mean any of the six species of anadromous salmonids of the genus Oncorhynchus, commonly known as chinook, chum, coho, pink, and sockeye salmon, and steelhead.

2. Within six months of the date of this injunction, the Defendants, in consultation with the Plaintiff Tribes and the United States, shall prepare a current list, or lists if different by agency (the List), of all culverts under state-owned roads within the Case Area existing as of the date of this injunction, that are salmon barriers. In compiling the List, the Defendants shall use the barrier assessment methodologies in the Fish Passage Barrier and Surface Water Diversion Screening Assessment and Prioritization Manual (WDFW 2000) (WDFW Assessment Manual).

3. In addition to compiling the List, the Defendants shall make ongoing efforts to assess and identify culverts under state-owned roads in the Case Area that become partial or full barriers to salmon passage after the entry of this Injunction, using the WDFW Assessment Manual or any later state barrier assessment standards, provided such standards are consistent with the terms of this injunction.

4. Any new culvert constructed by the Defendants in the future on salmon waters within the Case Area and any future construction to provide fish passage at State barrier culverts on such waters shall be done in compliance with the standards set out in this injunction.

5. By October 31, 2016, WDFW, DNR, and State Parks shall provide fish passage in accordance with the standards set out in this injunction at each barrier culvert on the List located on lands owned or managed by those agencies in the Case Area.

6. Within 17 years of the date of this injunction, WSDOT shall provide fish passage in accordance with the standards set out in this injunction at each barrier culvert on the List owned or managed by WSDOT if the barrier culvert has 200 lineal meters or more of salmon habitat upstream to the first natural passage barrier.

7. WSDOT shall provide fish passage in accordance with the standards set out in this injunction at each culvert on the List having less than 200 lineal meters of upstream salmon habitat at the end of the culvert's useful life, or sooner as part of a highway project, to the extent required by other applicable law.

8. Notwithstanding the provisions of paragraph 6, above, WSDOT may defer correction of an aggregation of culverts that cumulatively comprise barriers to no more than 10 % of the total salmon habitat upstream of those WSDOT culverts that would otherwise be subject to correction on the schedule set forth in Paragraph 6, but only upon fulfillment of the following conditions: In consultation with the Plaintiff Tribes and the United States, the Defendants shall develop and complete an assessment of the amount of salmon habitat upstream of each WSDOT barrier culvert on the List for which a "full physical survey," as described in § 3.4 of the WDFW Assessment Manual, has not been completed as of the date the List is compiled. In conducting the assessment, the Defendants shall use the full physical survey methodology or such other methodology as the parties may agree upon. Each correction deferred by this provision shall be corrected to the standards of this injunction at the end of the culvert's useful life, or sooner as part of a highway project, to the extent required by other applicable law. In undertaking the corrections, the Defendants shall be guided by the principle of providing the greatest fisheries habitat gain at the earliest time. The Defendants may utilize the "Priority Index" methodology described in the WDFW Assessment Manual in determining the sequence of correction if they so desire.

9. In carrying out their duties under this injunction, the Defendants shall design and build fish passage at each barrier culvert on the List in order to pass all species of salmon at all life stages at all flows where the fish would naturally seek passage. In order of preference, fish passage shall be achieved by (a) avoiding the necessity for the roadway to cross the stream, (b) use of a full span bridge, (c) use of the "stream simulation" methodology described in *Design of Road Culverts for Fish Passage* (WDFW, 2003) or *Stream Simulation: An Ecological Approach to Providing Passage for Aquatic Organisms at Road–Stream Crossings* (U.S. Forest Service, May 2008), which the parties to this proceeding have agreed represents best science currently available for designing culverts that provide fish passage and allow fluvial processes. Nothing in this injunction shall prevent the Defendants from developing and using designs other than bridges or stream simulation in the future if the Defendants can demonstrate that those future designs provide equivalent or better fish passage and fisheries

habitat benefits than the designs required in this injunction.

10. In rare circumstances, Defendants may deviate from the design standards in paragraph 9, above, if they can establish or the parties agree that use of the standards required in paragraph 9 is not feasible because of: (a) an emergency involving an immediate threat to life, the public, property, or of environmental degradation, and a correction using the required design standards cannot be implemented in time to forestall that threat; or (b) the existence of extraordinary site conditions. If a design standard other than that specified in paragraph 9 is used, in addition to providing the best feasible fish passage at the barrier site, the Defendants shall mitigate for the impacts of deviating from the standards of this injunction so that the resulting correction plus any mitigation provides at least the same net benefit to the salmon resource as would have occurred had the correction applied the required standards.

11. The Defendants shall provide fish passage in accordance with the standards set out in this injunction within a reasonable period of time: (a) when any culvert corrected under the injunction remains a barrier culvert after attempted correction, or again becomes a barrier culvert following an initially successful correction, or (b) when any culvert is newly identified as a salmon barrier culvert after the initial completion of the List.

12. The Defendants shall monitor their implementation of the injunction, and evaluate whether their efforts to provide fish passage at their salmon barrier culverts are effective in meeting the standards of this injunction. The Defendants shall take reasonable steps to maintain their culverts in such a manner as to prevent development of fish barriers and to protect salmon habitat.

13. The Defendants shall provide the interested Tribes with sufficient notice of State barrier culvert inventory, identification of previously unidentified State barrier culverts, assessment, and potential or actual State barrier culvert correction activities to permit the Tribes to monitor and provide effective recommendations for compliance with the requirements of this injunction.

14. The Court shall retain continuing jurisdiction over this subproceeding for a sufficient period to assure that the Defendants comply with the terms of this injunction.

## ORDER

Is it is so ORDERED this 29th day of March 2013.

JOINT MOTION FOR ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT

NOTE ON MOTION CALENDAR:
April 23, 2013

Subproceeding No. 89–3–08 (Shellfish)

(April 23, 2013)

KAREN L. STROMBOM, Judge.

The Suquamish Tribe and A & K Shellfish LLC seek this Court's entry of an order approving the Consent Decree and Settlement Agreement attached hereto as Attachment A, which resolves all disputes in this Subproceeding. The undersigned representatives of the Parties affirm and agree that the Settlement Agreement is fair and reasonable and, by the signatures of their representatives below, the Parties consent to and are fully bound by its terms.

The Parties note that Paragraph 12 of the Consent Decree and Settlement Agree-

ment states that in the event the Parties are unable to resolve a dispute under the agreement themselves, one or both of the Parties may request the assistance of United States Magistrate Judge Brian A. Tsuchida to resolve the dispute informally. At the Parties' Settlement Conference on March 27, 2013, Judge Tsuchida indicated he would be willing to assist the Parties in this way. The Parties sincerely appreciate Judge Tsuchida's assistance in resolving this dispute and his generous offer of assistance in the future. The Parties believe the Consent Decree and Settlement Agreement set forth a clear process for the Parties to follow going forward and will make every effort not to burden Judge Tsuchida or this Court with disputes under the agreement.

Each undersigned representative of the Parties to this Consent Decree certifies that he or she is fully authorized by that Party to enter into and execute the terms and conditions of this Joint Motion for Order Approving Consent Decree and Settlement Agreement, and to legally bind such Party to the Consent Decree and Settlement Agreement. By their representatives' signatures below, the Parties consent to the entry of the Order Approving the Consent Decree and Settlement Agreement.

### ATTACHMENT A

HONORABLE KAREN L. STROMBOM

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

UNITED STATES OF AMERICA, et al., Plaintiffs,

vs.

STATE OF WASHINGTON, et al., Defendants

Case No.: C70–9213

Subproceeding No. 89–3–08 (Shellfish)

### CONSENT DECREE AND SETTLEMENT AGREEMENT

The Suquamish Tribe and A & K Shellfish LLC, by and through their undersigned counsel of record, hereby submit this Consent Decree and Settlement Agreement to this Court for its approval.

1. This Consent Decree and Settlement Agreement ("Agreement") shall be between the Suquamish Tribe ("Tribe") and A & K Shellfish LLC ("A & K"), including any person acting on behalf of the Tribe or A & K. The Agreement uses the term "Party" when referring to either the Tribe or A & K, and "Parties" when referring to the Tribe and A & K collectively.

2. This Agreement shall only apply to tidelands located west and south of a line drawn between Point Monroe on Bainbridge Island and Point Jefferson to a line at the south of Rich Passage between Orchard Point and Beans Point, including Port Madison, Agate Passage, Liberty Bay, Port Orchard Passage, Dyes Inlet, Sinclair Inlet, and Rich Passage. This area is depicted on the map attached as Exhibit A. For purposes of the Agreement, these tidelands are referred to as "Agreement Tidelands."

3. Nothing in the Agreement modifies or affects, or intends to modify or affect, the relationship between the Tribe and A & K outside of the geographic area described in Paragraph 2.

4. Nothing in this Agreement modifies or affects, or intends to modify or affect, the provisions of the Revised Shellfish Implementation Plan, Subproceeding No. 89–3, Doc. 14331.

5. Nothing in this Agreement modifies or affects, or intends to modify or affect, the rights of any other Indian tribe or the relationship between A & K and any other tribe.

6. A & K shall not commercially harvest shellfish on Agreement Tidelands, whether before or after a survey, until such time as one of the following occurs:

(A) A & K and the Tribe have entered a harvest plan that provides for the implementation of the Tribe's treaty right to take up to 50% of the naturally-occurring shellfish on the tidelands; or

(B) the Tribe has agreed in writing or the United States District Court has determined that Agreement Tidelands proposed and used for cultivation do not contain a natural shellfish bed; or

(C) the Tribe has indicated in writing that it does not intend to exercise its treaty right to take shellfish on the tidelands.

7. The Tribe and A & K shall use best efforts to complete all surveys and to develop all harvest plans on the schedule set forth in Paragraph 8. If a Party foresees difficulty in meeting this schedule, that Party will immediately notify the other Party, and the Parties shall confer and determine a reasonable schedule for completing the surveys and proposed harvest plans. If the Tribe has previously surveyed the Agreement Tidelands, the Parties shall confer and determine whether another survey is appropriate under the circumstances. Nothing in this Agreement shall prevent A & K from conducting its own survey of Agreement Tidelands, but the Tribe reserves its right to conduct a survey.

8. After A & K provides notice to the Tribe of its intent to harvest an Agreement Tideland, the Tribe will have forty (40) days within its normally scheduled survey season (typically scheduled for daytime tides from April to August) to complete a survey. If A & K provides notice prior to the start of the survey season, the Tribe will complete the survey within the first forty (40) days of the survey season. If A & K provides notice during the survey season, the Tribe will complete the survey within forty (40) days of receiving the notice, provided that forty (40) days remain in the survey season. If forty (40) days do not remain in the survey season, A & K and the Tribe will confer as to whether the Tribe will be able to complete the survey by the end of the survey season. The Tribe will provide A & K the survey results and a proposed harvest plan, as appropriate, within thirty (30) days of completing the tribal survey.

9. With respect to particular Agreement Tidelands, following the occurrence of one of the three things stated in Paragraph 6, this Agreement shall no longer apply to that tideland(s) for the duration of the resolution of the Tribe's rights under that Paragraph. For example, after the Parties enter a harvest plan, the terms of the harvest plan shall control for the duration of the plan. This Agreement shall continue to apply to all other Agreement Tidelands acquired by A & K (through ownership, lease, or otherwise controlled) until the occurrence of one of the three things stated in Paragraph 6, and shall apply if the resolution of the Tribe's rights under that Paragraph has expired.

10. If, due to exigent circumstances, A & K or the Tribe desires to harvest prior to the occurrence of one of the three things stated in Paragraph 6, the Party shall notify the other Party immediately, and at least five (5) days prior to the proposed harvest. The Parties will confer in good faith and seek to reach an agree-

ment with respect to the proposed harvest, and to ensure that each Party has the opportunity to take a fair share of the available shellfish under the circumstances. "Exigent circumstances" include unforeseen lease cancellations and imminent threats of closure orders (e.g., harmful algal bloom, oil spill). For any harvests under this Paragraph, each Party may have a monitor present and will share with the other Party its harvests records within five (5) days of the harvest.

11. Within fourteen (14) days of the signing of the Agreement, A & K shall produce all records (including daily harvest reports, weigh out records, fish receiving tickets, and invoices) showing any harvests of shellfish by A & K on tidelands owned or previously owned by Mr. Dean Capps, Kitsap County Parcel No. 4414–000–016–0004, Mr. Russell Robison, Kitsap County Parcel No. 4415–000–020–0106, Mr. Lachlan Munro, Kitsap County Parcel No. 282501–4–010–2004, Ms. Orpha Straw, Kitsap County Parcel No. 282501–1–010–2000, Mr. Ronald Moore, Kitsap County Parcel No. 282501–1–034–2002, Dr. Joe Jack Davis, Kitsap County Parcel No. 282501–1–034–2003, Ms. Debra Allbee, Kitsap County Parcel No. 282501–1–040–2004, and/or Mr. George Degroot, Kitsap Parcel No. 212501–4–033–2004 ("Degroot parcel"), to the extent A & K has not already produced these records. Customer and price information may be redacted from these documents.

12. In the event a dispute arises under this Agreement, the Party will notify the other Party of the dispute in writing. Unless the Parties agree otherwise, they will meet within five (5) days and seek to re-solve the dispute. If the Parties are unable to resolve the dispute, one or both Parties may request the assistance of United States Magistrate Judge Brian A. Tsuchida in resolving the dispute.

13. The Court retains jurisdiction for the purpose of enforcing this Agreement. The Parties shall comply with the procedures set forth in Paragraph 12 before invoking the Court's jurisdiction to enforce the Agreement.

14. This Agreement resolves the First Dispute and Second Dispute in the case captioned *United States v. Washington,* Case No. C70–9213, Subproceeding 89–3–08 (*Suquamish Tribe v. A & K Shellfish, LLC*) (Dkt. # 1). The Parties shall bear their own attorney fees and costs. Upon the Court's approval of this Agreement, the Parties stipulate to the dismissal of the First Dispute with prejudice, and further stipulate to the dismissal of the Second Dispute without prejudice. The harvest plans involved in the Second Dispute will contain no "shortfall" provision, but after two harvest cycles, the Parties will meet and discuss whether the harvest plans are succeeding in providing both Parties the opportunity to harvest a fair share. Nothing in this Agreement shall prevent the Tribe or A & K from invoking the Court's jurisdiction to resolve any other existing or future dispute between the Parties.

15. This Agreement shall not be cited as precedent in any other proceeding.

Respectfully submitted this 23rd day of April, 2013.

EXHIBIT A

JOINT MOTION
PAGE 12

## ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT

Subproceeding No. 89-3-08 (Shellfish)

(April 23, 2013)

KAREN L. STROMBOM, United States Magistrate Judge.

IT IS HEREBY ORDERED:

The Court, having considered the Joint Motion for Order Approving Consent Decree and Settlement Agreement, which addresses disputes arising between the Suquamish Tribe and A & K Shellfish LLC, finds that the Consent Decree and Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Consent Decree and Settlement Agreement is hereby entered and approved. This action is hereby dismissed pursuant to the terms set forth in the Consent Decree and Settlement Agreement.

## ORDER ON LUMMI MOTION FOR STAY PENDING APPEAL

Subproceeding 11-2

(April 26, 2013)

This matter is before the Court for consideration of a motion by the Lummi Nation for a stay of enforcement of this Court's final Order dated October 11, 2012 (Dkt. # 59) and Order on Motion for Reconsideration dated February 15, 2013, pending appeal. Dkt. # 91. In these Orders this Court granted a motion for summary judgment filed by the Requesting Tribes, namely the Jamestown S'Klallam, Lower Elwha Klallam, and Port Gamble S'Klallam (together, "the S'Klallam"), on their Request for Determination regarding the usual and accustomed fishing area ("U & A") of the Lummi Nation, the Respond-

ing Tribe in this matter. Dkt. # 59. Specifically, the Court found that

(1) The Usual and Accustomed Fishing Area (U & A) of the Lummi Nation does not include the eastern portion of the Strait of Juan de Fuca or the waters west of Whidbey Island, an area more specifically described as the marine waters east of a line running from Trial Island near Victoria, British Columbia, to Point Wilson at the westerly opening of Admiralty Inlet, bounded on the east by Admiralty Inlet and Whidbey Island, and bounded on the north by Rosario Strait, the San Juan Islands, and Haro Strait; [and]

(2) The Lummi Nation is prohibited from issuing regulations or otherwise authorizing its fishers to exercise treaty fishing rights in the waters described above....

*Id.,* p. 16. This determination was based on a finding that it is the law of the case that the Lummi U & A does not include the Strait of Juan de Fuca, together with an independent review of the evidence that was before Judge Boldt which supported that conclusion. *Id.,* pp. 8, 11–15.

The Lummi moved for partial reconsideration and the Court denied that motion. Dkt. # 72. Now the Lummi Nation moves for an Order staying enforcement of these Orders pending their appeal. Specifically, they request a stay that

will allow Lummi to continue to fish in the southern portion of Washington State Salmon Catch Reporting Areas 6A and 7 in the same manner as it has every year since Judge Boldt's original decision in 1974, while refraining from fishing in any portion of Areas 6 and 6B during the pendency of the appeal.

Motion for Stay, Dkt. # 72, p. 2. The Lummi have supported the motion with declarations by fourteen Lummi fishermen, stating that they have long been fishing in

these areas and that it would be a hardship to now be excluded from fishing there. Dkt. ## 77–90.

The earlier Lummi Motion for Reconsideration was based on the assertion that the Court erred in including Areas 6A and 7 within the case area from which they were to be excluded. In rejecting that assertion and denying reconsideration, the Court stated,

> The Court specifically reviewed and discussed the evidence that was before Judge Boldt regarding Lummi fishing locations, together with his specific language. Order on Motion for Summary Judgment, Dkt. # 59, pp. 11–14. The Court noted the evidence that the Lummi were highly dependent upon reef net fishing, which was conducted nearshore off promontories and headlands, and that no reef net sites were reported south of Lopez Island. *Id.*, p. 13. There was no evidence before Judge Boldt to demonstrate Lummi fishing in the open area of the Strait of Juan de Fuca lying south and offshore of the San Juan Islands and west of Whidbey Island. This area comprises the southernmost part of Area 7 and all of Area 6A.

Order on Motion for Reconsideration, Dkt. # 72, p. 4. The Lummi request to continue fishing in Areas 6A and 7 thus amounts to an improper motion for "re-reconsideration" with respect to these areas and could be denied on that basis alone. Nevertheless, the Court will address the merits of the motion.

■ The Lummi motion properly sets forth the standards applicable to a motion for a stay pending appeal, which are similar to the standards for a preliminary injunction. The Court should consider:

(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits of its appeal;

(2) whether the applicant has shown it will be irreparably injured in the absence of a stay;

(3) whether the issuance of a stay will substantially injure the other parties interested in the proceedings; and

(4) where the public interest lies.

*See, Leiva–Perez v. Holder*, 640 F.3d 962, 964 (9th Cir.2011).

In arguing the likelihood of success on the merits of the appeal, the Lummi assert that "the Ninth Circuit is likely to reverse the Court's judgment for several reasons," and contend that the Court's Order is "inconsistent with the plain language of prior, controlling Ninth Circuit decision." Motion for Stay, Dkt. # 74, p. 6. Specifically, the Lummi argue,

> In the appeal in the Subproceeding 89–2, the Ninth Circuit held that Lummi's U & A included Admiralty Inlet, and that "Admiralty Inlet consists of **the waters to the west of Whidbey Island,** separating that island from the Olympic Peninsula." [*U.S. v. Lummi Indian Tribe,*] 253 [235] F.3d [443] at 452 [ (9th Cir. 2000) ] (emphasis added). This language, which is binding on this Court, prohibited the Court from concluding that Lummi's U & A "does not include the . . . the [sic] waters west of Whidbey Island." For this reason alone, reversal is likely.

Motion for Stay, Dkt. # 74, p. 6.

■ This "waters west of Whidbey Island" argument fails, as it misrepresents this Court's ruling and the Ninth Circuit's, and has already been rejected by the Court. This quote, by underlining only the "waters to the west of Whidbey Island" attempts to change the meaning of the ruling by the Ninth Circuit Court of Appeals which found that Admiralty Inlet is included within the Lummi U & A. As the Court stated previously,

This argument mis-reads the Ninth Circuit's definition of Admiralty Inlet and impermissibly expands its scope. The correct reading of the Ninth Circuit's language describes Admiralty Inlet as "[those] waters to the west of Whidbey Island [which] separate that island from the Olympic Peninsula."

Order on Motions for Summary Judgment, Dkt. # 59, p. 10. In other words, not **all** waters west of Whidbey island, but only those which separate Whidbey Island from the Olympic Peninsula and thus from Admiralty Inlet. The northern limit of the Olympic Peninsula on this eastern edge is at Point Wilson, which along with Partridge Point on Whidbey Island define the northern limits of Admiralty Inlet. The waters above and to the west of the entrance to Admiralty Inlet do not separate the two land masses (Whidbey Island and the Olympic Peninsula); instead they constitute the open water of the Strait of Juan de Fuca. Therefore, even though these open waters lie to the west of Whidbey Island, they do not lie within the Lummi U & A because they are not in Admiralty Inlet. The Ninth Circuit Court of Appeals specifically found that Judge Boldt did not intend to include the Strait of Juan de Fuca within the Lummi U & A. *U.S. v. Washington,* 235 F.3d 438, 453 (9th Cir. 2000). Lummi may not gain access to fishing in Areas 6A and 7 by claiming they lie in the "waters west of Whidbey Island," because these areas indisputably are within the Strait of Juan de Fuca, not Admiralty Inlet. The Lummi have no possibility of success on the merits of this argument, which is geographically unsupportable.

 The Lummi advance another argument to support their request for a stay, renewing their "logic" argument that was decided against them in the Court's summary judgment Order. *See,* Dkt. # 59, p. 1012. Here they assert again that this Court's Order is "inconsistent with the logic of the prior, controlling Ninth Circuit decision." Motion for Stay, Dkt. # 74, p. 6.

As noted above, in the 89–2 appeal, the Ninth Circuit explained how it concluded that Admiralty Inlet was part of Lummi's U & A because it was a passageway through which Lummi treaty-time fishers would naturally traverse en route from their homes in the San Juan Island to the Seattle area. In discerning Judge Boldt's intent in crafting his description of Lummi U & A, the Ninth Circuit concluded that his reasoning was based on the patterns he understood fishermen would follow, both at treaty time and at the time of trial.

The logic of the Ninth Circuit decision precluded this Court from reaching any conclusion other than that the waters at issue [are] part of Lummi's U & A. The waters at issue in this subproceeding lie directly between the San Juan Islands and Admiralty Inlet, along precisely the same path that the Ninth Circuit found to be controlling regarding Admiralty Inlet. A fisher traveling from Haro Strait (which is undeniably within Lummi U & A) on the way to Admiralty Inlet (also part of Lummi U & A), would traverse the waters in dispute.

Motion for Stay, Dkt. # 74, p. 7.

The Lummi "logic" argument fails because it ignores the well-established rule, originally articulated by Judge Boldt in Finding of Fact 14, that transit through an area does not, without more, establish a tribe's U & A in that area.

14. Although not all tribes fished to a considerable extent in marine areas, the Lummi reef net sites in Northern Puget Sound, the Makah halibut banks, Hood Canal and Commencement Bay and other bays and estuaries are examples of some Indian usual and accustomed fish-

ing grounds and stations in marine waters. Marine waters were also used as thoroughfares for travel by Indians who trolled en route. Such occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the transiting Indians.

*U.S. v. Washington,* 384 F.Supp. 312, 353 (W.D.Wash.1974).

In examining Judge Boldt's intent and finding that Admiralty Inlet is included within the Lummi U & A, the Ninth Circuit Court of Appeals would have considered Finding of Fact 14 as part of that intent, and would necessarily have found evidence of treaty-time Lummi fishing in the areas deemed part of their U & A. Extension of the Lummi U & A into the Strait of Juan de Fuca based on "logic" of the travel path would violate the "transit rule" and, contrary to the Lummi argument, would be inconsistent with the Ninth Circuit's decision. Thus there is little likelihood of success on this argument.

In the absence of any finding of a likelihood of success, the Court need not address the other factors required for issuance of a stay. However, the Court will briefly note that the Lummi fishermen cannot argue that they will be irreparably harmed by exclusion from fishing in areas where, under several court decisions, they should not be fishing. On the other hand, the tribes with U & A fishing rights in the contested areas (6A and 7) would be harmed if Lummi were allowed to continue to fish there during pendency of the appeal, as their share of the treaty catch would be diluted. Finally, the public interest is best served by the Court's consistency in upholding prior decisions by this Court and the Ninth Circuit Court of Appeals which hold that the Lummi U & A does not include the Strait of Juan de Fuca.

The motion for a stay pending appeal (Dkt. # 74) is accordingly DENIED.

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

### Subproceeding 09–1

### (July 8, 2013)

This matter was initiated by the filing of a Request for Determination by the Makah Indian Tribe, asking for a determination of the Usual and Accustomed Fishing Grounds ("U & A") in the Pacific Ocean of the Quinault Indian Nation ("Quinault") and the Quileute Indian Tribe ("Quileute"). Dkt. # 1. It is now before the Court for consideration of a motion by the Makah for partial summary judgment. Dkt. # 125. The motion was opposed by the Quinault and the Quileute, as well as the Hoh Indian Tribe as an Interested Party. The State of Washington, also an Interested party under the procedures established in this case, also filed a response to the motion. The Court heard oral argument on May 22, 2013 and has fully considered the parties memoranda and exhibits, together with prior Orders in this case. For the reasons set forth below, the Makah motion shall be substantially granted.

## BACKGROUND

The Makah filed this Request for Determination on December 4, 2009, invoking the continuing jurisdiction of the Court under two specified provisions of Paragraph 25 of the Permanent Injunction, as modified by the Court's Order Modifying Paragraph 25 (C70–9213, Dkt. # 13599) dated August 23, 1993. Dkt. # 1. The Makah requested a determination of the U & A's of the Quinault and Quileute in the Pacific Ocean, to the extent they were not specifically determined in Final Decision # 1, *U.S. v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974) ("Final Decision # 1").

The Makah themselves have an adjudicated U & A in the Pacific Ocean extending forty miles offshore, specifically determined and described in proceedings subsequent to Final Decision #1. *U.S. v. Washington*, 626 F.Supp. 1405, 1467 (1985).

The sections of Paragraph 25 invoked by the Makah in the Request for Determination are Paragraph (a)(1) and Paragraph (a)(6). As set forth in Paragraph 25,

(a) The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:

(1) Whether or not the actions intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision #1 or this injunction; [and]

. . . .

(6) The location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision #1[.]

*U.S. v. Washington*, 384 F.Supp. at 419.

The U & A of the Quinault with the *U.S. v. Washington* case area was determined by Judge George Boldt in Final Decision #1, and is described as encompassing

the following rivers and streams: Clearwater, Queets, Salmon, Quinault (including Lake Quinault and the Upper Quinault tributaries), Raft, Moclips, Copalis, and Joe Creek. Ocean fisheries were utilized in the waters adjacent to their territory.

*U.S. v. Washington*, 384 F.Supp. at 374. In the same Order, Judge Boldt described the U & A of the Quileute, determining that

[b]efore, during, and after treaty times, the usual and accustomed fishing places of the Quileute and Hoh Indians included the Hoh River from the mouth to its uppermost reaches, its tributary creeks, the Quileute River and its tributary creeks, Dickey River, Soleduck River, Bogachiel River, Calawah River, Lake Dickey, Pleasant Lake, Lake Ozette, and the adjacent tidewater and saltwater areas. In aboriginal times the Quileute Indians utilized fishing weirs where salmon were caught along the Quillayute River. In 1861 James G. Swan encountered fish weirs about a mile up from the bend of the Quillayute River near its mouth and about a mile further upstream. Along the adjacent Pacific Coast Quileutes caught smelt, bass, puggy, codfish, halibut, flatfish, bullheads, devilfish shark, herring, sardines, sturgeons, seal, sea lion, porpoise and whale.

*Id.* at 372.

The Request for Determination ("RFD") asserts that the Quinault and Quileute have been fishing (along with Makah and other Tribes) for salmon, halibut, groundfish, and highly migratory species of fish in the Pacific Ocean under regulations promulgated by the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS"). RFD ¶ 3(b)(i).[1] The Makah have been fishing for Pacific whiting in the offshore coast waters since 1996, under allocations or set-asides determined by NMFS. RFD ¶ 3(c)(i). Beginning in 2008, the Quileute and Quinault have informed NMFS that they intended to also participate in the Pacific whiting fishery. RFD ¶ 3(c)(iii). In response to this information, NMFS has begun the process to determine the "overall Indian treaty allocation in the Pacific whiting fish-

---

**1.** The Court notes that in the case of halibut, the Quinault and Quileute have been actively participating with other Tribes in developing management plans for the fishery. *See, U.S. v. Washington*, Subproceeding 91–1 (Halibut).

ery." RFD ¶ 3(c)(v). Because the whiting migrate from south to north, any fishing for this species by the Quinault or Quileute in the offshore waters south of the Makah U & A would have an impact on the Makah whiting fishery. RFD ¶ 3(c)(iii), (iv). The Makah sought to engage the Quinault and Quileute in management planning discussions for the whiting fishery in 2008 and 2009 but the two tribes declined to participate. RFD ¶ 9(c)(vi)-(viii). Makah then informed Quinault and Quileute that "the manner in which they proposed to participate in the pacific whiting fishery" would "trigger the need for a judicial determination" of their U & A's in the Pacific Ocean. RFD ¶ 3(c)(vii). According to the Makah, the western (offshore) boundary of the other tribes' U & A's "appears to be approximately 5 to 10 miles offshore...." RFD ¶ 3(c)(ix). If that is the case, asserts Makah, then the Quinault and Quileute have been conducting fisheries for salmon, halibut and black cod outside their U & A's. RFD ¶ 3(d).

The Quinault and Quileute initially responded to the Request for Determination with motions to dismiss. Dkt. ## 51, 53. They argued that the RFD should be dismissed on various grounds including sovereign immunity, lack of standing, failure to state a claim, lack of ripeness, and laches. In addressing the sovereign immunity claim, the Court cited to previous rulings as well as to the Tribes' objections to the Court's proposed entry of a "Sunset Order" closing this case. Order on Motions to Dismiss, Dkt. # 86, pp. 3–4. The Court then stated,

> [t]he Quinault and Quileute benefitted from the Court's ruling on the tribes' waiver of sovereign immunity in their dispute with the Makah in 1983–1985. They joined the other tribes in arguing against the Sunset Order on the basis that continuation of this case is necessary because of the waivers of sovereign

immunity that are in place. They will not now be heard to assert that their sovereign immunity bars consideration of the Makah Request.

*Id.*, p. 4.

With respect to standing of the Makah to request a determination of another Tribe's U & A, the Court pointed to the language of Paragraph 25 stating that "any party" may invoke the Court's continuing jurisdiction for the purposes specifically enumerated in the paragraph. Thus the Makah had standing to request definition of the Quinault and Quileute U & A's under Paragraph 25(a)(1) and 25(a)(6) as set forth in the RFD. *Id.* As for ripeness and laches, the Court dispensed with these arguments on grounds that need not be repeated here. *Id.* The Court concluded that its jurisdiction had been properly invoked under paragraph 25(a)(6), "because the western boundary of the Quinault and Quileute U & A's were not 'specifically determined' in Final Decision I." *Id.*, p. 5. This language was subsequently modified upon motion for clarification filed by several other Tribes who appeared as Interested parties under the custom and procedure of this case. The conclusion was amended to read, "This Court's jurisdiction has been properly invoked by the Makah under sections (a) and (6) of Paragraph 25 of the Permanent Injunction." Order on Motion for Reconsideration, Dkt. # 104, p. 2. The balance of the sentence, regarding the "western boundary" of the Quinault and Quileute U & A's was stricken. *Id.* The Court then stated that "it views this subproceeding as addressing the meaning of the term 'adjacent' as used by Judge Boldt in describing the Quinault and Quileute U & A's. Therefore it shall proceed under Paragraph 25(a)(1), and evidence shall be limited to the record that was before Judge Boldt." *Id.*

Following the Court's denial of the motions to dismiss, the parties filed their Joint Status Report and Discovery Plan ("JSR"). Dkt. # 114. The JSR described, under the heading "Nature and Complexity of the Case," several issues that the parties consider unresolved by the Court's Order on the motions to dismiss. The third and fourth of these issues have led to this motion for summary judgment by the Makah. As the parties set forth in the JSR,

Third, Quileute and Quinault have stated that they intend to continue to challenge Makah's standing to seek an adjudication of their ocean usual and accustomed fishing grounds. Hoh also intends to challenge Makah's standing to bring this subproceeding.....

The fourth matter involves possible additional proceedings in this subproceeding under Paragraph 25(a)(6) of the Court's Permanent Injunction. Some of the undersigned parties have expressed differing views on this matter, which are set forth below.

*Makah's Views.* Makah believes that, if the Court determines that Judge Boldt's 1974 findings did not specifically determine a western boundary for Quileute and Quinault ocean usual and accustomed fishing ground or a northern boundary for Quileute usual and accustomed fishing grounds, the Court should hold further proceedings in this subproceeding pursuant to Paragraph 25(a)(6) to make such determinations. Makah believes that additional initial disclosures and discovery should take place if the Court agrees to hold such proceedings.

*Quileute, Quinault, and Hoh's View.* Quileute, Quinault and Hoh believe that this is essentially a request that the Court reconsider its prior ruling about the scope of this proceeding, and that

the Court bifurcate or phase various issues for later determination. Quileute, Quinault and Hoh oppose any bifurcation or phasing of this Subproceeding and believe that the Court meant what it said about the issues to be litigated. If additional issues are to be resolved, Quileute, Quinault and Hoh believe such issues should be identified now, and that discovery on them should precede any trial or resolution of any issues.

Joint Status Report, Dkt. # 114, pp. 5–6.

After the parties' JSR was filed, the Hoh Indian Tribe moved for leave to intervene, asserting that "it is likely that any determination of Quileute ocean fishing usual and accustomed fishing grounds will also affect and define Hoh ocean fishing usual and accustomed fishing grounds." Dkt. # 115, p. 2. The Court denied the motion to intervene, noting that "[t]o the extent that factual and legal determinations in this subproceeding have implication[s] for the scope of the usual and accustomed fishing grounds of the Hoh, that Tribe may argue their position in memoranda filed in their status as [a] participant under Paragraph 25." Order on Motion for Leave to Intervene, Dkt. # 128, p. 2. The Hoh did in fact file a response to the Makah motion for summary judgment, and as set forth below, it was considered along with the responses filed by the Quinault and Quileute. Dkt. # 152.

The motion for partial summary judgment brings before the Court the two issues identified by the parties in the JSR, set forth above. The Makah request a ruling that,

(1) it has standing to seek an adjudication of the location of the Pacific Ocean usual and accustomed fishing places of the Quileute Indian Tribe (Quileute) and the Quinault Indian Nation (Quinault); and (2) in Final Decision # 1, the Court's finding that Quileute and Qui-

nault had usual and accustomed fishing places in "adjacent" Pacific Ocean waters did not specifically determine the location of those places (with the exception of certain beaches and river mouths) and did not include waters more than three miles offshore.

Motion for Partial Summary Judgment, Dkt. # 125, p. 1.

## DISCUSSION

In opposing the motion, the Quileute assert that it is essentially an improper motion for reconsideration of the Court's prior Orders regarding the scope of this subproceeding, and should be stricken. Quileute Response, Dkt. # 157, p. 5. However, the positions taken by the Quinault, Quileute and Hoh could equally well be viewed as constituting a motion for reconsideration on the Court's prior ruling on standing and jurisdiction. The Court will therefore reiterate and, where necessary, clarify the prior rulings with the expectation that the ruling will guide the parties in open meaningful negotiations to resolve this issue by agreement.

### (1) Scope of this Subproceeding

The Quileute point to the Court's language in the earlier Order on Motion for Reconsideration, stating that this subproceeding "shall proceed under Paragraph 25(a)(1), and evidence shall be limited to the record that was before Judge Boldt." Dkt. # 104, p. 1. According to the Quileute, this forecloses the Makah from requesting a ruling that the U & A's of the two coastal tribes were not "specifically determined" in Final Decision # 1, and limits the subproceeding to an interpretation of Judge Boldt's meaning under Paragraph 25(a)(1). However, the Court's language was not intended to be so limiting. As the Court has noted, the Makah properly invoked the Court's jurisdiction under both

Paragraph 25(a)(1) and (a)(6). Therefore the statement should be read, "this subproceeding shall proceed *initially* under Paragraph 25(a)(1) ..." However, in the event that the issues cannot be resolved through a Paragraph 25(a)(1) proceeding, the Court could find that the Quinault and Quileute U & A's were not specifically determined by Judge Boldt, and turn to Paragraph 25(a)(6) for further proceedings. While the Quinault at oral argument raised the specter of "pre-emptive" Requests for Determination under Paragraph 25(a)(6) by all the Tribes, the Court does not view that as a serious threat.

The Makah motion shall accordingly be granted, to the extent that it asks for a ruling that they may be allowed to proceed under Paragraph 25(a)(6). However, the Court cannot find within the context of this motion that the Quinault and Quileute U & A's were not "specifically determined" by Judge Boldt. While the parties are in agreement that his ruling was limited to the State of Washington coastal waters (within the three-mile limit), that does not answer the question of what he meant by the term "adjacent." If the Court should find, in proceedings under Paragraph 25(a)(1), that "adjacent" meant only one or two miles offshore, then the U & A's would have been "specifically determined." If, on the other hand, there was evidence before Judge Boldt that the treaty-time Quinault and/or Quileute fishermen went more than three miles out to sea in their quest for fish, then the extent of their U & A's in the ocean would not have been specifically determined by him. Only in the latter case would the Paragraph 25(a)(6) proceedings go forward.

### (2) Standing and Jurisdiction

▮ The Quileute and Quinault stated in the JSR that they intend to continue to challenge Makah's standing to seek an ad-

judication of their ocean U & A's. The Hoh join in that challenge, although their U & A is not in dispute in this subproceeding. In their responses to the Makah motion, the Hoh and Quinault have also questioned the Court's subject matter jurisdiction, and the Hoh once again raised the banner of sovereign immunity. Hoh Response, Dkt. # 152. The sovereign immunity issue was decided in the Court's Order on Motion to Dismiss, a portion of which is quoted above. Dkt. # 86. The Court will not revisit or reconsider that ruling.

The Hoh and Quinault both argue that the Court lacks subject matter jurisdiction because they only waived sovereign immunity for the purpose of determining their treaty fishing rights vis-a-vis the State of Washington. Hoh Response, Dkt. # 152, p. 1–2; Quinault Response, Dkt. # 153, p. 14. They contend that the Court does not have jurisdiction over the waters outside the original case area, which extended only to the three-mile limit. This is incorrect. The Court's subject matter jurisdiction in this case arises from the treaties under 28 U.S.C. § 1331. That jurisdiction extends to all treaty-based fishing and is not limited to State of Washington waters.

In 1975, in the "Herring Fisheries" proceedings, the court found,

The subject matter of the original trial in this action was limited to off-reservation treaty Indian fishing rights in the case area and the application of said rights to anadromous fish resources.

The court has, however, expressly retained continuing jurisdiction to assure implementation of the court's ruling and to deal with environmental issues and other relevant matters. Issues relating to fishing outside of the case area, on-reservation fishing, or nonanadromous fishing are clearly within the subject matter jurisdiction of this federal district court so that that [sic] litigation

with respect to such issues could clearly be brought before this court in separate actions. However, equity favors prevention of a multiplicity of actions, and in the opinion of this court, proper exercise of its jurisdiction permits, and efficient administration of justice requires, this court to deal with matters related to, but not included within, Final Decision # 1 such as possible treaty-right nonanadromous fishing.

*U.S. v. Washington,* 459 F.Supp. 1020, 1048 (W.D.Wash.1978) (citations omitted). The fact that the Court's jurisdiction extended to all treaty fishing rights, whether within or outside the waters of the State of Washington, was again recognized in the Makah's own determination of their ocean fishing rights. There, the Court noted that the Treaty of Neah Bay,

secures to the Makah Tribe non-exclusive fishing rights in those portions of the fishing grounds described in Finding of Fact No. 346 that are under the fisheries management jurisdiction of the United States, including jurisdiction conferred upon the State of Washington.

*U.S. v. Washington,* 626 F.Supp. 1405, 1468 (W.D.Wash.1985). Finding of Fact 346 described the Makah U & A as including offshore waters well outside the State of Washington territorial limits. *Id.* at 1467. As the Ninth Circuit stated more recently, "Nothing in the plain language of the treaty provides a geographic limitation, and longstanding case law establishes that U & A fishing grounds properly extend into waters under United States jurisdiction." *Midwater Trawlers Co-operative v. Department of Commerce,* 282 F.3d 710, 718 (9th Cir.2002).

These and other rulings clearly establish that the Court's subject matter jurisdiction extends to all treaty-based fishing, whether within or outside the boundaries of the

State of Washington. Nevertheless, the Quinault stated at the oral argument that,

> We're asserting the treaty right to fish between the areas of three miles out to where we and the federal government have determined is the limit or the extent or the boundary of our treaty fishing right, which is now somewhere approximately 40 to 50 miles off the coast ... We are fishing in that area legally. We are fishing in that area legally pursuant to federal regulations.

Transcript of Hearing, pp. 27–28. The argument is that NMFS has issued regulations allowing them to fish for halibut, black cod and other species in the open ocean, so therefore their fishing is "legal." There is no merit to this argument. NMFS does not determine tribal U & A's; they can only be established by this Court. The Quileute tacitly acknowledged this when they referred to "Judge Boldt's mandate that we each get 50 percent of what is in our U & As." Transcript of Hearing, p. 37. If there is no adjudicated U & A, there is no right to take 50 percent. And as counsel for the Port Gamble and Jamestown S'Klallam pointed out in summary, U & A's cannot be established by federal regulators or agencies; that would deny due process to other tribes and upset the very foundation of this case.

Long-established rulings in this case mandate that any Tribe wishing to exercise a treaty right to take fish must do so within the confines of this case, by following the principles established by Judge Boldt and others, and the procedures set forth in Paragraph 25. The Tribes came to Court in 1970 asking the Court to determine and enforce their treaty rights, and they subjected themselves to the Court's jurisdiction for all purposes relating to the exercise of their treaty rights. The Quinault and Quileute objections to the Makah

motion for partial summary judgment on jurisdiction are thus without merit.

As for standing, the Court earlier ruled that the Makah have standing to seek a determination of the boundaries of the Quinault and Quileute U & A's. Order on Motion to Dismiss, Dkt. # 86. Their assertion of a continued challenge to Makah's standing amounts to an improper motion for reconsideration of that ruling. The Court noted that Paragraph 25 allows "any party" to invoke the jurisdiction of this Court to determine, among other things, the location of any tribe's U & A where it was not specifically determined in Final Decision # 1. The Court further found that the Makah have alleged injury sufficient to meet the standing requirements, in that fishing by other tribes has an impact on the Makah share of the treaty allocation. The Court finds no basis for reconsideration.

The Makah motion for partial summary judgment is accordingly GRANTED, except as set forth above regarding whether Judge Boldt "specifically determined" the extent of the Quinault and Quileute U & A's in Final Decision # 1. The Court now directs the parties to again confer and provide a revised JSR so the Court can issue a scheduling order for further proceedings.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR DECLARATORY JUDGMENT

### Subproceeding No. 05-4

### (July 29, 2013)

This matter is before the Court for consideration of three pending motions for summary judgment, partial summary judgment, and declaratory judgment. Dkt. ## 193, 195, 199. The Court heard oral argument on these motions on April 24, 2013, and took the matter under advise-

ment. Having fully considered the record and the memoranda of the parties, the Court now rules as set forth below.

## BACKGROUND

The initial Request for Determination ("Request") was filed by the Tulalip Tribes on August 8, 2005. Dkt. # 1. It was one of two such Requests filed by Treaty Tribes in 2005 concerning the extent of the usual and accustomed fishing grounds ("U & A") of the Suquamish Tribe ("Suquamish"), which was described in 1978 by the Honorable George Boldt as follows:

> The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*United States v. Washington,* 459 F.Supp. 1020, 1049 (1978).

In June 2005, two months before this subproceeding was initiated, the Upper Skagit Indian Tribe ("Upper Skagit") filed a Request for Determination asking the Court to determine that certain defined areas to the east of Whidbey Island, namely Saratoga Passage and Skagit Bay, are not within the Suquamish U & A as defined by Judge Boldt. *U.S. v. Washington,* Cause No. 70–9213, Subproceeding 05–03. The Swinomish Indian Tribal Community ("Swinomish") filed a Cross–Request, essentially joining in the Upper Skagit's Request. This Court found in Subproceeding 05–03 that it retained juris-diction under Paragraph 25 of the Permanent Injunction in this case, as modified August 23, 1993, to consider the Request of the Upper Skagit and Swinomish. Upon the parties' cross motions for summary judgment, the Court ruled that neither Saratoga Passage nor Skagit Bay lies within the Suquamish U & A. *U.S. v. Washington,* C70–9213, Subproceeding 05–03, Dkt. # 198. This ruling was affirmed by the Ninth Circuit Court of Appeals and is now the law of this case. *United States v. Washington,* 590 F.3d 1020 (9th Cir. 2010).[1]

This Request for Determination, filed as Subproceeding 05–04 by the Tulalip, asks the Court to find that certain inland marine waters on the east side of Admiralty Inlet but west of Whidbey Island (specifically including Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay), as well as Saratoga Passage, Penn Cove, Holmes Harbor, Possession Sound (south to Point Wells), Port Susan, Tulalip Bay, and Port Gardner, do not lie within the Suquamish U & A as it was defined by Judge Boldt.[2] Amended Request for Determination, ¶ 1. The Tulalip assert that they do not seek to re-litigate the adjudicated U & A of the Suquamish Tribe, but rather seek to clarify the geographic scope of the area delineated by Judge Boldt. Request for Determination, ¶ 4. The Request invokes the jurisdiction of this Court pursuant to Paragraphs 25(a)(1), (a)(3), (a)(4), and (a)(7) of the Permanent Injunction dated March 22, 1974, as amended August 23, 1993. C70–9213, Dkt. # 13599.

---

**1.** The United States Supreme Court denied a Suquamish petition for writ of certiorari on October 18, 2010. *Suquamish Indian Tribe v. Upper Skagit Indian Tribe,* —— U.S. ——, 131 S.Ct. 414, 178 L.Ed.2d 322 (2010).

**2.** The Tulalip assert that these named areas "approximate Washington Puget Sound Salmon Management and Catch Reporting Areas 8, 8A, 8D and eastern portions of 9." Amended Request, Dkt. # 81, p. 1 n. 1. They also "approximate Marine–Fish Shellfish Management and Catch Reporting Areas 24B, 24C, 24D, 26B, and 26A." *Id.* (citations omitted).

The Court earlier determined that it retains jurisdiction to consider this Request under Paragraph 25(a)(1), which empowers the Court to determine whether the actions of the Suquamish in fishing certain areas are in conformity with Final Decision # 1 or the Permanent Injunction. Order on Motion to Dismiss, Dkt. # 105. The Court rejected an argument by the Suquamish that a 1983 settlement agreement between the parties precludes use of Paragraph 25(a)(1) as a basis for jurisdiction, stating that "[t]he 1983 agreement may further define the rights of these two parties, but it does not deprive this Court of Paragraph 25(a)(1) jurisdiction." *Id.,* pp. 3–4.[3] The Court accordingly denied a Suquamish motion to dismiss, and directed the Suquamish to respond to the Request. *Id.*

In answering the Request, the Suquamish asserted affirmative defenses of res judicata, judicial estoppel, and laches. The Suquamish also advanced a counterclaim for breach of the 1983 court-approved settlement agreement between the Suquamish, Muckleshoot, and Tulalip Tribes ("MST Agreement").[4] Suquamish Answer, Affirmative Defenses, and Counterclaims, Dkt. # 139. The Suquamish assert that jurisdiction to hear the counterclaim arises from the settlement agreement itself. *Id.,* ¶ 2. However, the MST Agreement itself provides that it "shall be enforceable pursuant to the procedures established under the continuing jurisdiction of this case …" *U.S. v. Washington,* 626 F.Supp. at 1477, ¶ 3. Thus a claim of breach must be pursued through the procedures established in Paragraph 25.

Under the jurisdictional provisions of Paragraph 25, a counter-request is allowed where it "relates directly to the subject matter of the request for determination." Paragraph 25(b)(4). The subject matter of this Request, as framed by the Tulalip, is the Suquamish U & A and whether it includes certain named bodies of water which, according to Tulalip, "approximate Washington Puget Sound Salmon Management and Catch Reporting Areas 8, 8A, 8D and eastern portions of 9." Amended Request for Determination, Dkt. # 81, p. 1, n. 1. Although Area 9 was covered in the MST Agreement, Areas 8, 8A, and 8D were not. *See,* Stipulation of Muckleshoot, Suquamish and Tulalip Tribes re Tulalip Usual and Accustomed Fishing Areas, Dkt. # 200, Exhibit G. Thus it cannot be said that the Suquamish counter-request relates directly to the subject matter of the Request, as required. Nor is there any indication that the Suquamish complied with the pre-filing requirements set forth at Paragraph 25(b) with respect to this counter-claim. They do not so state in the counter-claim statement. The Tulalip recitation of pre-filing negotiations includes no mention of the MST Agreement. *See,* Amended Request for Determination, Dkt. # 81, ¶¶ 37–41. The Court therefore declines to take jurisdiction of the Suquamish counter-claim for breach of the MST Agreement in this subproceeding.

The Tulalip have filed a motion for declaratory judgment, which is essentially a motion for summary judgment on the merits of their Request for Determination. Dkt. # 199. The Suquamish Tribe, as responding party, has filed a motion for summary judgment as to its affirmative defenses. Dkt. # 195. The Swinomish, appearing as an Interested Party under the procedures established for this case,

---

**3.** The Court also noted that the Suquamish have initiated a separate subproceeding based on the 1983 settlement agreement. *United States v. Washington,* C70–9213, Subproceeding 08–01RSM.

**4.** The Court's approval of this MST Agreement is found at *U.S. v. Washington,* 626 F.Supp. 1405, 1476–78 (W.D.Wash.1985).

have filed a motion for partial summary judgment with respect to certain aspects of the Tulalip Request. Dkt. # 193. The Court has jurisdiction to consider these matters pursuant to Paragraph 24(a)(1) of the Permanent Injunction. The three motions shall be addressed separately.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defend against the motion, the nonmoving party must then establish a genuine issue for trial by pointing to specific evidence along with its location in the record. *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 774–75 (9th Cir.2002). A moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an element essential to its case and with respect to which it bears the burden of proof. *Celotex,* 477 U.S at 322–23, 106 S.Ct. 2548.

### II. Analysis

#### A. Suquamish Motion for Summary Judgment

The Suquamish have moved for summary judgment on the affirmative defenses of res judicata, judicial estoppel, and laches asserted in their answer to the Request for Determination. The judicial estoppel argument shall be addressed first.

 Judicial estoppel is an equitable doctrine invoked at the discretion of the Court. *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 601 (9th Cir.1996). The doctrine "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Id.* at 600. The purpose is to protect the integrity of the courts, including "general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings ... [and] is intended to protect against a litigant playing fast and loose with the courts." *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991). Accordingly, the doctrine is designed to protect the interests of the Court, not of individual parties. *In re Coastal Plains, Inc. v. Mims,* 179 F.3d 197, 205 (5th Cir. 1999) ("Because the doctrine is intended to protect the judicial system, *rather than the litigants,* detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary.") (emphasis in original.)

The Court's determination to invoke it is "driven by the specific facts of the case." *Johnson v. State of Oregon,* 141 F.3d 1361, 1368 (9th Cir.1998). Because the rule is "intended to prevent 'improper use of judicial machinery.'" the application of judicial estoppel is not reducible to a set formula. *New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

Several factors typically inform the decision whether to apply the doctrine in a

particular case: First, a party's later position must be "clearly" inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750–51, 121 S.Ct. 1808 (internal citations omitted). Relevant to the instant case, the Court emphasized that "in enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the application of judicial estoppel. Additional factual considerations may inform the doctrine's application in specific factual contexts." *Id.* at 751, 121 S.Ct. 1808.

■ The Suquamish assert that the Tulalip have taken inconsistent positions on Judge Boldt's use of the term "marine waters of Puget Sound," arguing in the past for a broader application for their own U & A than they now apply to the Suquamish U & A. They contend that the Tulalip attempt to mislead the Court by "trying to define the term 'marine waters of Puget Sound' more strictly against Suquamish than for itself in either 1975 or 1983." Suquamish Tribe's Motion for Summary Judgment, Dkt. # 195, p. 9. They point to the Court's language in an earlier Order in this subproceeding stating that the Tulalip "are now arguing for a limitation on the term 'Puget Sound' which is inconsistent with their 1975 claim [for their own U & A]." Order on Motion to Dismiss, Dkt. # 17, p. 4. The Court stated in that Order that the doctrine of judicial estoppel "may well apply to the inconsistent positions taken by the Tulalip Tribe on the extent of 'Puget Sound' here" but declined to apply it. *Id.,* p. 4. What the

Suquamish have failed to note, however, is that this Order was appealed by the Tulalip and the matter was remanded to this Court by the Ninth Circuit Court of Appeals, essentially vacating that Order of Dismissal. Moreover, as shown below, the Court's statement regarding inconsistent positions by the Tulalip was based upon incomplete development of the record and of the relevant principles which have come to guide the Court in deciding U & A issues. In other words, it was premature.

After remand to this Court, the Tulalip filed an Amended Request for Determination, asserting Paragraph 25(1)(a) as an additional basis for this Court's jurisdiction. The date of that filing, November 30, 2007, is significant in that it was ten months after this Court's decision in Subproceeding 05–03, ruling that neither Saratoga Passage nor Skagit Bay lies within the Suquamish U & A. On the way to that ruling, the Court found that Judge Boldt tended to use the term "Puget Sound" broadly, generally including all marine waters inward from the mouth of the Strait of Juan de Fuca. In order to determine how he intended the term to apply to a Tribe's U & A, it was necessary to look to specific facts and the evidence that was before Judge Boldt when he described that U & A. Examination of those facts led the Court to find that the two disputed areas (Saratoga Passage and Skagit Bay), although they were part of Puget Sound as Judge Boldt generally used the term, were not part of the Suquamish U & A.

The "fast and loose" branch of judicial estoppel requires more than a "threshold inconsistency." *General Signal Corp. v. MCI Telecom. Corp.,* 66 F.3d 1500, 1505 (9th Cir.1995). Here, the inconsistencies of which the Suquamish complain do not create a basis for the application of the doctrine of judicial estoppel. Under the two-step procedure established in *Muckle-*

*shoot Tribe v. Lummi Indian Tribe,* 141 F.3d 1355 (9th Cir.1998) ("*Muckleshoot I*"), *Muckleshoot Tribe v. Lummi Indian Nation,* 234 F.3d 1099 (9th Cir.2000) ("*Muckleshoot II*"), and *United States v. Muckleshoot Indian Tribe,* 235 F.3d 429 (9th Cir.2000) ("*Muckleshoot III*"), a Tribe may argue that a term used by Judge Boldt is ambiguous or that he intended something other than its apparent meaning. Thus, Tulalip may take different positions on the meaning of the term "Puget Sound" when applied to its own U & A as opposed to the Suquamish U & A without running afoul of the doctrine of judicial estoppel, because the underlying factual considerations for the two U & A's are different. As the Ninth Circuit Court of Appeals noted in affirming this Court's opinion in Subproceeding 05–03, "whether the language of one of Judge Boldt's findings is ambiguous is a factor in ascertaining the judge's intent, but not a dispositive one, because it is necessary to understand the findings 'in light of the facts of the case.'" *United States v. Washington (Upper Skagit Indian Tribe v. Suquamish Indian Tribe),* 590 F.3d at 1024 (quoting *Muckleshoot III,* 235 F.3d at 433). Thus, in the specific context here, the Court declines to apply the doctrine of judicial estoppel. *New Hampshire v. Maine,* 532 U.S. at 751, 121 S.Ct. 1808. The Suquamish motion for summary judgment on this basis shall be denied.

 The Suquamish next contend that the Tulalip Request is barred by laches. Laches is an equitable defense that

places a time limitation on a party's right to bring suit. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir.2002). In order to establish this equitable defense, a party must demonstrate that (1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice to the party asserting the defense. *Petrella v. Metro–Goldwyn–Mayer,* 695 F.3d 946, 951–52 (9th Cir.2012). This is a factual determination. *Id.*[5]

The Suquamish laches argument rests on the Court's prior language in the now-vacated Order of Dismissal (Dkt. # 17). As noted above, that Order granting a Suquamish motion to dismiss was filed very early in these proceedings and was based upon incomplete development of the record. The Suquamish may not rely upon the language in this vacated Order to support their summary judgment motion.

Moreover, the prior Order was directed to the original Request for Determination, which did not invoke this Court's jurisdiction under Paragraph 25(a)(1) as the Amended Request does. That is a crucial distinction. Paragraph 25(a)(1) addresses actions by a party which are not "in conformity with Final Decision # 1." Some of the Suquamish actions which the Tulalip allege are not in conformity with final Decision # 1 did not occur until 2003 and 2004. *See,* Request for Determination, Dkt. # 1, ¶¶ 13, 14; Amended Request for Determination, Dkt. # 81, ¶¶ 13, 14. It

---

**5.** The Tulalip, Port Gamble and Jamestown S'Klallam Tribes, and others have pointed to language in a prior Court Order ruling that equitable defenses such as laches are "not available in the determination of U & A fishing places." C70–9213, Dkt. ## 11596. The Court earlier allowed the laches defense, reasoning that it is not determining the Suquamish U & A but rather examining what was already determined by Judge Boldt. Dkt.

# 17. As that Order was vacated by the remand, the Court's language with respect to the viability of a laches defense in this subproceeding is no longer valid. In the interest of resolving this matter on the merits, the Court will address the laches claim, but such action shall not be deemed a renewal of the court's prior determination that laches may be asserted in a subproceeding brought to clarify a Tribe's U & A, and may not be cited as such.

cannot be said that the time between these Suquamish actions and the filing of this subproceeding in 2005 constitutes a delay, much less an unreasonable delay.

█ The Suquamish motion for summary judgment does not point to any facts, beyond the language in the vacated Order, which would lead the Court to find laches here. Instead, Suquamish "refers to and incorporates here its previous memorandum supporting its assertion that Laches bars Tulalip, as a matter of law, from further pursuing its suit." Suquamish Tribe's Motion for Summary Judgment, Dkt. # 195, p. 23. Such "incorporation by reference" violates the page limitations set forth in Local Rule LCR 7(e)(3). Nevertheless, in the interest of resolving the issue on the merits, the Court will briefly address the argument advanced by Suquamish in the earlier memorandum. Dkt. # 9.

The Suquamish argued in that earlier motion that

> [h]ere, Tulalip asserts in its Request that the Ninth Circuit Court in 1990, in *United States v. Suquamish Tribe,* "note" that Suquamish did not have fishing places on the eastern side of Puget Sound. RFD, 4:8–13. Thus, for at least 15 years Tulalip has known about its potential cause of action.

> Tulalip further asserts that since the time of the 1990 ruling, Suquamish has "attempted to open various fisheries in sheltered marine waters on the east side of Puget Sound." *Id.* at 4:18–20. Tulalip infers that Suquamish issued fishing regulations for the case area for many years and specifically points to Suquamish issuance of fishing regulations in September 2003, March 2004, April 2005 and June 2005. *Id.* at 4:21–23, 27; 5:1.

Suquamish Tribe's Motion to Dismiss, Dkt. # 9, p. 12.

The 1990 opinion of the Ninth Circuit Court of Appeals, to which the Suquamish refer, did not create a cause of action for Tulalip under Paragraph 25(a)(1) regarding Suquamish fishing in the areas at issue in this subproceeding. The Suquamish sought to expand their treaty fishing rights to certain freshwater lakes and rivers, based on the allegation that they were successors to the treaty-time Duwamish Tribe. The appellate court affirmed a district court ruling which denied the Suquamish Request for Determination regarding fishing places in Lake Washington, Lake Sammamish, the Duwamish River and the Lake Washington Ship Canal. Request for Determination, C70–9213, Dkt. # 10,054 (Subproceeding 85–1). These are freshwater areas which lie to the east of the marine waters of Puget Sound. In affirming the Court's ruling, the Ninth Circuit Court of Appeals stated that the Court "did not clearly err in finding and concluding that the Suquamish did not merge with the Duwamish and **were not entitled to exercise fishing rights on the east side of Puget Sound.**" *United States v. Suquamish Indian Tribe,* 901 F.2d 772, 778 (9th Cir.1990) (emphasis added). This reference to the "east side of Puget Sound" could not give rise to a Tulalip cause of action for Suquamish fishing within the marine waters of Puget Sound which are at issue in this subproceeding, as the Ninth Circuit's ruling did not concern those areas. Thus, as the Suquamish admit in the second paragraph set forth above, it was their issuance of fishing regulations in certain areas in 2003 and subsequent years that triggered the Tulalip Request. As to those actions by the Suquamish, there is no laches, and the Suquamish motion for summary judgment on the basis of laches shall be denied.

█ Finally, the Suquamish assert that the Tulalip is barred by the doctrine of res

judicata. Again, the motion refers to the Court's prior, now-vacated Order for support. However, the limited analysis provided in that Order is not relevant to the Amended Request for Determination. By invoking Paragraph 25(a)(1) as a jurisdictional basis for this subproceeding, the Tulalip are not attempting to re-litigate matters already decided, nor are they raising issues they could have brought to the Court earlier. Rather, they ask for a declaration that the Suquamish fishing in certain areas since 2003 is "not in conformity with" their U & A as it was described by Judge Boldt. The Suquamish U & A was actually and finally determined by Judge Boldt, and the Court's role in this subproceeding is not to alter or amend that determination but to clarify it. Under the procedures established for this case, that will require an examination of the evidence that was before Judge Boldt to determine his intent. Such examination is not barred by the doctrine of res judicata. The Suquamish motion for summary judgment on the basis of res judicata shall be denied.

B. Swinomish Indian Tribal Community Motion for Partial Summary Judgment (Dkt. # 193)

■ The Swinomish have moved for summary judgment with respect to certain specific areas included in the Tulalip Request, asserting that this Court's ruling in Subproceeding 05–03 bars Suquamish claims to a U & A in Penn Cove and Saratoga Passage, and that the rule of issue preclusion bars their claim to any U & A in Holmes Harbor. Penn Cove and Holmes Harbor are small narrow bays which open onto Saratoga Passage on the

east side of Whidbey Island. Saratoga Passage was itself determined to be outside the Suquamish U & A in Subproceeding 05–03, but the Court's Order did not specifically name either Penn Cove or Holmes Harbor. Dkt. # 198. Nevertheless, Penn Cove was included in that ruling because the parties and the Court equated the case area in Subproceeding 05–03 as "that portion of Saratoga passage within Catch Reporting Area 24C, plus Skagit Bay (Catch Reporting Area 24A)." Order on Motions for Summary Judgment, Dkt. # 198, p. 1. n. 1. Penn Cove lies entirely within Catch Reporting Area 24C.[6]

With respect to Holmes Harbor, the Suquamish assert in response to the Swinomish motion that the bay was not at issue in Subproceeding 05–03, and argue that the Court's ruling should not be read as including Holmes Harbor. Holmes Harbor is a separate catch reporting area (24D) and was not specifically named in subproceeding 05–03. However, the Court found after reviewing the evidence that was before Judge Bolt that he did not intend to include Saratoga Passage in the Suquamish U & A. As noted there, he relied heavily on the reports and testimony of Dr. Barbara Lane. She "reported and testified that the Suquamish traveled by canoe from their territory (Port Madison) up through the San Juan Islands, and Haro and Rosario Straits, as far as the Fraser River." Order on Motions for Summary Judgment, Subproceeding 05–03, Dkt. # 198, p. 15. However, "[n]othing in her testimony or her report indicated a Suquamish presence in Saratoga Passage or Skagit Bay, neither as winter fishing

---

6. Tribal U & A's were described by Judge Boldt in geographic terms, not by State of Washington Department of Fisheries catch reporting areas (which did not exist at treaty times). However, the parties have from time to time throughout these proceedings used catch reporting area boundaries as a convenient way to define a specific area at a given point in time. The Court adopted that convention in Subproceeding 05–03 and finds it appropriate in this subproceeding as well.

grounds, nor as a route for travel up to the San Juan Islands." *Id.* This language is determinative of the issue here with respect to Holmes Harbor, because the Suquamish could not have reached Holmes Harbor without traveling some distance up Saratoga Passage. The Suquamish conceded this point at the oral argument, but asserted that "in treaty times people did portage" and that at trial they could present evidence of a Suquamish presence at Holmes Harbor in treaty times. April 13, 2013 Transcript of Proceedings, Dkt. # 239, p. 24. However, they have not pointed to any such evidence that was before Judge Boldt when he made his determination. This proceeding is limited to that evidence.

The Court has previously determined that the Suquamish U & A does not include Saratoga Passage. Order on Motions for Summary Judgment, Subproceeding 05–03, Dkt. # 198, p. 15. The Court also determined that evidence in the record demonstrated the Suquamish understanding, in 1975, of their own U & A as it was described by Judge Boldt. The Court found it significant that their 1975 fishing regulations did not include any waters on the eastern side of Whidbey Island. *Id.*, p. 14. Those regulations appear to be comprehensive in that they addressed Suquamish fishing in the Strait of Juan de Fuca, the San Juan Islands, Admiralty Inlet, Hood Canal, certain freshwater lakes, and the waters of Puget Sound west of Whidbey island, but not east of Whidbey island. *See,* Declaration of David Hawkins, Subproceeding 05–03, Dkt. # 133, Exhibit C. While these regulations are not evidence of Judge Boldt's intent, they do constitute evidence of the Suquamish con-

temporaneous understanding of Judge Boldt's ruling.

Thus the same analysis that the Court applied to Saratoga Passage in Subproceeding 05–03 applies as well to Penn Cove and Holmes Harbor, both small, enclosed bodies of water that extend off Saratoga Passage. The Suquamish have not pointed to any evidence that was in the record before Judge Boldt that would indicate he intended to include these small bays, which can only be accessed by water from Saratoga Passage, in the Suquamish U & A. Their offer to present evidence of portage across Whidbey Island is unavailing, as evidence that was not before Judge Boldt when he made his U & A determinations is inadmissible in a Paragraph 25(a)(1) proceeding. Moreover, Holmes Harbor was specifically named in Dr. Lane's report titled "Identity, Treaty Status, and Fisheries of the Swinomish Indian Tribal Community," found in the record as Exhibit USA–74, which was before Judge Boldt when he made his determination on the U & A of the Swinomish in April, 1975.[7] *U.S. v. Washington,* 459 F.Supp. at 1049. Dr. Lane noted that Holmes Harbor was an important location for herring fishing "within territories used by the ancestors of the present Swinomish people." USA–74 at 27. She further identified Holmes Harbor as one of the "constricted marine waters" which "were likely controlled by the resident groups in whose territory those waters were located." USA–74 at 29. Nowhere in this discussion of Holmes Harbor are the Suquamish mentioned. Nor is Holmes Harbor or Penn Cove mentioned in Dr. Lane's report on the Suquamish, or the appendices attached thereto. Exhibit USA–73.

---

**7.** Pursuant to Fed.R.Civ.P. 56(c)(3), the Court may consider materials in the record which are not cited by either party.

As the Suquamish have failed to point to any evidence in the record that was before Judge Boldt that would support their claims of treaty-time fishing in Penn Cove or Holmes Harbor, the Swinomish motion for partial summary judgment as to these areas shall be granted.

### III. Tulalip Motion for Declaratory Judgment (Dkt. # 199)

The Tulalip have moved for declaratory judgment, asking the Court to declare that (a) "the Suquamish Tribe's adjudicated usual and accustomed fishing areas are limited to the west side of Puget Sound as demonstrated by the evidence submitted to the District Court and as intended by the court in its 1975 ruling," and that (b) "the Suquamish Tribe does not have adjudicated usual and accustomed fishing grounds and stations in the marine waters of Saratoga Pass[age], Holmes Harbor, Port Susan, Possession Sound, or Port Gardner, and on the west side of Whidbey Island, including Useless Bay, Mutiny Bay, and Admiralty Bay." Tulalip Motion, Dkt. # 199, p. 25. The motion further seeks a declaration "that the Suquamish Tribe has impermissibly sought to expand its fishing areas by seeking to fish on the east side of Puget Sound in the marine waters listed above" (citing to the list at (b)). *Id.* The motion is designated in the caption as a motion for declaratory judgment, and in the footers and on the docket as a motion for summary judgment. Because it asks for a judgment on the merits of the Request for Determination, it will be treated as a motion for summary judgment.

The Court shall proceed with the two-step procedure set forth in *Muckleshoot I, II,* and *III,* as approved by the Ninth Circuit Court of Appeals in *U.S. v. Washington (Upper Skagit Indian Tribe v. Suquamish),* 590 F.3d at 1023. The first step has already been completed in Subpro-

ceeding 05–03, with the finding that Judge Boldt addressed a broad area in the term "Puget Sound," including the waters of Saratoga Passage and Skagit Bay. Subproceeding 05–03, Dkt. # 109; *U.S. v. Washington,* 2007 WL 30869 (W.D.Wash. Jan. 4, 2007). It would also encompass all the waters at issue here. The second step of the inquiry, determining whether Judge Boldt intended to include each specific area at issue in this subproceeding within the Squamish U & A, requires examination of the evidence that was before him at the time he made his determination. *U.S. v. Washington (Upper Skagit Indian Tribe v. Suquamish),* 590 F.3d at 1023. As to this determination, the Tulalip bear the burden of demonstrating that "there was no evidence before Judge Boldt that the Squamish fished [in the disputed areas] or traveled there in route to the San Juans and the Fraser River area." *Id.*

As set forth above, the Court has already made this determination with respect to Skagit Bay and Saratoga Passage, and has explained that this ruling encompasses Penn Cove and Holmes Harbor as extensions of Saratoga Passage, as to which there is no evidence of Suquamish presence. These areas lie outside the Suquamish U & A as it was determined by Judge Boldt. As to the remaining areas named by the Tulalip, namely Possession Sound, Port Gardner, Port Susan, and bays on the west side of Whidbey Island, including Useless Bay, Mutiny Bay, and Admiralty Bay, the Court must proceed to an examination of the evidence that was before Judge Boldt to determine whether he intended to include them in the Suquamish U & A.

As an initial matter, the Court notes that the Tulalip Request is based in part on the theory that the Suquamish U & A does not include marine waters on the east side of Puget Sound. This is apparent

from the relief sought in the Request, namely that the Court declare that Suquamish "has impermissibly sought to expand its fishing areas by seeking to fish **on the east side of Puget Sound in the marine waters listed above**," citing to Possession Sound, Port Gardner, Port Susan, bays on the west side of Whidbey Island, and other areas at issue in this Request (emphasis added). The Tulalip "eastern Puget Sound" argument has appeared on various occasions in this subproceeding, and formed the basis for the Suquamish laches argument: the Suquamish contended that the "eastern Puget Sound" theory was spawned in 1990 by the language used by the Ninth Circuit Court of Appeals in a previous proceeding regarding the Suquamish U & A. *United States v. Suquamish Indian Tribe*, 901 F.2d at 778. It appears that since that time the term has taken on a life of its own. However, as this Court noted above, that language was used to affirm a district court ruling, in Subproceeding 85–1, that the Suquamish U & A does not include Lake Washington, Lake Sammamish, the Duwamish River, or the Lake Washington Ship Canal. Those areas are indeed on the east side of Puget Sound, but they do not lie within the marine waters of Puget Sound. They lie east of Puget Sound, beyond the shoreline. The district court itself referred to these areas as "situated to the east of Puget Sound," not as "eastern Puget Sound" or "the east side of Puget Sound." *See*, Finding of Fact 384, *U.S. v. Washington (In re Suquamish Tribe's Request for Determination of Additional Usual and Accustomed Fishing Places)*, C70–9213, Dkt. # 11202 (February 25, 1989).

The Ninth Circuit's "east side of Puget Sound" references in *U.S. v. Suquamish Indian Tribe* could only refer to what was actually at issue in the Request for Determination filed in the District Court in Subproceeding 85–1, specifically freshwater lakes and rivers situated to the east of Puget Sound. This language should not and cannot be read as referring to some undefined "eastern side" of the marine waters of Puget Sound, and it does not in any way limit the Suquamish U & A to the western side of some imaginary line drawn down the middle of Puget Sound. The Court accordingly rejects any and all Tulalip arguments based on the Ninth Circuit statement that the Suquamish "were not entitled to exercise fishing rights on the east side of Puget Sound." *U.S. v. Suquamish*, 901 F.2d at 778. Instead, the Tulalip must demonstrate, area by area, that there was no evidence before Judge Boldt from which he could have found that the contested area was included within the Suquamish U & A.

It is beyond dispute that Judge Boldt relied heavily on the reports and the testimony of anthropologist Dr. Barbara Lane in determining the U & A's of various Treaty Tribes. *Muckleshoot I*, 141 F.3d at 1359. Often he quoted the language of her written reports verbatim when describing the extent of an individual Tribe's U & A. Dr. Lane's report on the Suquamish is titled "Identity, Treaty Status and fisheries of the Suquamish Tribe of the Port Madison Indian Reservation." Tulalip Tribe Motion for Summary Judgment, Dkt. # 200, Exhibit I. It was admitted at the trial before Judge Boldt on April 9, 1975, as Exhibit USA–73. Dr. Lane testified in that day's proceedings, and the transcript of her testimony appears in the record at Docket No. 7268 in C70–9213. The Court has previously reviewed the evidence that was before Judge Boldt in Dr. Lane's report and testimony with respect to the marine waters on the east side of Whidbey Island, specifically Skagit Bay and Saratoga Passage, in Subproceeding 05–03. The Court's findings in Subpro-

ceeding 05–03 are adopted and incorporated without further recitation here.

With respect to the other waters at issue in this subproceeding, the Court shall review the evidence Dr. Lane's report put before Judge Boldt. As to these areas, her report states in relevant part,

In 1855 the Suquamish held the west side of Puget Sound from near the mouth of Hood Canal south to Vashon island. Their territory included the land around Port Madison, Liberty Bay, Port Orchard, Dye's Inlet, Sinclair Inlet and south to Olalla. It also included Bainbridge Island, Blake island, and possibly also the west side of Whidbey Island. It is difficult at this time to establish the precise nature of Suquamish use of the west coast of Whidbey island. Achilles de Harley, who collected information on the Indian tribes of Oregon Territory before the separate existence of Washington Territory, reported in 1849

The Soquamish are a warlike tribe of Indians, whose relations with the whites and with the Hudson's Bay Company are friendly. They occupy the country about Port Orchard and neighbourhood, and the West side of Whidbey's Island. Males, 150; females, 95; children under 12 years, 210; slaves, 64; total 519. They live by labour.

George Gibbs, reporting on the Indians of western Washington in 1854 did not identify the Suquamish with Whidbey Island, although he did mention Snohomish and Skagit occupation of Whidbey Island. Gibbs' failure to note Suquamish connection with Whidbey Island does not necessarily negate de Harley's report, as Gibbs gives very little space to the Suquamish in his report. Gibbs also failed to mention Suquamish use of Bainbridge island, although this is clearly established by other sources.

So far as I have been able to determine, there appears to be no clear evidence of Suquamish winter villages on the west side of Whidbey Island. It may be that de Harley had reference to seasonal use of the island by Suquamish for fishing, hunting, and collecting activities.

. . . .

The Suquamish often travelled to Hood Canal and to upper Puget Sound as well as in other directions to harvest natural resources or to visit with relatives in other areas. The Suquamish, like all of the other Coast Salish peoples in western Washington and beyond, were related by marriage with most of the neighboring peoples.

. . . .

In the mid-nineteenth century the Suquamish resided in several villages: one at the present site of Suquamish, one at the head of Liberty Bay near the present town of Pouslbo, one at the mouth of Curley Creek where the present town of Colby is situated, one at or near Point White on the southern shore of Bainbridge Island, one at Chico Creek on Dye's Inlet and one at Phinney Bay. Possibly there were other winter villages for which we have not located documentation. In addition to the winter villages, there were seasonal campsites. Information on Suquamish villages and campsites is derived from nineteenth century accounts by early visitors and settlers and on twentieth century archeological and ethnographic investigation. In addition, Indian testimony regarding Suquamish village locations was recorded in 1927.

The single most important source of information on Suquamish sites is contained in the unpublished nomograph of T.T. Waterman based on field investigations made about 1920. Waterman's manuscript was unknown to the ethnog-

raphers who worked in Washington from 1926 until 1968. It was not used by the anthropologists who offered expert testimony with regard to the Suquamish before the Indian Claims Commission.

The Waterman manuscript can be used as an independent check on later ethnographic work. In the case of the Suquamish, the Waterman data corroborate the later work of Snyder and provide considerable site data not available elsewhere. The Suquamish text portions and the map from Waterman's manuscript are included as Appendices 1 & 2 with this report. Snyder's material is included as Appendix 3.

. . . .

Like all of their neighbors, the Suquamish relied primarily on salmon for their food staple. There are no large rivers in Suquamish territory. Small streams and creeks and lakes constitute the freshwater fisheries area. These areas provided salmon and steelhead as well as trout.

The Suquamish territory is highly indented with bays and inlets which provide a large expanse of sheltered saltwater area abounding in shell-fish and other fish species. In the salt water areas immediately adjacent to the Kitsap peninsula, the Suquamish were able to procure fresh fish on a year-round basis.

**For their store of smoke-dried salmon to serve as winter provision, the Suquamish resorted to fisheries more distant from their own shores. They repaired to the mouth of the Duwamish and other large rivers to share in the harvest of fall salmon runs.**

The inability to secure sufficient supplies when confined to those fisheries on the west side of the Sound is attested to in correspondence from the agent at the Fort Kitsap reservation in 1856. George A. Paige, the Indian Agent in charge of the Fort Kitsap reservation, wrote to Governor Isaac I. Stevens under date of October 31, 1856 in part as follows:

> *During the month the Suquamish Indians in my charge have been engaged in fishing in the different Bays and inlets on the west side of the Sound, but owing to the scarcity of salmon in this vicinity they did not succeed in laying in as large a supply as I could have wished; [if] they were obliged to subsist solely on the food procured by them the supply would all be consumed in less than a month . . . .*

Paige's letter of October 31, 1856 states that salmon were so scarce on the west side of the Sound that the only way that the people at Port Madison would be able to obtain a sufficient supply of fish in those waters would be by seining. If the use of the seine was not a traditional taking technique among the Suquamish, and [Dr. D.S.] Maynard's report clearly indicated that it was not, **the reliance on access to river fisheries or fisheries at the mouths of the large rivers seems to be underlined.**

Because of the continued hostilities during the winter of 1856, the Indians on the west side of the Sound were not permitted to visit the rivers to get their winter salmon and steelhead. In his report dated November 31, 1856, Paige again reported to Stevens on the impact of this prohibition on the ability of the Indians to secure provisions.

> *The Suquamish Indians during the month have been engaged mostly in repairing and building houses for the winter and collecting food in the different bays & inlets on the west side of the Sound; but for the same reasons mentioned in my last monthly*

*report they have not succeeded in getting an extensive supply, though they have all the range they desire except the rivers.*

The following month Paige again reported to Stevens on the impossibility of the Suquamish Indians finding enough food while they were prevented from leaving the west side of the Sound. Under date of December 31, 1856 he wrote

*I send you by the express my monthly report for December 1856. About the 10th of the month the Suquamish Indians commenced moving in to the Reservation from their fishing grounds in considerable numbers. They continued to move in till the 20th since which time with the exception of a few families at Port Orchard, I have had the whole of the Tribe on my hands. They reported that they could find no more food, and had to come in to keep from starving. On proceeding to examine their stock of provisions, I found it very scant, so much so that if the whole amount collected was divided equally amongst them, they could not subsist on it above 3 or 4 weeks.*

It is my opinion that the foregoing reports written by Paige in the fall and winter months of 1856 **document the fact that the Suquamish were accustomed to harvest their fall and winter salmon supplies at the rivers on the east side of Puget Sound.** Modern Suquamish, as well as neighboring Indians, have attested that **the Suquamish traditionally fished at the mouths of the Duwamish and Snohomish rivers as well as in the adjacent marine areas.**

In spring and summer the Suquamish undoubtedly made use of wider marine areas. An 1827 report mentions the presence of Suquamish visitors as far north as Fort langley on the Fraser River.

. . . .

In my opinion, the evidence that the Suquamish travelled [sic] to the Fraser river in pre-treaty times documents their capability to travel widely over the marine waters in what are now known as the Strait of Juan de Fuca and Haro and Rosario Straits. According to oral tradition, the Suquamish regularly travelled through the San Juan Islands and to the Fraser river. It does not appear feasible, on the basis of written records, to document the frequency of such trips. The Fort Langley journal documents that the Suquamish did travel to the Fraser river. It is my opinion that the Suquamish undoubtedly would have fished the marine waters along the way as they travelled. It is likely that one of the reasons for travel was to harvest fish. **The Suquamish travelled to Whidbey Island to fish** and undoubtedly used other marine areas as well.

Dr. Barbara Lane, "Identity, Treaty Status and fisheries of the Suquamish Tribe of the Port Madison Indian Reservation," Exhibit USA–73, pp. 1–2, 4–5, 11–16 (emphasis added).

These passages from Dr. Lane's report demonstrate that there was competent and reliable evidence before Judge Boldt in 1975 that (1) the Suquamish fished in Admiralty Inlet and traveled as far as the western shores of Whidbey Island to do so (referencing the de Harley 1849 report); and (2) the mouth of the Snohomish River was an important fall and winter fishery for them. Indeed, Dr. Lane emphasized the importance of this fall/winter fishery with the quotes from Agent George Paige's letters to Governor Stevens, and the poignant reference to possible starvation resulting from their exclusion from this traditional fishery in 1856 by hostilities. She

also testified at the trial before Judge Boldt, on April 9, 1975, confirming that the Suquamish "did in fact go to the larger rivers on the mainland in order to harvest salmon because they had no rivers in their own country." Transcript of Proceedings, April 9, 1975, p. 49; found at C70–9213, Dkt. # 7268.

As already noted, Judge Boldt paid close attention to, and relied heavily on, Dr. Lane's report when he described tribal U & A's. He would have fully credited Dr. Lane's statement that the Suquamish traveled "to Whidbey Island to fish." Thus it is very likely that he intended to include waters west of Whidbey Island as far as the island shoreline, including the bays on the west side, in the Suquamish U & A. It is also highly likely, indeed a near certainty in light of Dr. Lane's emphasis on the importance of the winter fishery, that he intended to include the area at the mouth of the Snohomish River, specifically including Port Gardner Bay where the river meets the saltwater. Further, he would have understood that the Suquamish could only have reached their fishing grounds at the mouth of the Snohomish River by traveling through Possession Sound, and they would have fished there as an "adjacent marine area" as reported by Dr. Lane. Thus, it is highly likely that Judge Boldt intended to include Possession Sound in the Suquamish U & A, along with the bays on the west side of Whidbey island. The Tulalip's motion for summary judgment and declaratory judgment (Dkt. # 199) shall accordingly be granted in part and denied in part.

## CONCLUSION

The Court has considered the arguments of the parties and has reviewed the relevant evidence that was before Judge Boldt in the 1975 proceedings involving the Suquamish U & A. The Court has also considered and incorporated its own Orders, together with previous Orders by the district court and by the Ninth Circuit Court of Appeals. Upon review of the documents filed in the 1985 proceedings involving the Suquamish request to expand fishing into freshwater areas to the east of Puget Sound, the Court has rejected the Tulalip "eastern Puget Sound" arguments as based on an improper reading of the Ninth Circuit's language in *United States v. Suquamish Indian Tribe*, 901 F.2d at 778. Instead, the Court finds that Dr. Lane's report provided ample evidence from which Judge Boldt could have found that the Suquamish U & A included the mouths of certain rivers on the east side of Puget Sound. Indeed, given the emphasis she placed on the importance of the fall and winter fishery at the mouth of the Snohomish River, it is nearly certain that Judge Boldt intended to include Possession Sound and the waters at the mouth of the Snohomish River in the Suquamish U & A. On the other hand, there is an absence of evidence in her report regarding Suquamish fishing in the waters on the eastern side of Whidbey Island such as Skagit Bay, Saratoga Passage and its connecting bays Penn Cove and Holmes Harbor, and Port Susan. Therefore the Court finds that Judge Boldt did not intend to include these areas in the Suquamish U & A.

Accordingly, it is hereby Ordered:

(1) The Suquamish motion for summary judgment of dismissal of the Tulalip Request for Determination on grounds of judicial estoppel, res judicata and/or laches (Dkt. # 195) is DENIED;

(2) The Suquamish Counter–Request for Determination is DISMISSED for failure to properly invoke this Court's jurisdiction under Paragraph 25 of the Permanent Injunction;

(3) The Swinomish motion for partial summary judgment (Dkt. #193) is GRANTED, and the Court finds that Saratoga Passage, Penn Cove, and Holmes Harbor (also described as Shellfish Management Catch and Reporting Areas 24C and 24D) are not included within the U & A of the Suquamish as described by Judge Boldt in April, 1975; and

(4) the Tulalip motion for summary judgment and declaratory judgment (Dkt. #199) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Skagit Bay, Saratoga passage and its bays Penn Cove and Holmes Harbor, and as to Port Susan. The Court has found upon review of the evidence that was before Judge Boldt that there was none presented that would have led him to include these waters within the Suquamish U & A. The motion is DENIED as to Possession Sound,[8] Port Gardner Bay, and the bays on the west side of Whidbey Island, specifically Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay. The Court has found that there was reliable evidence before Judge Boldt from which he could find, and most likely did find, that the Suquamish fished these areas in treaty times. His description of the Suquamish U & A therefore included these areas.

The trial date in this matter was suspended pending the resolution of these issues in summary judgment proceedings. Dkt. #185. As no issues remain to be determined, the Court directs the Clerk to enter judgment as set forth above, and close this Subproceeding.

## ORDER ON MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR CERTIFICATION

Subproceeding 09–1

(September 3, 2013)

This matter is before the Court for consideration of a motion for reconsideration filed by the Quinault Indian Nation and the Quileute Tribe. Dkt. #172. The Hoh Tribe has joined in the motion. Dkt. #173. These parties ask for reconsideration of this Court's July 8, 2013, Order on Motion for Partial Summary Judgment or, in the alternative, for certification for immediate appeal.

Motions for reconsideration are disfavored, and will be denied in the absence of a showing of manifest error in the prior ruling, or a showing of new facts or legal authority which could not have been brought to the Court's attention earlier. Local Rule LCR 7(h)(1). The parties have brought this motion under the "manifest error" prong. The Makah Indian Tribe has opposed the motion as to certification for appeal, but has not filed opposition to

---

8. The Court is mindful that the geographic terms describing bodies of water are indefinite, in that they do not establish a precise dividing line between Possession Sound, which lies within the Suquamish U & A, and Port Susan and Saratoga Passage, which lie outside it. The Court also notes that salmon catch reporting area boundaries do not coincide with the boundaries of these geographic areas. However, the Marine–Fish Shellfish Management and Catch Reporting Areas come very close, in that all of the eastern fork of 26A lies within Possession Sound, and therefore is included in the Suquamish U & A. However, in order to include the multiple channels that comprise the mouth of the Snohomish River, a portion of 24B should be included in the Suquamish U & A as well. The actual dividing line would be north of the line that now separates 26A and 24B (Camano Head to Gedney Island to the City of Everett, see WAC 220–22–400(12)). Instead, from Gedney Island the line should extend eastward or southeastward to a point somewhat north of the estuary at the mouth of the Snohomish River. In the event the parties cannot agree on this line, the Court will entertain a brief motion and shall refer the matter for settlement.

the motion for reconsideration because it has not been directed to do so. Local Rule LCR 7(h)(3). The Court deems it unnecessary to request such response and shall, for the reasons set forth below, deny the motion as to both reconsideration and certification for appeal.

## DISCUSSION

This subproceeding was initiated by the filing of a Request for Determination by the Makah Indian Tribe, asking for a determination of the Usual and Accustomed Fishing Grounds ("U & A") in the Pacific Ocean of the Quinault Indian Nation ("Quinault") and the Quileute Indian Tribe ("Quileute"). Dkt. # 1. A motion to dismiss filed by the responding Tribes was denied. Dkt. # 86. The Makah subsequently requested partial summary judgment on two issues: the scope of this subproceeding, and their standing to request an adjudication of the other Tribes' usual and accustomed fishing areas ("U & A's"). Dkt. # 125. The motion was opposed by the Quinault and the Quileute, as well as the Hoh Indian Tribe as an Interested Party. The Court heard oral argument on May 22, 2013 and issued a decision seven weeks later, substantially granting the Makah motion. Dkt. # 171. Specifically, the Court ruled that (a) prior decisions established that the Makah have standing to bring this Request for Determination, that the Court has subject matter jurisdiction over the request, and that the Quileute and Quinault have waived sovereign immunity for such a determination: and (b) that the scope of the subproceeding includes both Paragraph 25(a)(1) and (a)(6) proceedings.

## I. Motion for Reconsideration

The parties assert in their motion for reconsideration that the Court's Order "wrongfully denies Quinault and Quileute sovereign immunity and turns Paragraph 25(a)(6) on its head." Motion for Reconsideration, Dkt. # 172, p. 9. Their arguments on these assertions fail to demonstrate manifest error in the ruling and the Court declines to reconsider.

With respect to the sovereign immunity issue, the two Tribes have in the motion simply reiterated their positions taken and argued in the briefing and oral argument on the Makah motion: that in *U.S. v. Washington* they waived sovereign immunity only for the purpose of determining their treaty rights within the waters under the jurisdiction of the State of Washington. They assert that the waiver does not extend to fishing in the ocean in waters outside of state jurisdiction.[1] The Court rejected that argument, noting that prior rulings "clearly establish that the Court's subject matter jurisdiction extends to all treaty-based fishing, whether within or outside the boundaries of the State of Washington." Order, Dkt. # 171, p. 8. The Court also noted that "[l]ong-established rulings in this case mandate that any Tribe wishing to exercise a treaty right to take fish must do so within the confines of this case.... The Tribes came to Court in 1970

---

1. The Court earlier denied motions by the Quileute and Quinault to dismiss this subproceeding on grounds of sovereign immunity. The Court on September 28, 2011, held that sovereign immunity does not bar this Request for Determination by the Makah: "The Quinault and Quileute benefitted from the Court's ruling on the tribes' waiver of sovereign immunity in their dispute with the Makah in 19831985. They joined the other tribes in arguing against the Sunset Order on the basis that continuation of this case is necessary because of the waivers of sovereign immunity that are in place. They will not now be heard to assert that their sovereign immunity bars consideration of the Makah Request." Order on Motion to Dismiss, Dkt. # 86, p. 4. As to the issue of sovereign immunity, this motion for reconsideration is untimely, and it could be denied on that basis alone.

asking the Court to determine and enforce their treaty rights, and they subjected themselves to the Court's jurisdiction for all purposes relating to the exercise of their treaty rights." *Id.*, p. 9. In so doing, they waived sovereign immunity with respect to determinations of the scope of their treaty rights.

The motion for reconsideration on the issue of sovereign immunity is both untimely and lacking in merit. It shall be denied.

As to the Paragraph 25(a)(6) issue, the tribes assert that the Court has "turned paragraph 25(a)(6) on its head" because they believe the Court has required them to point to evidence in the record that was before Judge Boldt that their treaty-time fishery extended beyond the three-mile limit of State of Washington waters. This imposes an impossible burden upon them, they assert, because evidence of fishing beyond state waters was irrelevant in the proceedings before Judge Boldt, so they did not need to present it at that time. They read the Court's Order of July 8, 2013 as requiring them to be "clairvoyant," by anticipating in 1974 that such evidence would later be needed. Motion for Reconsideration, Dkt. # 172, p. 7. However, the Court notes that the parties' memoranda did cite to evidence in the record before Judge Boldt that could be deemed a sufficient showing of ocean fishing beyond the three-mile limit. Indeed, the Makah Request for Determination implicitly acknowledges this, by seeking to limit the other tribes' ocean fishing to "5 to 10 miles offshore," rather than within the three-mile limit. Dkt. # 1, p. 10.

The Court noted in the prior Order that it could not at that time find that the two Tribes' U & A's were not "specifically determined" by Judge Boldt, because that question was not before it. Order on Motion for Partial Summary Judgment, Dkt. # 171, p. 6. While the Court's Order anticipated a two-step proceeding, first under Paragraph 25(a)(1) and then under Paragraph 25(a)(6), the parties could expedite final resolution of this matter by simply stipulating in their Joint Status Report (which they were directed to file in the July 8 Order) that Judge Boldt did not "specifically determine" the western and northern extent of the Tribes' U & A, and the subproceeding will go forward under Paragraph 25(a)(6).[2] This will require a period of discovery, as a Paragraph 25(a)(6) proceeding is not limited to the evidence that was before Judge Boldt. A proposed plan for discovery should be included in the parties' JSR.

With that clarification, the motion for reconsideration shall be denied as to the Paragraph 25(a)(6) issue.

## II. Motion for Certification

The Quileute and Quinault ask, in the event the Court denies the motion for reconsideration, that the issue of their sovereign immunity be certified for immediate appeal, pursuant to 28 U.S.C. § 1292(b). This section states, in relevant part,

---

**2.** The Makah invoked both Paragraph (a)(1) and Paragraph (a)(6) in their Request for Determination. Pursuant to Paragraph 25 of the Permanent Injunction,

> (a) The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:
> (1) Whether or not the actions intended or effected by any party (including the party

> seeking a determination) are in conformity with Final Decision # 1 or this injunction; [and]
> . . . .
> (6) The location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # 1[.]
> *U.S. v. Washington*, 384 F.Supp. 312, 419 (W.D.Wash.1974).

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for a difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

28 U.S.C. § 1292(b).

Under this statute, for a district court decision to warrant immediate interlocutory review, that decision must "involve[ ] a controlling question of law as to which there is substantial ground for difference of opinion." Further, "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). Courts have parsed section 1292(b) into a three-part test, *see, e.g. Loritz v. CMT Blues*, 271 F.Supp.2d 1252, 1253–54 (S.D.Cal. 2003). The Court should consider (1) whether a decision involves a controlling issue of law; (2) whether there exists a substantial ground for difference of opinion; and (3) whether immediate appeal may speed ultimate resolution of the case. *Id.* Courts have cautioned that interlocutory appeals are not appropriate "merely to provide review of difficult rulings in hard cases." *United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir.1966). Instead, interlocutory appeals under section 1292(b) are to be permitted "sparingly," i.e., only in "exceptional" and "extraordinary" circumstances. *See James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 n. 6 (9th Cir.2002) (noting that such

certification is appropriate only "in rare circumstances"); *United States Rubber Co.*, 359 F.2d at 785. One district court has noted that section 1292(b) demands nothing less than "exceptional circumstances [to] justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after entry of a final judgment"). *Rottmund v. Continental Assurance Co.*, 813 F.Supp. 1104, 1113 (E.D.Pa.1992).

 Decisions regarding whether or not to certify an order for appeal rest within the sound discretion of the district court. *Loritz*, 271 F.Supp.2d at 1253–54. The court of appeals retains the authority to reject a interlocutory appeal certified by the district court, and it "does so quite frequently." *See James*, 283 F.3d at 1068 n. 6. By contrast, a district court's denial of a motion to certify a decision for immediate appeal under section 1292(b) is not reviewable by the appellate court. *Executive Software N. America, Inc. v. United States*, 24 F.3d 1545, 1550 (9th Cir.1994).

The Court notes as an initial matter that the certification motion is untimely, as the Court first found that the two movant tribes had waived sovereign immunity in the September 28, 2011 Order on Motion to Dismiss, as discussed above. Further, in neither that Order (Docket No. 86) nor the Order on Motion for Partial Summary Judgment (Docket No. 171) did the Court make the required findings in writing within the order as stated in section 1292(b).

 Applying the three-factor test here in spite of these deficiencies, the Court agrees with the moving parties that the issue of their sovereign immunity is a controlling one. However, their motion fails at the next step, as the Court cannot find that there is substantial ground for a difference of opinion on this issue. The

Court stated in the September 28, 2011 Order and again in the July 8, 2013 Order that a Tribe seeking to exercise treaty fishing rights may do so only within the confines of this case. The Tribes came to Court in 1970 asking for determination and enforcement of their treaty fishing rights, and subjected themselves to this Court's jurisdiction for that purpose, thereby waiving their sovereign immunity. The Quinault, Quileute, and Hoh invoked this very principle to their own benefit in proceedings between them and the Makah Tribe in 1983. The three Tribes filed a Motion for Declaratory Judgment and Permanent Injunction regarding the Makah ocean fishery for coho salmon. *U.S. v. Washington*, 626 F.Supp. 1405, 1470 (W.D.Wash.1985). In denying a Makah motion to dismiss for lack of jurisdiction, the Court held that

[t]he Makah Indian Tribe is a party to this case and has used the equitable powers of this Court to protect its treaty rights. This case is about enforcement of each of the tribes' treaty fishing rights adjudicated in this case and the Court has jurisdiction over the subject matter of the dispute, the fish.

This is not the first proceeding in which this Court has been asked to determine the rights of one tribe as against another.

. . .

Sovereign immunity is not a bar to the relief requested by the Quinault, Hoh, and Quileute Tribes. The Makah Tribe waived its immunity and consented to a full adjudication of its treaty fishing rights when it intervened in this case seeking a determination of those rights, and asking that the Court exercise its equitable powers to protect those rights. The court therefore has jurisdiction over the Makah to determine whether they threaten to infringe the adjudicated treaty rights of other tribes as alleged,

and to grant equitable relief if it is appropriate.

*U.S. v. Washington*, 626 F.Supp. at 1470–71 (citations omitted). What the Court stated thirty years ago holds true today, so it cannot be said there is a substantial ground for difference of opinion. The motion for certification for immediate appeal shall accordingly be denied.

## CONCLUSION

The motion for reconsideration and alternative motion for certification for immediate appeal (Dkt. #172) are both DENIED. The parties shall confer and submit a Joint Status Report (JSR) for further proceedings in this case by October 1, 2013.

## ORDER ON MOTION TO STRIKE

### Subproceeding No. 05–4

### (September 13, 2013)

This matter is before the Court for consideration of a post-judgment motion to strike filed by the Suquamish Tribe. (Dkt. #244). The Suquamish ask that the Court strike and "remove from the record" an August 4, 2011 Declaration of Barbara Lane, which was filed by the Tulalip Tribes ("Tulalip") at Docket No. 200, Exhibit C. They express the concern that the Tulalip will attempt to use this declaration in support of their pending appeal of this matter. The Tulalip have opposed the motion on the basis that it is untimely, because it was filed after judgment was entered, and the Court lacks jurisdiction to consider it. The Court will deny the motion to strike on that basis, as it does not have jurisdiction to alter the record at this time.

The Court notes, however, that this ruling is not prejudicial to the Suquamish, as the 2011 Lane declaration was not considered by this Court for any purpose, and

thus is not part of the record on appeal. Indeed, the Court granted a Tulalip motion to quash a deposition subpoena sent to Dr. Lane on the basis that she "may not offer latter-testimony regarding the evidence that was before Judge Boldt when he rendered his decision in 1974." Order on Motion to quash, Dkt. # 216, p. 2 (quoting *U.S. v. Washington*, 2006 WL 2882968 *1 (W.D.Wash.2006)). Thus, in ruling on the parties' motions for summary judgment, the Court considered only Dr. Lane's 1974 anthropological report, which was before Judge Boldt as Exhibit USA–73. The Court did not and could not consider her 2011 declaration, pursuant to the long-established rule that Dr. Lane's latter-day testimony may not be considered as evidence of Judge Boldt's intended meaning. *See, Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1360 (9th Cir.1998). The 2011 declaration attempts to explain and even modify her statements regarding the Suquamish fall and winter fishery at the mouths of rivers on the east side of Puget Sound in the 1974 report, and it is clearly inadmissible for that purpose. It is therefore unnecessary for the Court to strike the declaration.

The Motion to Strike Barbara Lane Declaration and Remove it from the Court Record is DENIED.

CONSENT DECREE AND SETTLE-MENT AGREEMENT—SQUAXIN ISLAND TRIBE AND GOLD COAST OYSTER LLC

Subproceeding 89–3–10

(November 15, 2013)

The Squaxin Island Tribe and Gold Coast Oyster LLC, by and through their undersigned counsel of record, hereby submit this Consent Decree and Settlement Agreement ("Agreement") to this Court for its approval.

1. This Agreement shall be between the Squaxin Island Tribe ("Tribe") and Gold Coast Oyster LLC, including any person acting on behalf of the Tribe or Gold Coast, and Gold Coast's, members, owners, successor entities, agents, employees, assigns, and contractors ("Gold Coast"). The Agreement uses the term "Party" when referring to either the Tribe or Gold Coast, and "Parties" when referring to the Tribe and Gold Coast collectively.

2. This Agreement shall only apply to all tidelands in southern Puget Sound that are below the Tacoma Narrows, including Carr and Case Inlets. This area is depicted on the map attached as Exhibit A. For purposes of the Agreement, these tidelands are referred to as "Agreement Tidelands."

3. Nothing in this Agreement modifies or affects, or intends to modify or affect, the rights of any other Indian tribe or the relationship between Gold Coast and any other tribe, including the Puyallup and Nisqually Indian tribes that each have in-common shellfishing rights in portions of the Agreement Tidelands.

4. Gold Coast has entered into harvest plans for the Anderson and Gyswyt tidelands, which is attached hereto as Exhibit B.

5. No later than 15 days after signing this Agreement, Gold Coast shall submit to the Tribe: (1) a list of all tidelands (except the Anderson, Gyswyt tidelands) within the Agreement Tidelands that are currently under Gold Coast's control through contract or otherwise for purposes of conducting commercial shellfishing activities; (2)

for each tideland including the Campbell tideland, all information required under Section 6.3 of the Shellfish Implementation Plan, as well as all other records (including daily harvest reports, weigh out records, fish receiving tickets and invoices) showing any harvests of shellfish by Gold Coast on such tidelands.

6. Within 30 days after signing this Agreement, Gold Coast shall enter into a harvest plan for the Campbell tidelands.

7. Gold Coast shall comply with all requirements of the Shellfish Implementation Plan, including but not limited to the following: Whenever Gold Coast plans to enhance an existing natural bed or create a new artificial bed on Agreement Tidelands, Gold Coast shall submit to the Tribe all information required under Section 6.3 of the Shellfish Implementation Plan at least sixty (60) days before the proposed enhancement or creation of the bed occurs; and shall accommodate and not interfere with the Tribe's opportunity to inspect those tidelands so long as the Tribe provides fourteen (14) days' advanced notice to Gold Coast.

8. In order to further ensure advance notice to the Tribe of Gold Coast's commercial shellfishing activities and the Tribe's access to production information on Agreement Tidelands, Gold Coast shall timely apply for Aquatic Farm Registrations, and timely submit fish receiving tickets for sales of wild stock, as required by the Washington Department of Fish and Wildlife ("WDFW"), in addition to abiding by other requirements of State law. Gold Coast shall submit to the Tribe the application described herein within two (2) business days of submitting them to WDFW.

9. Gold Coast shall not commercially harvest shellfish on any Agreement Tide-lands, including but not limited to the Fredson tidelands at Mason County tax parcel no. 31902–43–00030, and any other tidelands that are currently under Gold Coast's control, and whether before or after a Tribal survey, until such time as one of the following occurs:

a. Gold Coast and the Tribe have entered a harvest plan that provides for the implementation of the Tribe's treaty right to take up to 50% of the naturally-occurring shellfish on the tidelands; or

b. The Tribe has agreed in writing or the United States District Court has determined that Agreement Tidelands proposed and used for cultivation do not contain a natural shellfish bed; or

c. The Tribe has indicated in writing that it does not intend to exercise its treaty right to take shellfish on the tidelands.

10. If a dispute arises under this Agreement, the Party will notify the other Party of the dispute in writing. Unless the Parties agree otherwise, they will meet within five (5) days and seek to resolve the dispute. If the Parties are unable to resolve the dispute, one or both Parties may request the assistance of this Court in resolving the dispute.

11. This Agreement shall continue to apply to all Agreement Tidelands under the control of Gold Coast (through ownership, lease or otherwise) until the occurrence of one of the three things stated in Paragraph 8, and shall apply if the resolution of the Tribe's rights under that Paragraph has expired.

12. The Court retains jurisdiction for the purpose of enforcing this Agreement.

The Parties shall comply with the procedures set forth in Paragraph 9 before invoking the Court's jurisdiction to enforce the Agreement.

13. This Agreement resolves Subproceeding No. 89–3–10. The Parties shall bear their own attorney fees and costs. Upon the Court's approval of this Agreement, the Parties stipulate to the dismissal of the dispute without prejudice. Nothing in this Agreement shall prevent either Party from invoking the Court's jurisdiction to resolve any other existing or future dispute between the Parties.

14. This Agreement shall not be cited as precedent in any other proceeding.

### Gyswyt & Anderson Tidelands Harvest Plan

Parcels # 32024–54–02022 (161 SE Skookum View Dr.) & 32024–51–00024

(171 SE Skookum View Dr.)

PARTIES: The parties to this Harvest Plan are Gold Coast Oysters, LLC ("Gold Coast"), a company organized under Washington law; Rita Gyswyt, a landowner; Anderson Family Trust, a landowner; and the Squaxin Island Tribe ("Tribe"), a federally recognized Indian tribe (collectively, "Parties").

PURPOSES: The purposes of this Harvest Plan are to effect a compromise on the identification and sharing of natural production of Manila clams on tidelands leased by a private land holder to commercial operator Gold Coast; to preserve the Squaxin Island Tribe's ("Tribe" or "Tribal") right to the Treaty share of the naturally occurring Manila clams found on these tidelands; and to carry out the Shellfish Implementation Plan [1], and other federal court orders in the shellfishing case of *United States v. Washington*, Subproc. 9213.

RECITALS: Rita Gyswyt owns Parcel No. 32024–54–02022, and the Anderson Family Trust owns Parcel No. 32024–51–00024. Gold Coast has entered into leases of these properties in order to commercially harvest shellfish. The Tribe has a right under the Treaty of Medicine Creek to take, from natural beds that include these tidelands, up to 50% of the sustainable harvest biomass on these properties.

TERM: The term of this Harvest Plan is from the latest date of signature by the parties until 30 days after the Tribe receives written notice that Gold Coast no longer has any legal interest in either or both properties. Also, a party may withdraw from this Harvest Plan if it first provides the other parties with 30 days advance notice before withdrawing, and makes good on any outstanding obligations. A new or amended harvest plan for this parcel shall be executed if commercial activities are intended to continue on either property after Gold Coast's lease(s) ends.

### Equalizing Tribal Initial Harvest Share: 630 lbs. (Gyswyt) + 1,524 lbs. (Anderson) = 2,154lbs.

INITIAL HARVEST: Due to the fact that the tidelands were harvested before an initial population estimate could be made, the initial standing stock is estimated to be equal to Gold Coast's harvest from 2011. The treaty share of the existing bed is 50% of the initial standing stock of Manila clams with a shell length of 1 ½ inches and greater. Since more than 50% of the standing stock has already been harvested, the parties agree to a harvest strategy of "matching catch" to equalize the sharing of the resource, Accordingly, in order for the Tribe to catch up to Gold Coast's 2011 harvest, Gold Coast shall not harvest any more Manila clams from both parcels until the Tribe has harvested 2,154 pounds of Manila Clams or unless otherwise agreed to in writing by the Tribe and Gold Coast. The Tribe will notify Gold Coast at least 5 days prior to the harvest so that Gold Coast has the opportunity to observe the harvest. Additionally the Tribe will only utilize up to 15 harvesters and will report the final poundage to Gold Coast within 14 days of completing its harvest.

SUBSEQUENT HARVESTS: Subsequent harvests of the tidelands will be of the naturally occurring populations of Ma-

---

1. Stipulation and Order Amending the Shellfish Implementation Plan (April 8, 2002), *United States v. Washington*, No, C70–9213, subproceeding No. 89–3. Available at: http://www.squaxinisland.org/legal/shellfish.html.

nila clams. The Tribe and Gold Coast will coordinate a site visit on these tidelands at least every three calendar years, which will determine if the Tribe desires to conduct a survey to estimate the total harvestable biomass, or desires to proceed with a harvest without a survey, and/or desires to adjust the site visit/harvest cycle schedule. Following the Tribe's stated desire, in writing, both the Tribe and Gold Coast shall then proceed to harvest 50% of the harvestable biomass but shall, before harvesting, coordinate their respective harvests.

INSPECTION PRIOR TO BOTH INITIAL AND SUBSEQUENT HARVESTS: In order to be able to convey the most accurate information about an upcoming harvest to its harvesters, the Tribe upon advance notice to Gold Coast shall be allowed to inspect the tidelands shortly before any scheduled Tribal harvest for purposes that include estimating available biomass, determining and marking boundaries, and inspecting the general condition of the tidelands.

CATCH REPORTING: Gold Coast and the Tribe shall report all harvests in good faith to coordinate the equal sharing of the naturally occurring clam resource on the tidelands. Reporting will occur within two weeks of the actual harvest. Harvest reports shall include the date and pounds harvested for each day of harvesting and must be in writing.

DISCLAIMERS: This Harvest Plan is not intended to be and shall not be used as evidence of the parties respective positions or interpretations of their respective rights. Each party retains all rights to their respective interpretation of the nature and scope of Treaty shellfishing rights. This Harvest Plan is a product of a compromise for the mutual benefit of the parties.

JURISDICTION: This Harvest Plan is enforceable in the following jurisdictions in priority order: in federal district court under Section 9 of the Shellfish Implementation Plan; and if that court determines that it lacks jurisdiction, then in state court.

## ORDER APPROVING CONSENT DECREE AND SETTLEMENT AGREEMENT—SQUAXIN ISLAND TRIBE AND GOLD COAST OYSTER LLC

Subproceeding 89–3–10

(November 18, 2013)

KAREN L. STROMBOM, United States Magistrate Judge.

IT IS HEREBY ORDERED:

The Court, having considered the Joint Motion for Order Approving Consent Decree and Settlement Agreement, which addresses disputes arising between the Squaxin Island Tribe and Gold Coast Oyster LLC, finds that the Consent Decree and Settlement Agreement is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. The Consent Decree and Settlement Agreement is hereby entered and approved. This action is hereby dismissed pursuant to the terms set forth in the Consent Decree and Settlement Agreement. This Agreement shall not be cited as precedent in any other proceeding.

## ORDER DISMISSING GROWER'S PETITION FOR REVIEW AND GRANTING TREATY TRIBES' MOTION TO STRIKE REPLY BRIEF

Subproceeding No. 89–3–06 (Shellfish)

(November 21, 2013)

RICARDO S. MARTINEZ, District Judge.

This matter comes before the Court upon Petition for Review by Defendant

Puget Sound Shellfish Growers Legal Defense Fund, on behalf of its member shellfish growers (collectively "Growers") (Dkt. #187), and upon Plaintiff Treaty Tribes' Motion to Strike reply brief by Defendants (Dkt. #197). The Growers bring their Petition for Review pursuant to Federal Rule of Civil Procedure 72 and Revised Shellfish Implementation Plan ("SIP") Section 9.1.4, seeking to appeal Magistrate Judge Strombom's September 19, 2013 decision granting the Plaintiff Treaty Tribes' Motion to Exclude Evidence. As the Court lacks jurisdiction to entertain an interlocutory appeal of a non-dispositive matter under both the SIP and Fed. R.Civ.P. 72(b), the Petition for Review is DENIED. The Treaty Tribes' Motion to Strike is GRANTED as Defendants' reply brief is explicitly disallowed under Local Civil Rule 72(b).

## BACKGROUND

This matter arises out of a Settlement Agreement ("Agreement"), entered into on June 20, 2007, between the State, Treaty Tribes, United States, and eight Growers to resolve "any and all disputes between and among them regarding implementation of the Tribes' treaty right to take shellfish from lands owned or leased by the Growers." *Agreement*, Subproceeding No. 89–3, Dkt. #14476, pp. 11–12. The Agreement provides a mechanism for Growers beyond the initial eight signatories to intervene and become part of the class covered by the Agreement. By the terms of the Agreement, putative intervenors must establish that they owned, leased, or had a right to commercial harvests of shellfish from Washington State tidelands prior to August 28, 1995, or that they acquired the right to harvest from a person whose tidelands were so covered. *Id.*, ¶2(B). The Agreement provided a March 1, 2008 deadline by which Growers must "intervene and file with the Court

and serve on the Plaintiff Tribes . . . copies of document that establish their compliance" with the Agreement terms. *Id.*, ¶¶ 2(B)(i)-(ii), 2(C). After the Treaty Tribes objected to evidence initially submitted by the March 1st deadline, Growers provided additional documentary evidence in late 2008, 2009, and 2012. These submissions proved controversial, as the parties were in dispute as to whether the March 1, 2008 deadline bars the Court from considering any evidence submitted after its passage or whether it allows the Court to consider additional evidence offered in response to Plaintiff Tribes' objections.

As Treaty Tribes' objections to coverage of certain parcels remained despite negotiations, the parties invoked the continuing jurisdiction of this Court under Section 11 of the Agreement to resolve disputes that arise under it. Section 11 provides that disputes including those regarding the "qualification of any person to become an intervenor-defendant pursuant to section 2 [and] whether a particular tideland is covered within the meaning of section 5 . . . shall be resolved as set forth in the Revised Shellfish Implementation Plan entered April 8, 2002." *Agreement*, § 11. The Court accordingly referred this subproceeding to Magistrate Judge Strombom for hearing and decision pursuant to the Revised Shellfish Implementation Plan. Dkt. #175.

During the course of proceedings regarding the underlying motions to intervene, Plaintiff Treaty Tribes filed a motion on January 16, 2013 seeking to exclude all documents filed after March 1, 2008 and all "non-documentary evidence, such as declarations." Dkt. #164. On September 10, 2013, Judge Strombom heard oral arguments and issued an oral decision on Plaintiff Treaty Tribes' Motion to Exclude Evidence, providing that documents sub-

mitted after the March 1, 2008 deadline shall not be considered by the Court in the dispute resolution process, with the exception of evidence submitted for the "purpose of explaining how the timely filed documents establish the claims of the proposed intervenors." *Minute Entry for Proceedings,* Dkt. # 181.

Defendants filed the instant Petition for Review (Dkt. # 187) on September 24, 2013, seeking to appeal Magistrate Judge Strombom's September 10, 2013 decision to strictly construe and enforce the March 1st deadline. Plaintiff Treaty Tribes' Motion to Deny Intervention (Dkt. # 57) and Defendant Growers' Motion for Joinder of Additional parties for Intervention (Dkt. # 124) remain pending further consideration by Magistrate Judge Strombom.

### ANALYSIS

#### Petition for Review

■ The Court finds that the interim order to exclude evidence by Magistrate Judge Strombom, an order on a nondispositive matter, is not subject to interlocutory appeal to the District Judge. The petition is premature under Section 9.1.4 of the SIP, which allows for appeal only of dispositive matters. The petition is also in conflict with the scheme provided for by the Magistrates Act and Federal Rule of Civil Procedure 72, which would be frustrated by interlocutory appeals creating micro-oversight of magistrate proceedings.

Section 9.1.4 of the Revised Shellfish Implementation Plan governs the resolution of disputes under the Agreement by decision of the Magistrate Judge. The Section provides exclusively for appeal of "written decision[s]" that "resolve the dispute" by way of Petition for Review to the District Judge within twenty days of the filing of the Magistrate Judge's decision. *SIP,* Subproceeding No. 89–3, Dkt.

# 14331, § 9.1.4. The Section explicitly indicates that such petitions for review "shall be considered pursuant to the procedures established in Federal Rule of Civil Procedure 72(b)," which applies exclusively to dispositive motions. By contrast, Section 9.1.4 contains no reference to Fed.R.Civ.P. 72(a), which applies to nondispositive matters such as Magistrate Judge Strombom's evidentiary order. Judge Strombom's oral decision was not in writing and did not dispose of the present dispute over the coverage of proposed defendant intervenors but merely resolved the scope of admissible evidence; the instant Petition for Review is thus premature under the SIP. Permitting interlocutory appeals of nondispositive matters would disrupt the efficient mechanism for dispute resolution contemplated by the SIP, allowing the District Judge to micro-manage Magistrate proceedings and impeding the timely resolution of disputes.

The Petition is also inconsistent with the scheme of review erected through the Magistrates Act, 28 U.S.C. § 636, and structured by Federal Rule of Civil Procedure 72. The Magistrates Act permits district judges to refer both "non-dispositive" pretrial matters and "dispositive matters" to a magistrate judge. 28 U.S.C. § 636(b)(1). The magistrate judge's rulings on the former are subject to a "clearly erroneous or contrary to law" standard of review. 28 U.S.C. § 636(b)(1)(A); Fed. R.Civ.P. 72(a). With regards to rulings on the latter, the magistrate judge makes proposed findings and recommendations to the district judge, which are subject to *de novo* determination by the district judge upon a party's objections. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b). Interlocutory appeal of an interim evidentiary ruling made in the course of proceedings on a dispositive matter would frustrate this clear dichotomy. *Magee v. Rowland,* 764 F.Supp. 1375, 1376 (C.D.Cal.1991). The

Act is structured so as to preclude micro-oversight by district judges of magistrate proceedings on referred dispositive matters, as it explicitly permits *de novo* review only upon entrance of the magistrate judge's disposition. *Id.* (concluding that "such micro-oversight of § 636(b)(1)(B) proceedings was not intended by Congress.").

The Court accordingly finds that it lacks jurisdiction to entertain Growers' premature Petition for Review as the Magistrate Judge has not yet entered a written disposition on the referred dispositive matter. Defendants may seek review of Judge Strombom's interim evidentiary determination only upon and through appeal of the Magistrate Judge's written ruling on the Grower's underlying motions to intervene.

**Motion to Strike**

In their surreply, Plaintiff Treaty Tribes move the Court to strike the reply brief filed by Defendants as improper under the Local Civil Rules. Having found that appeals under the SIP are subject to the procedural requirements of Fed.R.Civ.P. 72(b), concerning dispositive matters, the Court concludes that Growers' reply is improper and must be stricken. While Local Civil Rule 72(b) allows for a response brief to a party's objections to the magistrate judge's recommended disposition to be filed by the day before the noting date, it unequivocally provides that "no reply will be considered." Local Rules W.D. Wash. LCR 72(b). Accordingly, Defendant Growers' reply is not permitted under the Local Rules of this District and is stricken.

## CONCLUSION

For the reasons stated herein, the Court hereby ORDERS that Defendants' Petition for Review (Dkt. # 187) is DENIED without reaching the merits. Defendants' improperly filed reply brief (Dkt. # 194) is STRICKEN.

## ORDER DENYING MOTIONS FOR STAY PENDING APPEAL

Subproceeding No. 09–1

(December 5, 2013)

This matter comes before the Court upon Motions For Stay Pending Appeal by the Quinault Indian Nation and Quileute Tribe (Dkt. # 187) as well as by the Hoh Tribe (Dkt. # 188) under Federal Rule of Appellate Procedure 8(a)(1). All three tribes move the Court to stay its July 8, 2013 Order (Dkt. # 171) granting in part the Makah Tribe's motion for summary judgment pending appeal of the Court's ruling that (1) it has jurisdiction to conduct a Paragraph 25(a)(6) adjudication of usual and accustomed fishing grounds in oceanic waters beyond three miles from shore; (2) a judicial determination of fishing areas in ocean waters outside Washington's jurisdiction is legally required; and (3) that in order to proceed to an (a)(6) adjudication, the treaty tribes must have submitted evidence of their fishing in the subject area before Judge Boldt. Dkt. ## 187, p. 2; 188, p. 1. The Hoh Tribe also moves the Court for a stay pending appeal of its decision (Dkt. # 128) to deny the Hoh Tribe's motion to intervene as the Tribe is entitled to fully participate in this subproceeding as an interested party. *See* Dkt. # 188 at pp. 9–10. For the reasons set forth below, the motions for stay pending appeal are denied.

### I. Background

The Makah Tribe filed this Request for Determination ("RFD") on December 4, 2009, invoking the continuing jurisdiction of this Court under Paragraph 25(a)(1) and Paragraph 25(a)(6) of the Permanent Injunction, as modified by the Court's Order Modifying Paragraph 25 (C70–9213, Dkt. # 13599). Dkt. # 1. The Makah request

a determination of the western boundary of the Quinault Indian Nation and Quileute Tribe's usual and accustomed fishing grounds (U & A) in the Pacific Ocean, to the extent that their U & A's were not specifically determined in *U.S. v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974) ("Final Decision # 1"). At issue are the descriptions of the Quinault and Quileute U & A's by Judge Boldt in Final Decision # 1, both of which reference ocean areas "adjacent" to specified rivers, lakes, and tributaries. *See U.S. v. Washington*, 384 F.Supp. at 372, 419; Dkt. # 171, p. 2.

The Quinault and Quileute initially responded to the Request for Determination with a motion to dismiss on a number of grounds, including lack of subject matter jurisdiction and sovereign immunity. Dkt. ## 51, 53. In its Order denying the Tribes' motion, the Court cited to previous rulings as well as the Tribes' own objections to the Court's proposed entry of a "Sunset Order" closing the case in finding that the Tribes had waived their sovereign immunity. The Court stated,

> [t]he Quinault and Quileute benefited from the Court's ruling on the tribes' waiver of sovereign immunity in their dispute with the Makah in 1983–0–1985. They joined the other tribes in arguing against the Sunset Order on the basis that continuation of this case is necessary because of the waivers of sovereign immunity that are in place. They will not now be heard to assert that their sovereign immunity bars consideration of the Makah request.

Dkt. # 86, p. 4. The Court further found that the Makah had standing to request definition of the Quinault and Quileute U & A's under both Paragraphs 25(a)(1) and 25(a)(6) as invoked in the RFD. *Id.*

With regards to jurisdiction, the Court found that it had been properly invoked under Paragraph 25(a)(6) "because the

western boundary of the Quinault and Quileute U & A's were not 'specifically determined' in Final Decision I." *Id.* at p. 5. The Court subsequently modified this language upon motion for reconsideration by several other Tribes to read, "This Court's jurisdiction has been properly invoked by the Makah under sections (1) and (6) of Paragraph 25 of the Permanent Injunction." Dkt. # 104, p. 2. The Court then stated that "it views this subproceeding as addressing the meaning of the term 'adjacent' as used by Judge Boldt in describing the Quinault and Quileute U & A's. Therefore, it shall proceed under Paragraph 25(a)(1), and evidence shall be limited to the record that was before Judge Boldt." *Id.*

The Hoh Tribe subsequently moved for leave to intervene, asserting that "it is likely that any determination of Quileute ocean [sic] usual and accustomed fishing grounds will also affect and define Hoh ocean [sic] usual and accustomed fishing grounds." Dkt. # 115, p. 2. In denying the motion to intervene, the Court explained that "the Hoh are entitled to participate fully in this subproceeding without formally intervening as a responding party." Dkt. # 128, p. 2. The Hoh Tribe has since filed several responses (*See* Dkt. ## 137, 152), joined with the Quinault and Quileute in their Motion for Reconsideration (Dkt. # 173), and filed the instant Motion for Stay (Dkt. # 188).

The instant motions concern the Court's Order of July 8, 2013 (Dkt. # 171), substantially granting the Makah Tribe's motion for partial summary judgment. The Makah Tribe moved the Court for a ruling that (1) it has standing to seek adjudication of the Quileute and Quinault's Pacific Ocean U & A's and (2) that in Final Decision # 1, the Court did not specifically determine the U & A's in question. In its Order, the Court clarified first that the

Makah "may be allowed to proceed under Paragraph 25(a)(6)" as opposed to solely Paragraph 25(a)(1). Dkt. # 171, p. 6. The ·Court explained that its previous Order "should be read" to indicate that the "sub-proceeding shall proceed *initially* under Paragraph 25(a)(1)" and shift to Paragraph 25(a)(6) for further proceedings if the Court finds that the Quinault and Quileute U & A's were not specifically determined by Judge Boldt. *Id.* The Court clarified that if "there was evidence before Judge Boldt that the treaty-time Quinault and/or Quileute fishermen went more than three miles out to sea in their quest for fish, then the extent of their U & A's in the ocean would not have been specifically determined by him," in which case adjudication would proceed under Paragraph 25(a)(6). Dkt. # 171. The Court also found that it possesses subject matter jurisdiction as its previous rulings "clearly establish that the Court's subject matter jurisdiction extends to all treaty-based fishing, whether within or outside the boundaries of the State of Washington." The Court expressly declined to reconsider its prior rulings that the Tribes had waived their sovereign immunity and that the. Makah Tribe has standing to seek determination of the U & A's in question. *See* Dkt. # 86.

The Quinault Indian Nation and Quileute Tribe, joined by the Hoh Tribe, then moved the Court to reconsider its July 8, 2013 Order on Motion for Partial Summary Judgment, or, in the alternative to certify for immediate appeal. Dkt. ## 172, 173. The Court denied the motion as to both reconsideration and to certification for appeal. Dkt. # 179. As to the Tribes' assertion that the Court's Order "wrongfully denies" their sovereign immunity, the Court found that reconsideration on this issue is "both untimely and lacking in merit." Dkt. # 179, p. 3. As to the Tribes' contention that the Order

"turned paragraph 25(a)(6) on its head," the Court informed the Tribes that they "could expedite final resolution of this matter by simply stipulating in their Joint Status Report … that Judge Boldt did not 'specifically determine' the western and northern extent of the Tribes' U & A, and the subproceeding will go forward under paragraph 25(a)(6)," in which case the proceeding "is not limited to the evidence before Judge Boldt." Dkt. # 179, p. 4. Through their Joint Status Report filed on October 1, 2013, the Quinault, Quileute, Makah, and Tulalip Tribes did so stipulate that Judge Boldt "did not 'specifically determine' the western extent of the Quileute and Quinault's ocean usual and accustomed fishing grounds or the northern extent of the Quileute's ocean usual and accustomed fishing grounds." Dkt. # 181, p. 2.

Despite the Court's denial of certification for appeal, the Quileute and Quinault as well as the Hoh appealed the Court's Order on summary judgment (Dkt. # 171) and Order denying reconsideration (Dkt. # 179) to the Ninth Circuit Court of Appeals. The Hoh Tribe additionally appealed the Court's Order denying its motion to intervene (Dkt. # 128) and its Order denying the Tribes' motion to dismiss (Dkt. # 86). The Quinault and Quileute as well ·as the Hoh now move the Court to stay its Order substantially granting partial summary judgment pending these appeals. *See* Dkt. ## 178, 188.

## II. Discussion

### 1. Legal Standard

The Court possesses discretionary authority to grant a stay pending appeal from an interlocutory order. The Supreme Court has recognized that a court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for

itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). Whether to grant a stay "is an exercise of discretion" rather than "a matter or right, even if irreparable injury would result." *Nken v. Holder*, 556 U.S. 418, 433, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). "The party requesting the stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34, 129 S.Ct. 1749. Courts are guided by four factors in determining whether to issue a stay pending appeal of a civil order:

> (1) Whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Leiva–Perez v. Holder*, 640 F.3d 962, 964 (9th Cir.2011). While "[t]he first two factors are the most critical," *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), all four factors are considered under the flexible "sliding scale approach" endorsed by the Ninth Circuit. *Leiva–Perez*, 640 F.3d at 964–66. Through the instant motions, the moving Tribes fail to carry their burden of demonstrating that these four factors, alone or in combination, justify the issuance of a stay.

### 2. Likelihood of Success on the Merits

In order to satisfy the first prong of the four-part test for issuance of a stay, "a petitioner must show, at a minimum, that she has a substantial case for relief on the merits." *Leiva–Perez*, 640 F.3d at 968. Under the Ninth Circuit's formulation, the petitioner need not show that "success is more likely than not," but she must make a threshold showing that she has a "fair prospect" of success. *Id.* See also, *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir.2012). In evaluating a litigant's likelihood of success, courts consider "the likelihood that the Court of Appeals has jurisdiction over the order appealed from as well as the prospects for reversal assuming the existence of appellate jurisdiction." *In re Application of Chevron Corp.*, 709 F.Supp.2d 283, 300 (S.D.N.Y. 2010). The Quinault, Quileute, and Hoh Tribes fail both to demonstrate the existence of appellate jurisdiction and to establish a minimum likelihood of success on the merits even if appellate jurisdiction were proper.

Federal appellate jurisdiction is generally limited to review of final decisions of the district courts. *See* 28 U.S.C. § 1291. Decisions that do not end the litigation on the merits are not final appealable orders under 28 U.S.C. § 1291. Rather, such interlocutory decisions may be subject to discretionary appeal under 28 U.S.C. § 1292(b) if the district court first certifies that they "involve[ ] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Absent such certification, interlocutory decisions may still be appealable as effective final judgments under the collateral order doctrine or, under 28 U.S.C. § 1292(a), if they grant, modify, or dissolve an injunction. *See SEC v. Capital Consultants LLC*, 453 F.3d 1166, 1170 (9th Cir.2006) (explaining that "in certain circumstances, a decision that does not end the litigation may be considered final under the statute.").

The collateral order doctrine allows for appeal from a "narrow class of decisions that do not terminate the litiga-

tion, but must, in the interest of achieving a healthy legal system[,] nonetheless be treated as final." *Id.* at 1171 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 867, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994)). Collateral orders are those that (1) conclusively determine a disputed question; (2) resolve an important issue completely separate from the merits of the action; and (3) are effectively unreviewable from a final judgment. *Id.* at 1171. These requirements are to be strictly construed so as to avoid allowing for the narrow exception to swallow the general rule. *Digital Equip. Corp.,* 511 U.S. at 868, 114 S.Ct. 1992. "As with all final decisions, the time for appeal of an appealable collateral order begins to run on the date the court enters the order." *SEC,* 453 F.3d at 1173.

Of the issues that the Quinault and Quileute have appealed—lack of subject matter jurisdiction, alleged modification of Paragraph 25, and sovereign immunity—only the latter may properly be considered a collateral order. The Court's holding that it possess subject matter jurisdiction over the instant dispute, as it does over all Treaty-based fishing, is not a collateral order because it is reviewable upon post-judgment appeal from a final order. *See U.S. v. Layton,* 645 F.2d 681, 683 (9th Cir.1981) (noting that "the requirement that a federal court have subject matter jurisdiction 'does not ... encompass a right not to be tried which must be upheld prior to trial if it is to be enjoyed at all.'" (quoting *U.S. v. MacDonald,* 435 U.S. 850, 861, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978))).

Furthermore, the Court is not persuaded that the moving Tribes have a fair chance of succeeding on the merits of this claim. The Quinault and Quileute's argument that federal regulations addressing their oceanic fishing rights displace this Court's jurisdiction is misplaced. As the United States has itself noted, "NOAA's regulations addressing the Quinault and Quileute U & A's were not intended or interpreted to be a conclusive boundary determination, but instead were a 'reasonable accommodation' necessary for the agency's management of the ocean fisheries in the absence of a judicial determination of the boundaries of the Tribes' U & A's." Dkt. # 58, p. 7. In 1974, the Court expressly retained jurisdiction to determine "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined in Final Decision # 1." *U.S. v. Washington,* 384 F.Supp. at 419. The Court has since recognized and exercised its jurisdiction to determine usual and accustomed fishing grounds in waters beyond those of the State of Washington. *See, e.g., U.S. v. Washington,* 459 F.Supp. 1020, 1048 (W.D.Wash.1978) (finding that "proper exercise of its jurisdiction permits, and efficient administration of justice requires, this court to deal with matters related to, but not included within, Final Decision # 1"); *U.S. v. Washington,* 626 F.Supp. 1405, 1468 (W.D.Wash.1985) (determining Makah U & A's well outside State of Washington territorial limits); *Midwater Trawlers Co-operative v. Dept. of Commerce,* 282 F.3d 710, 718 (9th Cir. 2002) ("Nothing in the plain language of the treaty provides a geographic limitation, and longstanding case-law establishes that U & A fishing grounds properly extend into waters under United States jurisdiction."). The Court fails to identify any reasonable basis for disagreement as to its subject matter jurisdiction over the instant RFD.

The Court's ruling as to the evidentiary requirements of Paragraph 25 is also not a collateral order both because it is intertwined with the merits of the Makah Tribes' underlying Request for Determina-

tion and because it is reviewable upon appeal from a final judgment. The Quinault and Quileute's argument that the Court's decision as to Paragraph 25 is appealable under 28 U.S.C. § 1292(a)(1) is also unavailing. *See* Dkt. # 198, p. 6. The Court's decision, requiring that there have been some evidence presented to Judge Boldt that the Tribes fished beyond three miles from shore to effect proceedings under Paragraph 25(a)(6), did not have the "practical effect of refusing" an injunction, *Carson v. American Brands,* 450 U.S. 79, 83, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), as none was sought. Nor did it modify the terms of or dissolve an injunction, as the Court has never enjoined the Treaty Tribes from fishing in areas that have not yet been subject to a request for determination.

The Quinault and Quileute evidently attempt to construe Final Decision # 1 as the relevant injunction whose modification would subject this Court's order to immediate interlocutory appeal. This argument too is unavailing, as the Court's July 8, 2013 Order on summary judgment did not "alter the legal relationship between the parties" so as to have the practical effect of modifying an injunction. *Public Serv. Co. of Colorado & U.S. v. Batt,* 67 F.3d 234, 237 (9th Cir.1995). The Court merely clarified the process by which it would proceed to an adjudication under Paragraph 25(a)(6); it did nothing to alter the rules under which this longstanding case has operated. Moreover, the parties' stipulation in their Joint Status Report of October 1, 2013 that "this subproceeding will go forward under Paragraph 25(a)(6)" (Dkt. # 181, at 2–3) renders any dispute about the evidentiary requirements for proceeding under Paragraph 25(a)(6) moot for the purposes of this subproceeding. Interlocutory appeals are precluded "[u]nless a litigant can show that an interlocutory order of the district court might have

a 'serious, perhaps irreparable, consequence.' " *Carson,* 450 U.S. at 84, 101 S.Ct. 993. As the adjudication is already proceeding under Paragraph 25(a)(6) pursuant to the parties' stipulation, the Court's interpretation of Paragraph 25 in its July 8 order cannot have caused any serious prejudice to the parties in the instant matter.

■ By contrast, the Court's decision that the Quinault and Quileute have waived their sovereign immunity for adjudications of their Treaty fishing rights would have been appealable under the collateral order doctrine were it not untimely. An order denying a claim of tribal sovereign immunity is an appealable collateral order. *See Burlington Northern & Santa Fe Rwy. Co. v. Vaughn,* 509 F.3d 1085, 1091 (9th Cir.2007). *See also, DC Comics v. Pac. Pictures Corp.,* 706 F.3d 1009, 1014 (9th Cir.2013) (noting that "the Supreme Court had held that orders pertaining to immunities created by federal law ought to be immediately appealable via the collateral order doctrine."). However, appealable collateral orders are still subject to mandatory timeliness requirements. *See Harmston v. City & San Francisco,* 627 F.3d 1273, 1279 (9th Cir.2010) ("Rule 4(a)'s timeliness requirement is both mandatory and jurisdictional" (internal quotations omitted)). Under Federal Rule of Appellate Procedure 4(a)(1)(B), notice of appeal must be filed within 60 days of the entry of the order appealed from in cases, such as the present, where the United States is a party.

Here, the Court entered its decision on the Quinault and Quileute's motion to dismiss on September 28, 2011 (Dkt. # 86), expressly rejecting the Tribes' assertion "that their tribal sovereign immunity bars consideration of this request." Dkt. # 86, pp. 3–4. Nowhere did the Court limit its

findings as to the Tribes' waiver of their sovereign immunity to the original case area or to Paragraph 25(a)(1) proceedings. Rather, the Court construed the waiver broadly, declaring that the Tribes "would not now be heard to assert that their sovereign immunity bars consideration of the Makah request," a request which extended to determination of the Tribes' usual and accustomed fishing grounds in the Pacific Ocean. *Id.* at pp. 1, 4. Even if the Tribes could have misconstrued the Court's decision as limiting their waiver to Paragraph 25(a)(1) proceedings, any question over the scope of the waiver was settled by the Court's decision on March 14, 2012, amending its September 28 Order to state that the Court's jurisdiction "has been properly invoked by the Makah under sections (1) and (6) of Paragraph 25 of the Permanent Injunction." Dkt. # 104, p. 2.

 The Orders appealed from in the instant matter both expressly declined the revisit the Court's sovereign immunity decision. *See* Dkt. # 171, p. 7 (stating that "[t]he sovereign immunity issue was decided in the Court's Order on Motion to dismiss" and declining to "revisit or reconsider that ruling."); Dkt. # 179, p. 3 (declaring that "[t]he motion for reconsideration on the issue of sovereign immunity is both untimely and lacking in merit."). As the Court's July 8 and September 13, 2013 Orders did not "determine" or "resolve" the sovereign immunity issue, they are not appealable under the collateral order doctrine. *See SEC,* 453 F.3d at 1171. The window to appeal the Court's decision on sovereign immunity lapsed 60 days after entrance of its Orders of September 28, 2011 or March 4, 2012. Appeal of the Court's decision on sovereign immunity is consequently time-barred.

 Moreover, even was timeliness not a bar, the moving parties have still failed to demonstrate that they have a substantial case for relief on the merits. As it stated in denying certification for appeal, the Court "cannot find that there is substantial ground for a difference of opinion" on the issue of sovereign immunity. Dkt. # 179, p. 6. When the Tribes came to this Court in 1970 seeking enforcement of their treaty fishing rights, they submitted themselves to the Court's jurisdiction and accordingly waived their sovereign immunity for the general purpose of determining their usual and accustomed fishing grounds. Nothing in the history of this long-running case suggests that the Tribes targeted their waiver of sovereign immunity to certain jurisdictional provisions of Final Decision # 1 but not to others.

 Finally, the Hoh Tribe's attempt to appeal the Court's Order denying the Hoh's motion to intervene (Dkt. # 128) is both time-barred and fails to meet the substantive jurisdictional criteria of the collateral order doctrine. The window to appeal the Court's Order lapsed 60 days after it was entered on August 9, 2012. Moreover, the Court's decision is not a collateral order because it is "effectively unreviewable on appeal from a final judgment." *SEC,* 453 F.3d at 1171. The Court's decision did not preclude the Hoh from participation but rather clarified that they are already "entitled to participate fully in this subproceeding without formally intervening as a responding party." Dkt. # 128, p. 2. In *Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 373, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987), the Supreme Court similarly found that the district court's decision denying a request to intervene as of right but granting it permissively with significant limitations was not a reviewable collateral order. The Court explained that because the intervenor "is now a party to the suit by virtue of its permissible intervention, it can obtain

effective review of its claims on appeal from the final judgment." *Id.* at 375, 107 S.Ct. 1177. Similarly, the Hoh Tribe, as an active participant in the subproceeding, has not lost its right to appeal the Court's decision denying formal intervention upon final disposition of the subproceeding.

Moreover, the Court cannot find that the Hoh have a fair chance of prevailing on the merits even apart from the issue of appellate jurisdiction. The Court did not limit the Hoh's ability to fully participate in the subproceeding but simply clarified its scope as limited to the determination of the Quileute and Quinault's usual and accustomed fishing grounds. The Hoh have not presented any substantive reason to reconsider this decision.

### 3. Irreparable Injury

 The party moving for a stay must show that irreparable harm is probable if a stay is not granted. *Leiva–Perez,* 640 F.3d at 968. *See also, Rajagopalan v. Noteworld, LLC,* 2012 WL 2115482, *2 (W.D.Wash.2012). The moving Tribes only claim to this effect is that irreparable harm will ensue were the case to proceed in a court that lacks jurisdiction due to tribal sovereign immunity. Dkt. # 187, p. 10. The Tribes are correct that infringement of tribal sovereign immunity may constitute irreparable harm by invading tribal self-government in a way that "cannot be adequately compensated for in the form of monetary damages" and because the loss of tribal sovereignty may not be subject to remedy upon final determination on the merits. *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1250–51 (10th Cir.2001). *See also, Burlington Northern & Santa Fe Ry. Co. v. Vaughn,* 509 F.3d at 1090. However, the weight of this argument is diminished where the Tribes fail to establish the converse: that is, the Tribes fail to establish that irreparable harm could be avoided if a stay were granted. As explained supra, the Tribes' failure to timely appeal the Court's ruling on their waiver of sovereign immunity and to raise a serious legal question makes it highly improbable that a stay would avert any harm.

Furthermore, the Tribes have failed to establish that their waiver of sovereign immunity was, in fact, involuntary. As this Court explained in denying certification for appeal, the Quinault, Quileute, and Hoh Tribes voluntarily waived their sovereign immunity in submitting themselves to the Court's jurisdiction to determine their Treaty fishing rights in 1970, and again invoked this waiver "to their own benefit in proceedings between them and the Makah Tribe in 1983." Dkt. # 179, p. 6. The Tribes cannot establish that they would be irreparably harmed by a waiver that they voluntarily affected.

The moving Tribes' claim that they will be injured by incurring litigation expenses pending a ruling on appeal (*See* Dkt. # 187, pp. 11–12) is also unavailing as it fails to rise to the level of irreparable harm. *See, e.g., Guifu Li v. A Perfect Franchise, Inc.,* 2011 WL 2293221 (N.D.Cal.2011) ("Many courts … have concluded that incurring litigation expenses does not amount to an irreparable harm."); *Sample v. Brookdale Senior Living Communities, Inc.,* 2012 WL 195175, at *2 (W.D.Wash. Jan. 23, 2012) (explaining that "monetary expenses incurred in litigation are normally not considered irreparable").

### 4. Harm to Other Parties and to the Public Interest

 The Quinault and Quileute argue that the Makah will be not be substantially harmed by a stay as they have already entered into management agreements governing their fisheries to which Makah has

been a party and because the Quinault and Quileute have not entered the whiting fishery, the threat of which precipitated the Makah's request for determination. The moving Tribes are correct that the Makah are unlikely to be severely harmed by further protraction of the RFD, though the Makah would be injured were the Quinault and Quileute to act on their threatened entrance into the whiting fishery outside of their usual and accustomed fishing grounds. However, the moving Tribes elide the injury to the other interested parties to the case as well as to the public interest.

As the Port Gamble and Jamestown S'Klallam Tribes note, "[a] public interest here is the necessity of not providing an equitable remedy as reward to a party that engages in unilateral conduct in derogation of the rights of other Tribes." Dkt. # 192, p. 5. The requested stay injures the many Tribes who have dutifully followed the process established by this Court by carving out a favorable process for ocean Tribes and, in particular, for those two Tribes who seek to avail of this Court's jurisdiction only when to their advantage. The need to protect the integrity of the process established under Final Decision # 1 and followed since and to treat equally all those tribes who have consented to the jurisdiction of this Court warrants heavily against a stay.

### III. Conclusion

The Quinault, Quileute, and Hoh Tribes have failed to carry their burden of demonstrating that the four factors described herein, individually or in combination, favor a stay. In particular, the moving Tribes' inability to establish that the Ninth Circuit possesses jurisdiction over the appealed interlocutory orders alone provides sufficient grounds for denying a stay. The unlikeliness of irreparable harm to the moving parties combined with the likely harm to the public interest were a stay to issue provide more than sufficient grounds for this Court to deny the requested stay. For the reasons stated herein, the Court ORDERS that the Motion to Stay by the Quinault Indian Nation and Quileute Tribe (Dkt. # 187) and the Motion to Stay by the Hoh Tribe (Dkt. # 188) are DENIED.